UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2005 JAN 19 A 10: 42

U.S. DISTRICT COURT
DISTRICT OF MASS



RONALD P. PASSATEMPO, Trustee of the Samuel )
Pietropaolo Irrevocable Trust,                )
SAMUEL PIETROPAOLO, Grantor of the            )
Samuel Pietropaolo Irrevocable Trust, and     )
PATRICIA D. PIETROPAOLO, Beneficiary of the   )
Samuel Pietropaolo Irrevocable Trust,         )
                                              )
                    *Plaintiffs*,             )
                                              )
            v.                                )
                                              )
FREDERICK V. MCMENIMEN III,                   )
BARRY G. ARMSTRONG,                           )
NEW ENGLAND ADVISORY GROUP, LLC,              )
1717 CAPITAL MANAGEMENT COMPANY,              )
NATIONWIDE PROVIDENT f/k/a Provident Mutual   )
Life Insurance Company, and                   )
NATIONWIDE FINANCIAL SERVICES, INC.,          )
                                              )
                    *Defendants*.             )

**05  10118 GAO**

MAGISTRATE JUDGE _____

## NOTICE OF REMOVAL

Defendant Frederick V. McMenimen, III ("Mr. McMenimen") hereby gives notice

that he has removed this action to this Court from the Middlesex Superior Court, where it

had been assigned docket number MICV2004-2661. Because 28 U.S.C. § 1446(a) requires

that "a copy of all process, pleadings, and orders served" upon the removing defendant be

included with this Notice, a copy of the Summons served upon Mr. McMenimen is

appended to this Notice at Tab A, and a copy of the First Amended Complaint is appended

at Tab B. Paragraph 44 of the First Amended Complaint and the documents appended to

that pleading as Exhibits A, B, C, D, F and I have been redacted to conform them with

Local Rule 5.3. As grounds for removal, Mr. McMenimen states the following:

1.     Count VII of the First Amended Complaint claims "Violations of the Massachusetts and Federal Securities Laws," and paragraph 128 of that pleading alleges, in pertinent part, violations of two specific provisions of Federal law:  Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10(b)(5).

2.     Accordingly, this is a "civil action of which the district courts have original jurisdiction founded on a claim or right arising under the . . . laws of the United States," and it is therefore "removable without regard to the citizenship or residence of the parties." 28 U.S.C. § 1441(b).

3.     Though this action was commenced in Middlesex Superior Court on July 1, 2004, Mr. McMenimen did not receive the Summons and First Amended Complaint until December 28, 2004, when he was served.  Before that date, Mr. McMenimen had not received, through service or otherwise, any initial or amended pleading, motion, order or other paper from which it could have been ascertained that this case is removable.  Indeed, before December 28, 2004, Mr. McMenimen did not even know that this lawsuit was pending.  This Notice of Removal is thus timely filed under 28 U.S.C. § 1446(b).

4.     As provided by Local Rule 81.1, Mr. McMenimen shall, within thirty (30) days after filing this Notice, file certified or attested copies of all records and proceedings in the Middlesex Superior Court and a certified or attested copy of all docket entries in that state court.

WHEREFORE, Mr. McMenimen respectfully requests that the Clerk docket this action and assign it to a District Judge and Magistrate Judge, as provided by Local Rule 40.1 and Magistrate Rule 8(a)(1)(A).

Respectfully submitted,

FREDERICK V. MCMENIMEN, III

By his attorney,

William P. Corbett, Jr. (BBO #561201)
THE CORBETT LAW FIRM
*A Professional Corporation*
85 Exchange Street, Suite 326
Lynn, Massachusetts 01901-1429
(781) 596-9300

Dated: January 19, 2005

## CERTIFICATE OF SERVICE

I hereby certify that on this nineteenth day of January, 2005, I caused a true copy of the foregoing document to be served by first class mail upon the plaintiffs' attorney of record and upon each other defendant in the captioned action.

William P. Corbett, Jr.

A

**TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED: —**
**TORT — MOTOR VEHICLE TORT — CONTRACT —**
**EQUITABLE RELIEF — OTHER**

## COMMONWEALTH OF MASSACHUSETTS

SUPERIOR COURT
DEPARTMENT
OF THE
TRIAL COURT
CIVIL ACTION
No. 04-2661

................. MIDDLESEX ............ , ss
[seal]

RONALD P. PASSATEMPO, TRUSTEE, On behalf of
the Samuel Pietropaolo Irrevocable Trust,
SAMUEL PIETROPAOLO, GRANTOR to the Samuel Plaintiff(s)
Pietropaolo Irrevocable Trust, and PATRICIA D.
PIETROPAOLO, BENEFICIARY of the Samuel Pietropaolo
Irrevocable Trust
v.

FREDERICK V. McMENIMEN III, BARRY G. ARMSTRONG, NEW
ENGLAND ADVISORY GROUP, LLC, 717....... , Defendant(s)
CAPITAL MANAGEMENT COMPANY, NATIONWIDE PROVIDENT
(f/k/a Provident Mutual Life Insurance Company),
and NATIONWIDE FINANCIAL SERVICES, INC.

### SUMMONS

To the above-named Defendant: Frederick V. McMenimen III

You are hereby summoned and required to serve upon ..David M. Burkoff........................

.................................................... plaintiff's attorney, whose address is ..Todd & Weld LLP.........

28 State Street, Boston, MA 02109................., an answer to the complaint which is herewith

served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you

fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also

required to file your answer to the complaint in the office of the Clerk of this court at ..Cambridge................

.......................................................... either before service upon plaintiff's attorney or within a

reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may

have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's

claim or you will thereafter be barred from making such claim in any other action.

Witness, Suzanne V. DelVecchio, Esquire, at ..........Cambridge...............................
                                                    Barbara J. Rouse
the .....23rd..................................... day of ......December.............................

......................, in the year of our Lord ...two thousand and four.........

*Edward J. Sullivan*
**Clerk**

NOTES.
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all such defendants should appear in the caption. If a separate summons is used
   for each defendant, each should be addressed to the particular defendant.

FORM NO. SUP. — 001

NOTICE TO DEFENDANT — You need not appear personally in court to answer the complaint, but if you claim to have a defense, either you or
your attorney must serve a copy of your written answer within 20 days as specified herein and also file the original in the Clerk's Office.

B

## COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT

|  |  |
|---|---|
| RONALD P. PASSATEMPO, TRUSTEE, )<br>On behalf of the Samuel Pietropaolo )<br>Irrevocable Trust, SAMUEL PIETROPAOLO, )<br>GRANTOR to the Samuel Pietropaolo )<br>Irrevocable Trust, and PATRICIA D. )<br>PIETROPAOLO, BENEFICIARY of the )<br>Samuel Pietropaolo Irrevocable Trust, )<br><br>　　　　Plaintiffs, )<br>)<br>　　　v. )<br>)<br>FREDERICK V. McMENIMEN III, BARRY )<br>G. ARMSTRONG, NEW ENGLAND )<br>ADVISORY GROUP, LLC, 1717 CAPITAL )<br>MANAGEMENT COMPANY, NATIONWIDE)<br>PROVIDENT (f/k/a Provident Mutual Life )<br>Insurance Company), and NATIONWIDE )<br>FINANCIAL SERVICES, INC., )<br>)<br>　　　　Defendants. )<br>) | Civil Action No. 04-2661 |

## FIRST AMENDED COMPLAINT AND JURY DEMAND

### i. Introduction

This Complaint seeks redress from the above-captioned Defendants for losses and

damages suffered as a result of their joint and several negligence; fraud, deceit and

misrepresentation; negligent misrepresentation; breach of fiduciary duty; intentional infliction of

emotional distress; negligent infliction of emotional distress; violations of Massachusetts and

federal securities laws; churning; breach of contract; and violations of consumer protection

laws—all relating to Nationwide Provident Flexible Premium Variable Life Insurance Policy No.

9,074,484 (the "Policy"). Variable life insurance policies contain both an insurance component and an investment component, and are therefore considered securities.

The Plaintiffs in this action are Samuel Pietropaolo, a retired school administrator on whose life the Policy was underwritten and who created the Samuel Pietropaolo Irrevocable Trust ("Family Trust") for his wife; Patricia D. Pietropaolo, the beneficiary of the Family Trust; and Ronald P. Passatempo, the trustee of the Family Trust, which is the current owner of the Policy (together, the "Plaintiffs").

Mr. Pietropaolo retired from the Revere Public School System in 1997. Upon his retirement, he sought to ensure that he would receive a monthly income sufficient to provide for himself and his family for the remainder of his life, plus a death benefit sufficient to provide for Mrs. Pietropaolo after his death. Mr. Pietropaolo had two existing life insurance policies, together worth approximately $150,000. Also, as a retiring school administrator, Mr. Pietropaolo had a pension with the Massachusetts Teachers' Retirement Board, and he was obligated at retirement to make an irrevocable choice between three pension payment options. However, none of these options provided adequate levels of lifetime monthly income and surviving spousal income to suit Mr. Pietropaolo's retirement needs. Thus, he sought the advice of his nephew, Defendant Frederick V. McMenimen, an insurance agent and financial advisor, who recommended a "pension maximization" plan.

Mr. McMenimen – in conjunction with Defendant Barry G. Armstrong, and as agent of Defendants New England Advisory Group, 1717 Capital Management Company, Nationwide Provident (f/k/a Provident Mutual Life Insurance Company) and Nationwide Financial Services, Inc. (together, the "Defendants") – advised Mr. Pietropaolo to cancel his two existing life insurance policies and to choose the pension option that would pay the most monthly income to

2

Mr. Pietropaolo for life, but which included no surviving spousal annuity for Mrs. Pietropaolo upon his death. Then, Mr. McMenimen advised Mr. Pietropaolo to use the proceeds from his existing policies to purchase a variable insurance product with a death benefit of at least $500,000, and with an investment component that would, within a few years' time, become "self-funding" and therefore relieve him of the obligation of making future premium payments.

Mr. Pietropaolo relied upon and accepted Mr. McMenimen's advice in full, and Mr. McMenimen agreed to obtain for him the type of policy he (Mr. McMenimen) had recommended. Inexplicably, however, Mr. McMenimen instead obtained a policy with a $200,000 death benefit, while representing to the Plaintiffs that the policy included a $500,000 death benefit. Meanwhile, with Mrs. Pietropaolo's written consent (based upon her reliance on Mr. McMenimen's representations), Mr. Pietropaolo made the irrevocable pension choice recommended by Mr. McMenimen, forgoing any surviving spousal income to Mrs. Pietropaolo, and he cancelled his existing insurance policies. As a result, per the Defendants' designs, Mrs. Pietropaolo's only source of income after Mr. Pietropaolo's death will be the death benefit of the Policy arranged for the Plaintiffs by Mr. McMenimen.

At Mr. McMenimen's insistence, the Plaintiffs sent the Policy premium payments to Mr. McMenimen directly. Believing that Mr. McMenimen obtained for them the $500,000 policy they had discussed, the Plaintiffs have made all required premium payments from July 1998 to the present, totaling approximately $100,000. In or around April 2003, the Plaintiffs finally learned that the Policy was worth far less than the policy for which they had bargained. Despite his purported continued involvement, Mr. McMenimen had never described to the Plaintiffs the true nature of the Policy. The Plaintiffs made repeated requests for a copy of the Policy, but Mr. McMenimen never delivered one; thus, they never had the opportunity to review, consent to or

3

"non-take" the policy. Further, as detailed below, once the truth came to light, Mr. McMenimen apparently went so far as to forge certain e-mails in an effort to show that he was addressing the problem. From 1998 until 2003, Mr. McMenimen maintained that the Policy included a $500,000 death benefit and that it would become "self-funding." Once it became clear that the Policy was worth much less, Mr. McMenimen apologized repeatedly and said that he would make amends. He never did.

As a result of the Defendants' repeated and willful misrepresentations, omissions and obfuscations in connection with the Policy, the Plaintiffs have suffered significant economic harm and emotional distress. By this Complaint, they seek appropriate remedies through this Court.

## Parties

1. Plaintiff Ronald P. Passatempo, Esq. ("Mr. Passatempo") is the trustee of the Family Trust, which is the owner of the Policy. Mr. Passatempo has a business address of 23 Forest Street, Suite 105, Medford, Middlesex County, Massachusetts.

2. Plaintiff Samuel Pietropaolo ("Mr. Pietropaolo") is the grantor to the Family Trust. The Policy was underwritten on the life of Mr. Pietropaolo and purchased by the Family Trust for the benefit of Mr. Pietropaolo's wife, Plaintiff Patricia D. Pietropaolo. Mr. Pietropaolo resides in Revere, Suffolk County, Massachusetts.

3. Plaintiff Patricia D. Pietropaolo ("Mrs. Pietropaolo") is the beneficiary of the Family Trust, which is the owner of the Policy. Mrs. Pietropaolo resides in Revere, Suffolk County, Massachusetts.

4. Defendant Frederick V. McMenimen III ("Mr. McMenimen") is an insurance agent and financial advisor who is or was an agent of Defendant New England Advisory Group, LLC

4

and Defendant Nationwide Provident. Mr. McMenimen has a current business address of 215 Newbury Street, Peabody, Massachusetts 01960, and a residential address of 6 Pumpkin Circle, Exeter, New Hampshire 03833.

5. Defendant Barry G. Armstrong ("Mr. Armstrong") is an investment advisor and former principal of Defendant New England Advisory Group, LLC who worked with Mr. McMenimen on the Policy for the Plaintiffs. Mr. Armstrong has an address of 35 Farm Street, Medfield, Middlesex County, Massachusetts 02052.

6. Defendant New England Advisory Group, LLC ("NEAG") is or was a Massachusetts limited liability company that sells insurance and investment products. Its manager's address is 35 Farm Street, Medfield, Massachusetts 02052 and its business address is 75 Wells Avenue, Newton, Middlesex County, Massachusetts 02459.

7. Defendant 1717 Capital Management Company ("1717 CMC"), a subsidiary of Defendant Nationwide Provident, is the broker-dealer and registered investment advisor through which Nationwide Provident offers securities and advisory services. 1717 CMC has a business mailing address at P.O. Box 15626, Wilmington, Delaware 15626 and operates as a foreign corporation in Massachusetts with a registered agent address of Corporation Service Company, 84 State Street, Boston, Massachusetts 02109.

8. Defendant Nationwide Provident ("Nationwide") is a member of the Nationwide Financial Services, Inc. companies, which have an address of 1 Nationwide Plaza, Columbus, Ohio 43215. Nationwide sold the Policy to the Plaintiffs through its agents 1717 CMC, NEAG, Mr. Armstrong and Mr. McMenimen. Nationwide is the successor to Provident Mutual Life Insurance Company and operates as a foreign corporation in Massachusetts under the name of

5

Nationwide Securities, Inc. with a resident agent address at CT Corporation System, 101 Federal Street, Boston, Massachusetts 02110.

9. Defendant Nationwide Financial Services, Inc. ("NFS") is the parent company of Nationwide and a provider of insurance and financial services. NFS has an address of 1 Nationwide Plaza, Columbus, Ohio 43215 and operates as a foreign corporation in Massachusetts with a registered agent address at CT Corporation System, 101 Federal Street, Boston, Massachusetts 02110.

## Facts

10. The Plaintiffs restate and reallege the allegations in the above-numbered paragraphs.

11. Mr. Pietropaolo was the Director of Special Education for the City of Revere, Massachusetts and worked for the City for over thirty-two years.

12. In June 1997, Mr. Pietropaolo retired at age sixty-eight.

13. As a long-time municipal employee, Mr. Pietropaolo was eligible for certain retirement benefits, including one of three pension payment options from the Massachusetts Teachers Retirement Board ("MTRB"). A description of these options is attached hereto as Exhibit A.

14. Option A would provide a monthly retirement payment of $4,438.88 with no surviving spousal support upon Mr. Pietropaolo's death. Mrs. Pietropaolo, as Mr. Pietropaolo's spouse, would be required to "sign off" on his election of Option A.

15. Option B would provide a monthly retirement payment of $4,228.31 with a limited amount of surviving spousal support upon Mr. Pietropaolo's death.

6

16. Option C would provide a monthly retirement payment of $3,151.62 with a surviving spousal support payment of $2,101.08 per month to Mrs. Pietropaolo upon Mr. Pietropaolo's death.

17. Mr. Pietropaolo discussed the three MTRB options with Mrs. Pietropaolo, and with his son, Samuel F. Pietropaolo ("Sam P.").

18. Mr. Pietropaolo wanted to secure for Mrs. Pietropaolo, upon his death, a steady stream of income and/or a lump sum payment to provide for her health and welfare needs. In this regard, he concluded that the fixed monthly income stream under MTRB Option C would not be satisfactory.

19. Sam P. recalled that Mr. McMenimen, who is his cousin and Mr. and Mrs. Pietropaolo's nephew, had told him in the past that he had experience working with municipal retirees and comparing their pension options with insurance options in order to maximize their retirement income. Mr. McMenimen had described such analyses to Sam P. as "pension maximization."

20. Mr. Pietropaolo and Sam P. decided to engage Mr. McMenimen to determine if Mr. Pietropaolo could afford an insurance policy the proceeds of which would (i) yield at least as much monthly income to Mrs. Pietropaolo as the "spousal survivor pension payments" under MTRB Option C ($2,101.08), or (ii) provide a lump sum payment to Mrs. Pietropaolo, through the Family Trust, sufficient to cover the cost of owning a home (she and Mr. Pietropaolo currently share a two-family home with Mr. Pietropaolo's sister) and/or any advanced medical care she might require after Mr. Pietropaolo's death.

21. In providing advice and ultimately obtaining a Policy for the Plaintiffs, Mr. McMenimen worked in conjunction with Mr. Armstrong. Mr. McMenimen was then an agent of

7

NEAG, and Mr. Armstrong was the principal thereof. As discussed below, however, the Plaintiffs were unaware of Mr. Armstrong's involvement until April 2004.

22. Mr. McMenimen analyzed Mr. Pietropaolo's situation in light of his goal of providing sufficient income to Mrs. Pietropaolo upon his death.

23. Mr. McMenimen represented to Mr. Pietropaolo and Sam P. that he was an experienced licensed insurance agent and financial advisor. He again represented that he had experience advising individuals in "pension maximization" situations.

24. Mr. McMenimen advised Sam P. that Mr. Pietropaolo would need an insurance policy worth at least $500,000 in order to "maximize" his pension.

25. Mr. McMenimen was aware of the limited financial resources of Mr. and Mrs. Pietropaolo, and he was aware of their limited financial planning and investing experience.

26. Mr. McMenimen was aware that Mr. Pietropaolo, on Mr. McMenimen's own advice, did not want to risk having less than $500,000 in guaranteed insurance for the benefit of Mrs. Pietropaolo.

27. Mr. McMenimen was aware that Mr. and Mrs. Pietropaolo's primary asset was the MTRB pension, and he was aware that once Mr. Pietropaolo chose between MTRB pension Options A, B and C, that choice would be irrevocable.

28. Mr. McMenimen reviewed Mr. Pietropaolo's three MTRB pension payment options.

29. Mr. McMenimen was aware that once Mr. Pietropaolo elected Option A, he would be forfeiting any guaranteed spousal survivor payment to Mrs. Pietropaolo upon his death.

30. Mr. McMenimen discussed with Sam P. that a policy worth at least $500,000 would, upon Mr. Pietropaolo's death, provide Mrs. Pietropaolo with monthly income equal to or greater

8

than the income she would receive under MTRB Option C, or alternatively would provide a lump sum for her benefit of at least $500,000 for her care and welfare.

31. Mr. and Mrs. Pietropaolo relied on the representations and advice of Mr. McMenimen in making the irrevocable choice between MTRB pension payment options. As a result of such reliance, Mrs. Pietropaolo will receive no surviving spousal income from Mr. Pietropaolo's MTRB pension.

32. Mr. McMenimen knew that Mr. Pietropaolo had two existing life insurance policies with John Hancock (the "John Hancock Policies") which had a combined guaranteed death benefit of approximately $150,000.

33. Mr. McMenimen knew that Mr. Pietropaolo was paying less than $500 per month for the John Hancock Policies.

34. Mr. McMenimen had Mr. Pietropaolo cancel the John Hancock policies in order to fund a new policy that Mr. McMenimen would obtain for Mr. Pietropaolo. Mr. Pietropaolo relied on the representations and advice of Mr. McMenimen in deciding to cancel the John Hancock Policies.

35. Mr. McMenimen had Mr. Pietropaolo apply for several insurance policies of varying types and amounts, and with various rates. At Mr. McMenimen's instruction, the Plaintiffs signed certain blank forms and returned them to Mr. McMenimen, whereupon Mr. McMenimen subsequently filled in the application details.

36. Mr. McMenimen applied for a $500,000 policy from Nationwide for Mr. Pietropaolo. Mr. McMenimen filled out the investment selections and certain other policy information on the Nationwide application without discussing these selections with the Plaintiffs.

9

37. Nationwide declined to insure Mr. Pietropaolo on or about May 8, 1998. Mr. McMenimen told Sam P. that Nationwide's decision was a mistake and that he would correct it.

38. Several of Mr. Pietropaolo's other insurance applications were approved, including applications for policies with Mutual of New York and Guardian. Mr. McMenimen directed Mr. Pietropaolo to instead purchase a policy from Nationwide. Mr. Pietropaolo relied on the representations and advice of Mr. McMenimen in deciding to cancel his applications for insurance with Mutual of New York and Guardian.

39. Nationwide subsequently approved Mr. Pietropaolo's insurance application.

40. Mr. McMenimen explained to Mr. Pietropaolo and Sam P. that to make the insurance more affordable, he would obtain a policy with two components; one component would have a face value of less than $500,000, but with the second component (a rider or a second policy), the aggregate value of Mr. Pietropaolo's insurance would never be less than $500,000.

41. Mr. McMenimen was aware of Mr. Pietropaolo's limited financial planning and investing experience, and he knew that Mr. Pietropaolo did not want any risk that the value of his insurance would fall below $500,000.

42. Mr. McMenimen assured the Plaintiffs that the insurance would always be worth at least $500,000. Mr. McMenimen also made numerous representations that the value of the insurance would grow *beyond* $500,000 and would become "self-funding."

43. Sam P. expressed to Mr. McMenimen that the Plaintiffs' primary concern was securing the $500,000 death benefit.

44. In July 1998, Mr. McMenimen obtained Nationwide Flexible Premium Variable Life Insurance Policy No. REDACTED 4,484 for Mr. Pietropaolo (the "Policy"). The Plaintiffs relied on the

10

representations and advice of Mr. McMenimen in deciding to purchase the Policy from Nationwide.

45. Mr. McMenimen, in coordination with Mr. Armstrong and NEAG, sold the Policy to the Plaintiffs through Defendants 1717 CMC, Nationwide and NFS. 1717 CMC is a subsidiary of Nationwide, and Nationwide is owned by NFS. Nationwide is the successor to Provident Mutual Life Insurance Company. The Defendants are all related by common ownership, control and/or contract, and are responsible for one another's acts and omissions in connection with the Policy.

46. The monthly premium payment for the Policy is $1,592.25. Since July 1998, Mr. Pietropaolo has paid the premium amounts to the Family Trust, and the Family Trust has sent the premium payments to Mr. McMenimen directly, at his instruction. The Family Trust has now paid approximately $100,000 in premium payments.

47. Mr. McMenimen led the Plaintiffs to believe that he would have continuing involvement in managing and monitoring the Policy, hence his instruction that the Plaintiffs send the premium payments to him directly.

48. Mr. McMenimen explained to Sam P. that a portion of the premiums would pay for the Policy's death benefits, while another portion would be invested to build a fund, which over time would allow the $500,000 policy to become "self-funding," relieving Mr. Pietropaolo from the obligation of making any further premium payments and allowing him to enjoy all of his Option A pension payments during his lifetime.

49. Mr. McMenimen described a number of investment scenarios to demonstrate how the investment portion of the Policy would eventually reach a "self-funding" state.

11

50. McMenimen never explained to Sam P. or the Plaintiffs that the death benefit would be variable or unguaranteed.

51. The final Policy and its terms were never delivered to the Plaintiffs, as indicated by the unsigned "Policy Delivery Receipt" attached hereto as Exhibit B.

52. On numerous occasions, Sam P. asked Mr. McMenimen for a copy of the Policy for Mr. Pietropaolo. Upon each and every request, Mr. McMenimen assured Sam P. that everything was in order and not to worry. None of the Plaintiffs ever received a copy of the Policy from Mr. McMenimen or from any other Defendant.

53. The Plaintiffs believed the Policy included a minimum $500,000 death benefit. The Plaintiffs relied upon McMenimen's purported continued oversight of the Policy and his insistence that it included a guaranteed $500,000 total death benefit.

54. Indeed, on or about May 4, 2004, Mr. McMenimen produced documents to Sam P. including a $500,000 Policy Schedule from Nationwide, a copy of which is attached hereto as Exhibit C. Curiously, however, Mr. McMenimen also produced a $200,000 Policy Schedule, a copy of which is attached hereto as Exhibit D. Both Schedules include the identical policy number, issue date and premium amount.

55. According to Nationwide's records, Mr. McMenimen never requested or purchased more than $200,000 of insurance for the Plaintiffs.

56. On or about April 2003, Mr. Pietropaolo received a call from another NEAG agent, Jesse McPhail ("Mr. McPhail"). Mr. Pietropaolo asked Mr. McPhail to speak with Sam P.

57. McPhail informed Sam P. that the Policy was worth $200,000 and had been "orphaned," that Mr. McMenimen was no longer the agent assigned to the Policy, and, further, that Mr. McMenimen was no longer affiliated with NEAG.

58. In response, Sam P. suggested that Mr. McPhail was misinformed, since the Policy as Mr. McMenimen had represented it to the Plaintiffs was worth $500,000 rather than $200,000. Sam P. asked Mr. McPhail to research the Policy to find out whether there were any riders or other components of the Policy that would raise its value to at least $500,000.

59. After investigating, Mr. McPhail advised Sam P. that the Policy was valued at just $200,000; that no additional riders or insurance had been purchased; and that the insurance portion of the Policy was becoming more expensive each year, thus leaving an increasingly smaller percentage of the premiums to be applied to the investment, "self-funding" portion of the Policy.

60. Sam P. advised the Plaintiffs that he would speak to Mr. McMenimen about this matter. Between April 2003 and July 2003, Sam P. and Mr. McMenimen had many conversations concerning the "orphaned" Policy.

61. Mr. McMenimen told Sam P. that he *was* still the agent responsible for the Policy. Further, he advised Sam P. that he would address the apparent problem and that Sam P. should not ask Mr. McPhail to perform any further investigation.

62. Sam P. complied with Mr. McMenimen's instructions.

63. Mr. McMenimen admitted to Sam P. that he "took his eye off the ball" by failing to monitor and manage the Policy, which resulted in its loss of value to less than $500,000. At the same time, Mr. McMenimen also tried to shift the blame, writing to Sam P. at one point that "someone else did not follow up." See the April 16, 2004 e-mail attached hereto as Exhibit E.

64. Mr. McMenimen assured Sam P. that he would correct the situation and secure the Policy's value at a minimum of $500,000.

13

65. To that end, Mr. McMenimen informed Sam P. in June 2003 that he was having the Policy re-underwritten, which would result in an additional $289,412 being added immediately to the existing $200,000. See the "Application for Policy Change" attached hereto as <u>Exhibit F</u>. Again, Mr. McMenimen produced blank forms for the Plaintiffs to sign in order to "expedite" his efforts to correct the Policy mistakes.

66. When Sam P. expressed his and the Plaintiffs' disappointment that Mr. McMenimen's proposed solution would fail to secure the entire $500,000 as originally promised, Mr. McMenimen said it was the best that he could do and that the investment portion of the Policy would continue to grow and was already worth more than $30,000. Added to the new $489,412 value of the Policy, Mr. McMenimen said, the $30,000 would push the Policy's value over the $500,000 target.

67. Between July and December of 2003, Sam P. repeatedly asked Mr. McMenimen for a copy of the amended Policy to review with the Plaintiffs. In response, Mr. McMenimen provided assurances that everything would be taken care of and that he would get the paperwork to Sam P. shortly. This he did not do.

68. When the year-end Policy Statement from Nationwide did not reflect any changes to the Policy between July and December 2003, Sam P. again confronted Mr. McMenimen regarding the Policy errors and lack of any corrections. Mr. McMenimen once again assured Sam P. that everything would be taken care of.

69. In March 2004, Mr. McMenimen finally responded substantively to Sam P., alleging mistakes by NEAG and Nationwide in failing to process the July 2003 Application for Policy Change and related paperwork.

14

70. On April 1, 2004, Mr. McMenimen met with Sam P. in Billerica, Massachusetts and provided various documents to Sam P. relating to his alleged July 2003 efforts to change the Policy. Among these documents are two e-mails that Mr. McMenimen claimed he had received from NEAG. Suspiciously, these e-mails are dated July 1, 2004 and August 21, 2004, months *after* the date Mr. McMenimen provided them to Sam P – *i.e.* months *after* April 1, 2004. Copies of the e-mails are attached hereto as Exhibit G.

71. Further, at his April 1, 2004 meeting with Sam P., Mr. McMenimen also produced copies of certain correspondence with Mr. Armstrong in which Mr. Armstrong described the Policy as "confusing" and wrote that "[w]e really want and need this business." In addition, Mr. Armstrong indicated that illustrations used to sell the Policy to the Plaintiffs were back-dated. See faxes dated July 16, 2004 and July 27, 2004, attached hereto as Exhibit H.

72. Mr. McMenimen told Sam P. for the first time that Mr. Armstrong had reviewed and worked on Mr. Pietropaolo's insurance applications with Mr. McMenimen. He said that Mr. Armstrong was instrumental in developing the strategy and the presentations made by Mr. McMenimen to the Plaintiffs.

73. Mr. Armstrong became the lead agent responsible for the Policy after Mr. McMenimen left NEAG. Mr. Armstrong never contacted the Plaintiffs, either during or after Mr. McMenimen's tenure at NEAG. Like Mr. McMenimen, Mr. Armstrong was only concerned with his expected commissions, and not with the stated investment objectives and risk tolerance of the Plaintiffs.

74. Indeed, Mr. McMenimen, Mr. Armstrong and/or NEAG have received (and continue to receive) commissions in connection with the Policy.

15

75. Since about April 2003, Sam P. and the Plaintiffs have attempted to obtain clarification from the Defendants regarding the Policy and any attempted changes thereto.

76. Mr. McMenimen told Sam P. that Nationwide representatives scheduled a meeting with the two of them for May 7, 2004 to discuss a potential resolution. Mr. McMenimen also told Sam P. that he had forwarded his files relating to the Policy to Nationwide for their review.

77. Nationwide has denied that any meeting was ever scheduled. According to Nationwide, no requests for any changes to the original $200,000 Policy were ever received from Mr. McMenimen, NEAG or any other entity or person.

78. On or about July 2, 2004, the Plaintiffs sent the Defendants a written demand for relief pursuant to Massachusetts General Law c. 93A, identifying themselves and the unfair acts and practices upon which they relied, and describing their resultant injuries. A copy of this letter is attached hereto as Exhibit I.

79. As of the date of this First Amended Complaint and Jury Demand, the Defendants have not made a reasonable offer of relief to the Plaintiffs and, in particular, Defendants McMenimen and NEAG have yet to respond.

### Count I

### (Negligence)

80. The Plaintiffs restate and reallege the allegations in the above-numbered paragraphs.

81. Mr. McMenimen used his position as a relative of Mr. and Mrs. Pietropaolo to garner their trust and gain their business.

82. Mr. McMenimen and the other Defendants, as financial advisors to the Plaintiffs in connection with the Policy, jointly and severally owed a duty to the Plaintiffs.

16

83. The Defendants, through their agent Defendant McMenimen, represented to the Plaintiffs that the Policy was worth more than its actual value and that the Policy they received was the Policy they bargained for. In this regard, the Defendants, through Defendant McMenimen, showed the Plaintiffs misleading analyses, reports and illustrations.

84. Once the truth arose, in or around April 2003, Defendant McMenimen falsely represented to the Plaintiffs that he was working on adjusting the Policy to reflect what they had originally bargained for.

85. The Defendants, by their acts and omissions in connection with the Policy, have jointly and severally breached their duty to the Plaintiffs.

86. As a result of the Defendants' acts and omissions, the Plaintiffs have suffered grievous harm.

## Count II

## (Fraud, Deceit and Misrepresentation)

87. The Plaintiffs restate and reallege the allegations in the above-numbered paragraphs.

88. The Defendants, through their agent Defendant McMenimen, knowingly lied, deceived and misled the Plaintiffs by representing to them that the Policy was worth more than its actual value and that the Policy they received was the Policy they bargained for.

89. Defendant McMenimen represented that he would obtain an insurance policy for the Plaintiffs with a guaranteed $500,000 death benefit and which would likely become "self-funding" within several years.

90. Defendant McMenimen showed the Plaintiffs misleading analyses, reports and illustrations in order to convince them that such a policy suited their stated investment goals, experience and desired risk.

17

91. Defendant McMenimen represented to the Plaintiffs that he had obtained such a policy.

92. Once the Plaintiffs learned, in or around April 2003, that no such policy had been obtained, Defendant McMenimen represented to them that he was working on adjusting the Policy to reflect what they had originally bargained for.

93. Each of the above representations was false when made and known to be false.

94. The Defendants knew or reasonably should have known that their representations, acts and omissions would and did induce reasonable reliance on the part of the Plaintiffs in connection with the Policy.

95. The Plaintiffs reasonably relied on the Defendants' representations, acts and omissions in connection with the Policy.

96. As a result of the Defendants' fraud, deceit and misrepresentations, the Plaintiffs have suffered grievous harm.

## Count III

### (Negligent Misrepresentation)

97. The Plaintiffs restate and reallege the allegations in the above-numbered paragraphs.

98. The Defendants, through their agent Defendant McMenimen, failed to exercise reasonable care in their dealings with the Plaintiffs by representing to them that the Policy was worth more than its actual value and that the Policy they received was the Policy they bargained for.

99. Defendant McMenimen represented that he would obtain an insurance policy for the Plaintiffs with a guaranteed $500,000 death benefit and which would likely become "self-funding" within several years.

18

100.    Defendant McMenimen showed the Plaintiffs misleading analyses, reports and illustrations in order to convince them that such a policy suited their stated investment goals, experience and desired risk.

101.    Defendant McMenimen represented to the Plaintiffs that he had obtained such a policy.

102.    Once the Plaintiffs learned, in or around April 2003, that no such policy had been obtained, Defendant McMenimen represented to them that he was working on adjusting the Policy to reflect what they had originally bargained for.

103.    The Plaintiffs reasonably relied on the Defendants' acts and omissions in connection with the Policy.

104.    As a result of the Defendants' failure to exercise reasonable care with respect to their acts and omissions in connection with the Policy, the Plaintiffs have suffered grievous harm.

### Count IV

### (Breach of Fiduciary Duty)

105.    The Plaintiffs restate and reallege the allegations in the above-numbered paragraphs.

106.    The Defendants, through their agent Defendant McMenimen, were financial advisors to the Plaintiffs in connection with the Policy.

107.    Defendant McMenimen is a relative of Plaintiffs Mr. and Mrs. Pietropaolo.

108.    Defendant McMenimen represented to the Plaintiffs that he had experience working with municipal retirees in "pension maximization" situations.

19

109.    Defendant McMenimen instructed the Plaintiffs to send their premium payments for the Policy directly to him.

110.    The Defendants owed fiduciary duties to the Plaintiffs.

111.    The Defendants, through Defendant McMenimen, breached their fiduciary duties by representing to the Plaintiffs that the Policy was worth more than its actual value and that the Policy they received was the Policy they bargained for.  In this regard, the Defendants, through Defendant McMenimen, showed the Plaintiffs misleading analyses, reports and illustrations.

112.    Once the truth arose, in or around April 2003, Defendant McMenimen breached his fiduciary duty by falsely representing to the Plaintiffs that he was working on adjusting the Policy to reflect what they had originally bargained for.

113.    As a result of the Defendants' breaches of fiduciary duty, the Plaintiffs have suffered grievous harm.

### Count V

### (Intentional Infliction of Emotional Distress)

114.    The Plaintiffs restate and reallege the allegations in the above-numbered paragraphs.

115.    By representing to the Plaintiffs, through Defendant McMenimen, that the Policy was worth more than its actual value and that the Policy they received was the Policy they bargained for, the Defendants knew or reasonably should have known that they were likely to cause emotional distress on the part of the Plaintiffs.

116.    Once the truth arose, in or around April 2003, by falsely representing to the Plaintiffs that he was working on adjusting the Policy to reflect what they had originally

20

bargained for, Defendant McMenimen knew or reasonably should have known that he was likely to cause emotional distress on the part of the Plaintiffs.

117.    The Defendants' acts and omissions in this regard were extreme and outrageous.

118.    As a result of these acts and omissions, Plaintiff Samuel Pietropaolo has been deeply concerned with his wife's potential welfare after his passing.  He has suffered from repeated episodes of anxiety and restlessness, leading to sleep deprivation, loss of appetite and increased frequency of smoking.

## Count VI

### (Negligent Infliction of Emotional Distress)

119.    The Plaintiffs restate and reallege the allegations in the above-numbered paragraphs.

120.    The Defendants, through their agent Defendant McMenimen, failed to exercise reasonable care in their dealings with the Plaintiffs by representing to them that the Policy was worth more than its actual value and that the Policy they received was the Policy they bargained for.

121.    Once the truth arose, in or around April 2003, Defendant McMenimen failed to exercise reasonable care in his dealings with the Plaintiffs by falsely representing to them that he was working on adjusting the Policy to reflect what they had originally bargained for.

122.    The Defendants' acts and omissions in this regard were extreme and outrageous.

123.    As a result of these acts and omissions, Plaintiff Samuel Pietropaolo has been deeply concerned with his wife's potential welfare after his passing.  He has suffered from repeated episodes of anxiety and restlessness, leading to sleep deprivation, loss of appetite and increased frequency of smoking.

## Count VII

### (Unsuitability and Violations of Massachusetts and Federal Securities Laws)

124.    The Plaintiffs restate and reallege the allegations in the above-numbered paragraphs.

125.    The Defendants obtained for the Plaintiffs a variable life insurance policy (the "Policy") that did not meet the Plaintiffs' stated investment objectives, experience and tolerance of risk.

126.    The Defendants invested 100% of the investment component of the Policy in the Fidelity Income Fund, with no diversification and without regard to market conditions, Plaintiff Samuel Pietropaolo's advanced age, the Plaintiffs' stated investment objectives and/or their tolerance of risk.

127.    The Defendants, through Defendant McMenimen, represented to the Plaintiffs that the Policy was worth more than its actual value and that the Policy they received was the Policy they bargained for. In this regard, the Defendants, through Defendant McMenimen, showed the Plaintiffs misleading analyses, reports and illustrations.

128.    By these acts and omissions, the Defendants violated Massachusetts and federal securities laws, including but not limited to section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78(j)(b); S.E.C. Rule 10b-5, 17 C.F.R. § 240.10(b)-5; and sections 101, 102 and 410(a) of the Massachusetts Uniform Securities Act, Mass. Gen. Laws c. 110A, §§ 101, 102, 410(a)(2).

22

## Count VIII

### (Churning)

129.    The Plaintiffs restate and reallege the allegations in the above-numbered paragraphs.

130.    In advising the Plaintiffs to cancel Mr. Pietropaolo's existing insurance policies and to use the proceeds to purchase the Policy, the Defendants were primarily motivated by their desire to receive commissions on the Policy and not by the Plaintiffs' stated investment needs, experience and tolerance of risk.

131.    As a result of the Defendants' acts and omissions in this regard, the Plaintiffs have suffered grievous harm.

## Count IX

### (Breach of Contract)

132.    The Plaintiffs restate and reallege the allegations in the above-numbered paragraphs.

133.    The Plaintiffs entered into an agreement with the Defendants, through Defendant McMenimen, to obtain an insurance policy with an aggregate death benefit of not less than $500,000, and which would likely become "self-funding" within several years.

134.    Since July 1998, when they purchased the Policy, the Plaintiffs have paid $19,107 annually as consideration for an insurance policy described by the Defendants as having an aggregate death benefit of not less than $500,000, and which would likely become "self-funding" within several years.

135.    The Defendants instead obtained a $200,000 insurance policy for the Plaintiffs that costs approximately three times as much, per month, as the John Hancock Policies (worth

23

approximately $150,000) they advised Plaintiff Samuel Pietropaolo to cancel in order to fund the purchase of the Policy.

136.    As a result of these acts and omissions by the Defendants, the Plaintiffs have not received the benefit of their bargain and have suffered grievous harm.

### Count X

### (Violation of Consumer Protection Laws)

137.    The Plaintiffs restate and reallege the allegations in the above-numbered paragraphs.

138.    The Defendants, through their agent Defendant McMenimen, represented to the Plaintiffs that the Policy they received was worth more than its actual value and was the Policy they bargained for. In this regard, the Defendants, through Defendant McMenimen, showed the Plaintiffs misleading analyses, reports and illustrations.

139.    Once the truth arose, in or around April 2003, Defendant McMenimen falsely represented to the Plaintiffs that he was working on adjusting the Policy to reflect what they had originally bargained for.

140.    By these unfair and deceptive trade practices, the Defendants have violated Massachusetts consumer protection laws, including but not limited to Massachusetts General Law chapters 93A and 176D.

141.    As a result of these practices on the part of the Defendants, the Plaintiffs have suffered grievous harm.

## Prayer for Relief

WHEREFORE, the Plaintiffs respectfully request that this Court:

1.   Determine and award damages appropriate to compensate the Plaintiffs for the

harm of which they complain;

2.   Award treble damages pursuant to Massachusetts General Law chapter 93A

section 9(3);

3.   Award the Plaintiffs' costs, expenses, interest and reasonable attorneys' fees; and

4.   Grant such other relief as justice may require.

## Jury Demand

THE PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE.

Respectfully submitted,

Plaintiffs RONALD P. PASSATEMPO,
TRUSTEE, On behalf of the Samuel
Pietropaolo Irrevocable Trust, SAMUEL
PIETROPAOLO, GRANTOR to the Samuel
Pietropaolo Irrevocable Trust, and
PATRICIA D. PIETROPAOLO,
BENEFICIARY of the Samuel Pietropaolo
Irrevocable Trust,

By their counsel,

Howard M. Cooper (BBO # 543842)
David M. Burkoff (BBO # 657447)
Todd & Weld LLP
28 State Street
Boston, MA  02109
(617) 720-2626

Dated: December  23, 2004

25

# Exhibit A



**MASSACHUSETTS TEACHERS' RETIREMENT BOARD**

| Boston Office | Western Regional Office |
|---|---|
| 69 Canal Street | 60 Macek Drive |
| Boston, MA 02114-2006 | Chicopee, MA 01013-3304 |
| (617) 727-3661 | (413) 592-4771 |
| Fax (617) 727-6797 | Fax (413) 784-1707 |

*Retiring from the MTRS*
## Option Selection Form

**INSTRUCTIONS:** Please verify the information in Section 1; review Sections 2 and 3; analyze your benefit options in Section 4 in light of your particular situation; complete Sections 5 and 6 (on back); make a copy of this form for your records and return this original form to us.

### 1 MEMBER DATA

SAMUEL PIETROPAOLO

45 THURLOW STREET
REVERE MA 02151

| | |
|---|---|
| School District | REVERE PUBLIC SCHOOLS |
| Social Security No. | REDACTED -4826 |
| Date of Retirement | 06/30/1997 |
| Veteran Status | VETERAN |
| Date of Birth | REDACTED/1929 |

### 2 RETIREMENT BENEFIT CALCULATION COMPONENTS

| | |
|---|---|
| | 68 /.0250 |
| | 32.6000 YRS |
| | $66,208.18 |
| | 80.45 |
| | .7100 |

### 3 ANNUITY ACCOUNT STATUS

This information is included for your reference in calculating your income tax after retirement. Refer to your *Retirement Information Booklet* or consult with your tax advisor for additional information. *All figures below are estimated.*

| | |
|---|---|
| | $26,428.14 |
| | $29,365.63 |
| | $43,531.57 |
| | $99,325.34 |

### 4 ESTIMATED ALLOWANCES BY OPTION (NOTE THAT THESE ARE SUBJECT TO CHANGE)

| Option | | Monthly | Annual |
|---|---|---|---|
| A | Amount paid to member for life | $4,438.88 | $53,266.56 |
| B | Amount paid to member for life | $4,228.31 | $50,739.72 |
| | Annual reduction from member's MTRS annuity savings account | | $8,164.56 |
| C | Amount paid to member for life* | $3,151.62 | $37,819.44 |
| | Amount paid to Option C beneficiary (named below) upon member's death, for life* | $2,101.08 | $25,212.96 |
| | PATRICIA PIETROPAOLO | | |

*Estimated figures will appear here ONLY if you completed Part 4 of your Application for Retirement and submitted your beneficiary's certified birth record and marriage certificate, if applicable, along with your Application. If you choose Option C and your beneficiary predeceases you, please contact the MTRB and request an Option C Reversion Claim Form.*

### 5 MEMBER'S RETIREMENT OPTION SELECTION, STATEMENT AND SIGNATURE

I, the undersigned, having applied for retirement from the Massachusetts Teachers' Retirement System, hereby elect to receive my retirement allowance under the option selected below (check one):

☒ **Option A**
(No survivor benefits)

☐ **Option B**
(Remainder of annuity savings account paid to named beneficiary in lump sum)

☐ **Option C**
(Monthly benefit paid to named beneficiary)

I also understand that: I cannot change my option selection after my date of retirement; and, if I do not return this *Option Selection Form* by my date of retirement, the MTRB will retire me under Option B.

| Date sent | Date due |
|---|---|
| 8-22-97 | 9-20-97 |

**Your signed Option Selection Form must be received in the Office of the MTRB by 9/22/97, (30 days from date of mailing), or your retirement allowance benefits will be paid under Option "B".**

Member's signature: *Samuel Pietropaolo*   Date: 9/22/97

Form RCS-F004-OSF-0597

**IMPORTANT: COMPLETE SECTION 6 ON THE BACK** ---------------------------------➤



**MASSACHUSETTS TEACHERS' RETIREMENT BOARD**

Boston Office
69 Canal Street
Boston, MA 02114-2006
(617) 727-3661
Fax (617) 727-6797

Western Regional Office
60 Macek Drive
Chicopee, MA 01013-3304
(413) 592-4271
Fax (413) 784-1707

*Option Selection Form (back)*

# Spousal Acknowledgment

**RECEIVED**

**SEP 2 2 1997**

MASSACHUSETTS TEACHERS
RETIREMENT BOARD

## INSTRUCTIONS TO RETIRING MEMBER

The law requiring this Spousal Acknowledgment (Chapter 306, § 18 of the Acts of 1996) became effective on November 7, 1996. As a member of the Massachusetts Teachers' Retirement System who is retiring from the Massachusetts Teachers' Retirement System and who files his or her *Option Selection Form* on or after November 7, 1996, you need to complete this *Spousal Acknowledgment.*

You must complete Section 6 and then, if applicable, your spouse must complete Section 7. If your spouse's whereabouts are unknown, you must complete a notarized affidavit, including your spouse's last known address. If your spouse is medically unable to sign the acknowledgment, you will need to submit a letter from the attending physician attesting to that fact. (Special affidavits for these situations are available from the MTRB.) You must also provide the Board with a copy of an executed durable power of attorney if one is available.

## 6 MEMBER'S STATEMENT AND SIGNATURE

| Member's name *(please print)* | Last PIETROPAOLO   First SAMUEL   Middle | Member's Social Security number   REDACTED   REDACTED 4826 |

I, the undersigned, having applied for retirement from the Massachusetts Teachers' Retirement System, have elected to receive my retirement allowance under the option selected in Section 5 of this *Option Selection Form.* I hereby certify that *(check one):*

☑ I am now married or expect to be married as of the date of retirement stated in Section 1 of this *Option Selection Form. Please sign and date Section 6, below, then give this form to your spouse for completion of Section 7.*

☐ I am currently divorced and it is my understanding that there
☐ is   ☐ is not   ☐ don't know
a Domestic Relations Order on file with the Massachusetts Teachers' Retirement Board. *Please sign and date Section 6, below, then return this form to the MTRB.*

☐ I am NOT currently married and do not expect to be married as of the date of retirement stated in Section 1 of this *Option Selection Form. Please sign and date Section 6, below, then return this form to the MTRB.*

I subscribe under the penalties of perjury that the information I have supplied in this form is true, complete and correct to the best of my knowledge.

Signature *Samuel Pietropaolo*          Date 9/22/97

## INSTRUCTIONS TO SPOUSE

As the spouse of a member who is retiring from the Massachusetts Teachers' Retirement System on or after November 7, 1996, you are entitled to both notification and explanation of the retirement option selected by the member. The member must complete Section 6 and then, if applicable, you must complete Section 7. You must sign Section 7 before one witness; the member named in Section 6, above, cannot be your witness. The witness must sign and date the form on the same day that you do; it is not necessary that your witness be a Notary Public.

Before completing this section, please see which retirement option your spouse has chosen in Section 5 on the front of this form and then read the explanations of the available retirement options as provided in the *MTRB Retirement Information Booklet* provided with your spouse's *Option Selection Form.* Please be sure that you have read and understand the various provisions of the option selected by your spouse, specifically, the benefits to which you may or may not be entitled to upon his or her death. If you have any questions, do not hesitate to contact the MTRB for an explanation.

If you fail to sign the *Spousal Acknowledgment,* the Board will notify you within fifteen (15) days by registered mail of the option selected by your spouse and your right to sign and return the spousal acknowledgment within thirty (30) days. Failure to sign and return the *Spousal Acknowledgment* to the Massachusetts Teachers' Retirement Board within 30 days will result in your spouse's selection becoming effective without your signature.

## 7 SPOUSAL ACKNOWLEDGMENT

| Spouse's name *(please print)* | Last PIETROPAOLO   First PATRICIA   Middle D | Spouse's Social Security number   REDACTED   REDACTED 0524 |

I, the undersigned, am the spouse of the member named in Section 6, above, who has applied for retirement from the Massachusetts Teachers' Retirement System. I hereby certify that

▶ I have read and understand the information on Options A, B and C provided in the *MTRB Retirement Information Booklet (The Three Options: An Overview);*

▶ I have reviewed Section 5 of this *Option Selection Form;* and,

▶ I am aware of the option selected by the member and understand the provisions of that option.

I subscribe under the penalties of perjury that the information I have supplied in this form is true, complete and correct to the best of my knowledge.

Signature *Patricia Pietropaolo*          Date 9/22/97

**SPOUSE'S SIGNATURE WITNESSED BY**

Signature *Mary McKenna Guanci*          Date 9/22/97

Name *(please print)* Mary McKenna Guanci   Address 25 Spy Pond Parkway, Arlington, MA

# Exhibit B



# PROVIDENT MUTUAL



RECEIVED
AUG - 5 1998

## POLICY DELIVERY RECEIPT

| AGENT<br>MEMENIMEN III, FREDERICK V | AGENCY<br>001-01 |
|---|---|
| INSURED<br>SAMUEL PIETROPAOLO | POLICY NO.<br>REDACTED 4,484 |
| OWNER (IF OTHER THAN INSURED) | |

| 1. ☐<br>PERSONAL<br>DELIVERY | I hereby certify that the above-referenced policy was personally delivered to me on _____ by the Agent signing below. |
|---|---|
| | OWNER SIGNATURE |  DATE |
| | AGENT SIGNATURE | DATE |

| 2. ☐<br>MAILING | I hereby certify that the above-referenced policy was mailed to the Owner on _____ |
|---|---|
| | AGENT SIGNATURE | DATE |
| | MANAGER OR OFFICE MANAGER SIGNATURE | DATE |

### FOR PENSION ADMINISTRATORS ONLY

| 3. ☐ | I hereby certify that the above-referenced policy is being retained by me pursuant to an authorization signed by the above-referenced Owner dated _____, a copy of which is attached. |
|---|---|
| | AGENT SIGNATURE | DATE |

THIS FORM IS TO BE RETAINED IN THE AGENCY OR REGIONAL

OFFICE'S CENTRALIZED POLICY RECEIPT FILE.

DO NOT RETURN TO THE HOME OFFICE

S15251  5.95                                        MC: 001M-1001 -0

# Exhibit C

# POLICY SCHEDULE

| | | |
|---|---|---|
| **INSURED** | SAMUEL PIETROPAOLO | |
| **POLICY NUMBER** | REDACTED / REDACTED 4,484 | 07/28/1998  **POLICY ISSUE DATE** |
| **FACE AMOUNT** | $500,000.00 | 69,MALE  **ISSUE AGE AND SEX** |
| **DEATH BENEFIT** | OPTION | 07/05/1998  **POLICY DATE** |
| **PREMIUM CLASS** | WITH EXTRA RATING | 07/05/2029  **FINAL POLICY DATE** |

*MAY Amount Collect* (handwritten)

## BENEFITS

FLEXIBLE PREMIUM VARIABLE LIFE INSU...
        INITIAL FACE AMOUNT        $500,000.00

This Policy provides life insurance coverage on the Insured until the final policy date, provided the Net Cash Surrender Value is sufficient to cover the deductions for the cost to that date of the benefits of this Policy and of any riders. You may have to pay more than the premiums shown below to keep this Policy and coverage in force to that date, and to keep any additional riders in force.

        MINIMUM INITIAL PREMIUM –        $3,145.00

        PLANNED PERIODIC PREMIUM –         $1,525.92 PAYABLE MONTHLY

        MINIMUM ANNUAL PREMIUM –        $18,870.00

# Exhibit D

05/31/2004  22:23   7.  J57732              ATTY PASSATEMPO                    PAGE  03/20

# POLICY SCHEDULE

**INSURED**   SAMUEL PIETROPAOLO

**POLICY NUMBER**   REDACTED REDACTED 4,484          07/28/1998   **POLICY ISSUE DATE**

**FACE AMOUNT**       $200,000.00          69,MALE     **ISSUE AGE AND SEX**

**DEATH BENEFIT**   OPTION A              07/05/1998   **POLICY DATE**

**PREMIUM CLASS**   WITH EXTRA RATING     07/05/2029   **FINAL POLICY DATE**

### BENEFITS

FLEX BLE PREMIUM VARIABLE LIFE INSURANCE
    INITIAL FACE AMOUNT      $200,000.00

This Policy provides life insurance coverage on the Insured until the final policy date, provided the Net Cash Surrender Value is sufficient to cover the deductions for the cost to that date of the benefits of this Policy and of any riders. You may have to pay more than the premiums shown below to keep this Policy and coverage in force to that date, and to keep any additional riders in force.

MINIMUM INITIAL PREMIUM —        $3,145.00

PLANNED PERIODIC PREMIUM —        $1,525.92 PAYABLE MONTHLY

MINIMUM ANNUAL PREMIUM —        $18,870.00

MINIMUM FACE AMOUNT —       $100,000.00   AFTER 10TH POLICY YEAR

MINIMUM PAYMENT —  $25.00

PARTIAL WITHDRAWAL — MINIMUM AMOUNT        $1,500.00

TRANSFERS — MINIMUM AMOUNT        $500.00

POLICY LOAN — FIXED        6.00% POLICY LOAN INTEREST RATE

        MINIMUM LOAN AMOUNT —  $500.00

# Exhibit E

## Pietropaolo, Sam

**From:** COACHMCM@aol.com
**Sent:** Friday, April 16, 2004 8:38 AM
**To:** Pietropaolo_Sam@emc.com
**Subject:** Follow up

I have asked for something earlier if possible. That was my mistake. I gave you bad dates for when I passed them to you. They are not coming to Massachusetts until the 5th or 6th. I looked at the wrong week. I have asked for something Thursday or Friday that week.

When I get my original NEAG file I will pass it right along. I am in the process of typing out my notes and a time line to pass to you with all that I have. I am going to storage this weekend to find my old files and see if anything is present.

I want to again apologize for this. I along with you thought based on the emails and forms that it was all set. I am very frustrated and angry that I was presented with something that someone else did not follow up. I want to insure you that your dad should not worry. IT WILL be handled properly and I would NEVER let you , your mom or dad be harmed by this in any way. I think its best said that family takes care of family and this will be settled right away. I am not going to let NEAG and their actions or lack of actions have a negative impact on family. I feel sick about it. I will push as hard as I can on this. I will be away over vacation but I think when everyone meets and sits down it will be handled quickly. I dont think we should make more of it than it is at this time. If we push to hard then I think it will take longer and if more people get involved it will bog down. They are willing to listen and then if we dont get immediate results we should push. I truly feel we will get a quick resolution. It will get resolved and I am sorry. I will write back as soon as I hear back from them today!

# Exhibit F

PC 0104

**Application for Policy Change**

## NATIONWIDE LIFE INSURANCE COMPANY OF AMERICA
Berwyn, Pennsylvania 19312-1181

(Policy(ies) must be sent to the Company with this application)

1. First—middle initial—last name of Insured

SAMUEL PIETROPAOLO

2. Date of birth — Month REDACTED Day 29 Year REDACTED
3. Policy Number REDACTED 4484

The undersigned request the Company to make in the above policy the change(s) indicated below. If a change under A2, A3 or, if policy numbered under 2,000,000, A4 is requested, any beneficiary designation or election of method of settlement heretofore made under the original policy is revoked as to said policy. Usual attachment requirements (see Form A48) for supplementary benefits not included in the original policy.

**A. 1. CONVERSION OF TERM AGREEMENT**

☐ Convert $_____ of the supplementary term insurance agreement into a new policy as described in (B) below. Convert as of:
☐ Attained age ☐ Original age.

☐ Convert $_____ of the supplementary term insurance agreement and in conjunction with a new application dated _____ issue a new policy as described in (B) below.

☒ Balance of $ 289,412 to continue under supplementary agreement attached to the original policy.

☐ Balance to lapse.

**A. 3.** ☐ Change or exchange the original policy into a new policy as described in (B) below.

**A. 2. CONVERSION OF TERM POLICY**

☐ Convert $_____ of the original term policy into a new policy as described in (B) below. Convert as of:
☐ Attained age ☐ Original age.

☐ Convert $_____ of the original term policy and in conjunction with a new application dated _____ issue a new policy as described in (B) below.

☐ Balance of $_____ to continue under a new policy of the same number, date and plan as the original policy.

☐ Balance to lapse.

**A. 4.** ☐ Cancel supplementary agreement for _____ attached to the original policy.

**B. PROVISIONS OF NEW POLICY**

1. a) Amount and plan of policy applied for:

b) Additional benefits:*
☐ Disability-waiver of premium
☐ Guaranteed purchase option—amount $_____
☐ Accidental death $_____
☐ Protected premium agreement
☐ Paid-up additions agreement $_____ Year(s)
☐ Paid-up additions agreement $_____ single premium
c) ☐ Insurance exchange agreement
d) ☐ Term dividend option-balance of dividends applied as in B3
e) ☐ Automatic premium loan ☒ Yes ☐ No
f) Policy Loan Interest Rate: Variable unless ☒ Fixed is selected.

2. Premium frequency: Yrly ☐ H-Yrly ☐ Qtly ☐ Mthly ☒ APP ☐ 1st prem. pd.? ☒ Yes ☐ No

3. Dividends: ☐ Paid-up additions ☐ Accumulations ☐ Pay in cash ☐ Reduce premium balance of dividends to: ☐ Paid-up additions ☒ Accumulations ☐ Pay in cash

4. Beneficiary: (Name) SAME (TRUST) (Relationship) Otherwise
Insured's executors or administrators, unless otherwise specified in remarks (Joint beneficiaries receive equally or survivor, unless otherwise specified.)

5. Owner: —All rights belong to insured unless specified in remarks.

6. Policy date desired?

7. Have you used any tobacco product or product containing tobacco or nicotine in the last 12 months? ☒ Yes ☐ No

8. Social Security No. of Insured REDACTED 4826

9. S.S. or Tax I.D. No. of Owner

REMARKS

In consideration for the change of policy herein provided, the undersigned acknowledge receipt of any sums payable as set forth in the Authorization and Statement of Account on the reverse side hereof and direct payment of such sums in the manner therein set forth.

It is hereby declared and agreed that all the statements contained herein and in the application for the original policy are complete and true and are hereby made the basis for the new policy and that the original policy (if a change is made under A2, A3 or, if policy numbered under 2,000,000, or the original supplementary agreement (if a change is made under A1 or A4) is hereby released and surrendered to the Company.

Any reference in this instrument to a beneficiary living or surviving will, unless otherwise provided, mean living at the Insured's death.

I (we) hereby certify, under penalties of perjury, that the social security number or taxpayer identification number I am (we are) providing is correct and I am (we are) neither currently subject to backup withholding, nor have been so notified by the Internal Revenue Service.

Signed at (City and State) Revere MASS
On (Date) JULY 5 2003 (Month Day Year)
Signature of Agent

Insured or Owner
All others having any interest in the policy Samuel Pietropaolo

If policy is owned by or assigned to a corporation, we must have signature of one officer (other than insured) with name and title clearly indicated on this form.

A49 7.00 (Rev. 6.02)

## AUTHORIZATION AND STATEMENT OF ACCOUNT

To NATIONWIDE LIFE INSURANCE COMPANY OF AMERICA _____ July 5 2003
(Month, Day, Year)

The undersigned hereby receipt for and approve and direct the application of the following moneys, as indicated below, originating from the change of the original policy number 9074484 . All of the following items, unless indicated otherwise, refer to the original policy.

In full consideration for the change of policy provided herein: $ 289,412

| | |
|---|---|
| Total conversion credits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (Dr. 5903 ) $ _____ |
| Fractional dividend—conversion credit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (Dr. 5773 ) $ _____ |
| Full release of dividends and interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (Dr. 5503120) $ _____ |
| Allowance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (Dr. 5503120) $ _____ |
| Cash value of $_____ paid-up additions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (Dr. 5503120) $ _____ |
| Reserve allowance—conversion credit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (Dr. 2003130) $ _____ |
| Return premium—conversion credit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (Dr. 1900030) $ _____ |
| Return premium . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ( ) $ _____ |
| . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ _____ |
| **Total** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |

**To be disbursed as follows:**

| | |
|---|---|
| Pay loan on policy_____ in full on account | (Cr. 0322010) $ _____ |
| | (Cr. 3322110) $ _____ |
| Pay interest on loan_____ , shall constitute a loan on the new policy, which loan shall be represented by the original loan agreement(s). The balance of such loan(s), $_____ | ( ) $ _____ |
| . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ( ) $ _____ |
| . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ( ) $ _____ |
| Deposit to Premium Deposit Fund (AC# _____ ) . . . . . . . . . . . . . . . . . . . . . . . . . . . | (Cr. 1290130) $ _____ |
| Pay_____ premium due_____ on policy_____ | (Cr. 1900030) $ _____ |
| . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ( ) $ _____ |
| . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ( ) $ _____ |
| . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ( ) $ _____ |
| . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (Cr. 1900030) $ _____ |
| Pay cost of change . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| Pay the balance by check . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (Cr. 1920040) Amount $ _____ |
| To the order of _____ Address _____ | (Cr. 1920040) Amount $ _____ |
| To the order of _____ Address _____ | |
| **Total paid** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |

Signed at Revere, MASS
(City and State)

Date signed 7/5/03
(Month, Day, Year)

Insured or owner x _Ronald_____

All others having any interest in the policy x _Samuel_____

| AGENT(S) OF CREDIT—PRINT FIRST 2 INITIALS—LAST NAME | % | F.E. | CODE |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

**Special Instructions or Remarks**

(Rev. 8.02)

A-49 7.89

☐ Nationwide Life Insurance Company of America
Service and Technology Center, P.O. Box 15750, Wilmington, DE 19850-5750, (800) 688-5177
☐ Nationwide Life and Annuity Company of America
Service and Technology Center, P.O. Box 15750, Wilmington, DE 19850-5750, (800) 688-5177

**Nationwide®**
**Provident**
a Nationwide® Financial company

PC 0702

## Fund Transfer/Allocation Change for Options Elite

| Insured's Name (please print) SAMUEL PIETROPAOLO | Policy No. REDACTED 4484 |
| Policy Owner's Name (please print) TRUST | Daytime Phone |

Please select all that apply: (If your allocation is different for each selection, use more than one form.)

☒ **Transfer of Current Account Value:** I elect to transfer my current account value into the following funds to the specified "end result". (Note: This will not change the allocation of future premium payments nor your election of asset rebalancing. To change those, check the box below.)

☐ **Allocation Changes for Future Premium Payments:** I wish to change the premium allocation percentages as specified. (Note: This will also affect Automatic Asset Rebalancing transfers, if previously elected.)

☐ **Allocation Changes for Monthly Deductions:** I wish to change the monthly deduction allocations as specified.(Not applicable to Options modified premium variable life policies.)

☒ **Allocation of Unscheduled Premium Payment:** $ 4200 % premium is enclosed. Allocate premium as specified. (Applies to this payment ONLY....will not affect future allocations).

| | Transfer/ Allocation Change (whole % only) | Deduction Allocation (whole % only) |
|---|---|---|
| **AMERICAN CENTURY VARIABLE PORTFOLIOS, INC.** | | |
| American Century VP Ultra Fund: Class I | ____ % | ____ % |
| American Century VP Income & Growth Fund: Class I | 25 % | ____ % |
| **DREYFUS INVESTMENT PORTFOLIOS** | | |
| Small Cap Stock Index Portfolio | ____ % | ____ % |
| **DREYFUS VARIABLE INVESTMENT FUND** | | |
| Appreciation Portfolio: Initial Shares | ____ % | ____ % |
| **FEDERATED INSURANCE SERIES** | | |
| Federated Quality Bond Fund II: Primary Shares | ____ % | ____ % |
| **FIDELITY VARIABLE INSURANCE PRODUCTS** | | |
| Fidelity Investment Grade Bond Portfolio: Service Class | 25 % | ____ % |
| Fidelity Equity-Income Portfolio: Service Class | 25 % | ____ % |
| Fidelity Growth Portfolio: Service Class | ____ % | ____ % |
| Fidelity Overseas Portfolio: Service Class | ____ % | ____ % |
| **GARTMORE VARIABLE INSURANCE TRUST** | | |
| Gartmore GVIT Government Bond Fund | ____ % | ____ % |
| Gartmore GVIT Investor Destinations Aggressive Fund | ____ % | ____ % |
| Gartmore GVIT Investor Destinations Conservative Fund | ____ % | ____ % |
| Gartmore GVIT Investor Destinations Moderate Fund | ____ % | ____ % |
| Gartmore GVIT Investor Destinations Moderately Aggressive Fund | ____ % | ____ % |
| Gartmore GVIT Investor Destinations Moderately Conservative Fund | ____ % | ____ % |
| **JANUS ASPEN SERIES** | | |
| Capital Appreciation Portfolio: Service Shares | ____ % | ____ % |
| **THE MARKET STREET FUND** | | |
| Equity 500 Index Portfolio | ____ % | ____ % |
| Money Market Portfolio | ____ % | ____ % |
| **OPPENHEIMER VARIABLE ACCOUNT FUNDS** | | |
| Capital Appreciation/VA: Initial Class | ____ % | ____ % |
| Global Securities Fund/VA: Initial Class | ____ % | ____ % |
| **VANGUARD VARIABLE INSURANCE FUND** | | |
| Equity Income Portfolio | ____ % | ____ % |
| Total Bond Market Index Portfolio | ____ % | ____ % |
| High Yield Bond Portfolio | ____ % | ____ % |
| Mid-Cap Index Portfolio | ____ % | ____ % |
| **GUARANTEED ACCOUNT** * | 25 % | ____ % |
| *Transfers from the Guaranteed Account may only be made within 30 days of a Policy Anniversary and are limited to 25% of the total account assets. | 100% | 100% |

**Or Request Specific Dollar Amount Transfers:**

☐ **Subaccount Transfer:** I elect to transfer the following dollar amounts from and to the specified funds. (Existing policy values only; does not affect allocation of future premium payments or asset rebalancing, if applicable)

| FROM Fund | Dollar Amount TOTAL | TO Fund |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

Confirmation of request will follow and should be reviewed for accuracy. Discrepancies must be brought to the attention of the Service Center immediately. Please contact your Agent or our Service Center at (800) 688-5177 for additional assistance.

| _Signature of Policy Owner(s)_ | _Signature of Authorized Third Party Instructed to Request this Transfer/Change by the Owner_ | 7/5/03 Date |

16171 1.03

Page 2 of 2

# Exhibit G

Subj:    **(no subject)**
Date:    7/01/2004 5:47:58 PM Eastern Standard Time
From:
         Paul Tomassini
To:
         CUSTOMLLC

Hi Rick,

Per our conversation I have received the forms that you had signed by the trustee and I will submit them. Effective July 5, which is the anniversary date the policy face amount will be changed via a change in death benefit options to 489,512. We will change the investment options as directed effective the same day. As discussed the policy may MEC out and if so lets discuss the options.

Your Uncle will receive the updates in his next statement. I will forward a copy to you. I am sorry about the confusion and the underwriter. I will take the heat for you if needed. Its our fault here and not yours. If we have any other issues I will call you.

Paul

Subj:     **(no subject)**
Date:     8/21/2004 3:16:42 PM Eastern Standard Time
From:
          Paul Tomassini
To:
          CUSTOMLLC

Rick,

　　This is to confirm our conversation yesterday. I did send in the paperwork and the death benefit as of today is $489,512. I will forward a statement to you at the end of September. The underwriter did me a favor on this one. Please do not call I do not want to put her in an awkward situation again. Thanks for the sox tickets as well. We had fun. Lets catch up soon.

# Exhibit H

MEMORY TRANSMISSION REPORT

```
                              TIME       : SEP 03 '98  02:43
                              TEL NUMBER : 6179648431
                              NAME       : NEAG NEWTON
```

| NBR | FILE | DATE | TIME | DURATION | PGS | TO | DEPT NBR | MODE | STATUS |
|-----|------|------|------|----------|-----|------|----------|------|--------|
| 084 | 35 | SEP.03 | 02:42 | 00/31 | 1 | 6037750603 | | EC | M OK |



July 27, 1998

Rick,

Per the phone conversation regarding your uncle I have worked with underwriting to get the policy issued as a favor to me. It is rated however I have come up with an illustration that will start with a DB of 326,563 and grow with the investment well above your 500000 target. This will be with a good portfolio strategy which I will forward. This will allow you to cancel the MONY policy ( or non take) and the Guardian. We really want and need this business and this will help. I realize its family and you have done a good job with us so I was able to get this done. It's a bit confusing but I will explain when you come in. Lets get it issued and placed then work through the modifications.

Barry

MEMORY TRANSMISSION REPORT

```
                              TIME       : SEP 10 '98  23:19
                              TEL NUMBER : 6179648431
                              NAME       : NEAG NEWTON
```

| NBR | FILE | DATE | TIME | DURATION | PGS | TO | DEPT NBR | MODE | STATUS |
|-----|------|------|------|----------|-----|-----|----------|------|--------|
| 209 | 06 | SEP.10 | 23:19 | 00/32 | 1 | F.V. M MENIMEN III | | G3   M | OK |



July 16, 1998

**As discussed heres the new illustration.  It has been backdated to April 29.
Please sign the illustration forms and we will fax to underwriters**

Barry

# Exhibit I

ATTY PASSATEMPO                                    PAGE  02/06

LAW OFFICES OF
# RONALD P. PASSATEMPO
ATTORNEY AT LAW

RONALD P. PASSATEMPO JD MBA
MEMBER MASSACHUSETTS BAR

23 Farm St Street, Suite 105
Medfield, Massachusetts 02155

Telephone (781) 395-7678
Facsimile  (781) 395-7732

July 1, 2004                          VIA CERTIFIED MAIL

Frederick V. McMenimen III
Custom Financial LLC
215 Newbury St.
Peabody, MA 01960

New England Advisory Group LLC
C/O Barry G. Armstrong
35 Farm St.
Medfield, MA 02052

Barry G. Armstrong
35 Farm St.
Medfield, MA 02052

Nationwide Provident
ATTN: James W. DuBois
300 Continental Drive
Newark, DE 19713-4399

RE:    POLICY  *REDACTED*
       Insured: Samuel Pietropaolo
       Owner – Ronald Passatempo, Trustee, Samuel Pietropaolo Family Trust

Dear Mr. McMenimen et al.:

Under the provisions of Massachusetts General Laws, Chapter 93A, Section 9, I hereby make written demand for relief as outlined in that statute.

On or about July 5, 2003, the following unfair or deceptive act occurred:

On or about April 2003, Mr. Pietropaolo received a phone call from an agent of New England Advisory Group ("NEAG") named Jesse McPhail ("McPhail") stating that the above referenced policy had been "orphaned" and he was the new agent on the account. Frederick McMenimen ("McMenimen") was no longer the account representative.

Upon further inquiry we learned that McMenimen was no longer associated with NEAG and Nationwide Provident; however, McMenimen continued to direct us to make all payments to Nationwide through is office. Further, we learned through McPha l that the policy was for a limited value of $200,000.

We contacted McMenimen who stated and assured that he was still the agent a id that while the policy showed $200,000 it was a mistake and he would correct the error.

In July 2003, McMenimen stated he executed documents to have policy cash value converted into $289,412 of permanent insurance which would raise the policy leath benefit to guaranteed 489,412. Although still below the origina; $500,000 mir imum; McMenimen promised continued growth in the investment portion of the polic y as he also changed the policies investment strategy (which had been overlooked for years by McMenimen).

To date, no changes have been effectuated and the policy sits with a value be ow what was originally sold.

The insured, Mr. Pietropaolo, originally engaged McMenimen to discuss "pe 1ion maximization" for his state teachers' retirement pension. Based upon review of Mr. Pietropaolo's pension options, it was determined that the minimum insurance o make it worth doing pension maximization was $500,000.

McMenimen did not place Mr. Pietropaolo into a guaranteed $500,000 policy. Despite numerous representations that the policy would never be at risk to go below $ 00,000. He did explain that a portion of the premium would go to a mutual fund to build cash in order to one day make the policy "self-funding".

In structuring the transaction, McMenimen had Mr. Pietropaolo cancel and ca h out an existing policy with John Hancock.

Mr. and Mrs. Pietropaolo made irrevocable elections regarding the pension r iximization advice from McMenimen.

McMenimen has placed Mr. Pietropaolo in an inappropriate policy with unsui table investment strategy. Mr. Pietropaolo placed the policy in trust for the benefit of his wife.

McMenimen was an agent of NEAG and Nationwide Provident.

McMenimen and NEAG earned commissions off of selling a policy to Mr. Pi tropaolo.

The Trustee has made all required premium payments to date on this policy.

Mr. Pietropaolo and the trustee have been trying for over a year to get this ma ter corrected.

McMenimen, NEAG, and Nationwide, jointly and severally, through their collective acts and omissions have misled, intentionally misrepresented, and deceived Mr. Pietropaolo, Mrs. Pietropaolo, and Mr. Passatempo for which seek equitable and legal redress.

This unfair or deceptive act or practice is, in my opinion, declared unlawful by Section 2 of Chapter 93A, which in part reads as follows:

> "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

As a result of this unfair or deceptive act or practice, I suffered injury or loss of money as follows:

1. Policy value is more than $300,000 less than originally sold.
2. We have paid approximately $115,000 in premiums without benefit of receiving a $500,000 policy.
3. Mr. and Mrs. Pietropaolo forfeited certain guaranteed payment options through Mr. Pietropaolo's retirement benefits.
4. Attorney's fees.

Therefore, I hereby demand the following relief:

1. *Immediate confirmation of a fully paid insurance policy with a guaranteed death benefit of not less than $800,000 (based upon the $500,000 original expected policy plus the approximate $290,000 of converted cash value in the policy as of 7/5/03) documentation of such acceptable to the Trust and Mr. and Mrs. Pietropaolo.*
2. *Immediate return of all previously paid premiums and costs with 6% per annum interest*
3. *Confirmation that death benefit guaranteed with no further premiums costs, or other obligations due or owing now or in the future for the policy*
4. *Indemnification against any adverse financial or tax implications to the Trust or Mr. and Mrs. Pietropaolo as a result of this settlement.*
5. *Payment of all attorneys fees relatives since January 2003 to the present relative to this matter*

Chapter 93A gives you the opportunity to make a good-faith response to this letter within thirty (30) days. Your failure to do so could subject you to triple damages, attorney's fees and costs if I decide to institute legal action.

Sincerely,

Ronald P. Passatempo, Trustee
Samuel Pietropaolo Irrevocable Trust