## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RONALD P. PASSATEMPO, TRUSTEE, On behalf of the Samuel Pietropaolo Irrevocable Trust, SAMUEL PIETROPAOLO, GRANTOR to the Samuel Pietropaolo Irrevocable Trust, and PATRICIA D. PIETROPAOLO, BENEFICIARY of the Samuel Pietropaolo Irrevocable Trust,<br><br>　　　Plaintiffs,<br><br>　　　v.<br><br>FREDERICK V. McMENIMEN III, BARRY G. ARMSTRONG, NEW ENGLAND ADVISORY GROUP, LLC, 1717 CAPITAL MANAGEMENT COMPANY, NATIONWIDE PROVIDENT (f/k/a Provident Mutual Life Insurance Company), and NATIONWIDE FINANCIAL SERVICES, INC.,<br><br>　　　Defendants. | Civil Action No. 05-10118-GAO |

## PLAINTIFFS' OPPOSITION TO DEFENDANT
## FREDERICK V. McMENIMEN III'S MOTION TO DISMISS

### i. Introduction

Plaintiffs Ronald P. Passatempo, Samuel Pietropaolo and Patricia D. Pietropaolo (together, the "Plaintiffs") respectfully submit this memorandum of law in opposition to Defendant Frederick V. McMenimen III's ("Mr. McMenimen") Motion To Dismiss [The] First Amended Complaint. As discussed below, Mr. McMenimen's motion is without merit and should be denied in its entirety where each of the Plaintiffs' causes of action is sufficiently well-pled; where the applicable statutes of limitation have not run given Mr. McMenimen's efforts to fraudulently conceal his and his co-Defendants'

wrongdoing; and where Mr. McMenimen, in his Memorandum of Law Supporting [His] Motion To Dismiss, repeatedly misconstrues or ignores the Plaintiffs' allegations such that he fails to accept the allegations made against him as true and fails to draw all reasonable inferences in the Plaintiffs' favor.

Indeed, in keeping with the mischaracterizations and mistruths that gave rise to this action in the first instance, Mr. McMenimen, in his memorandum of law, grossly mischaracterizes the substance of the Plaintiffs' claims in their First Amended Complaint and Jury Demand (the "Complaint"). He asserts that "[t]here are no allegations that Mr. McMenimen positively acted to conceal their causes of action from them," for example. McMenimen Memo. ("Memo.") at 7. Further, he claims, "the Complaint and its exhibits together suggest that Mr. McMenimen was at worst duped by those he trusted to issue a $500,000 variable life policy, and that he was thereafter unsuccessful in obtaining redress for the plaintiffs." Memo. at 10-11.

Much to the contrary, as the Complaint sets forth in great detail, it was the Plaintiffs who were so egregiously "duped by those [they] trusted," namely Mr. McMenimen in conjunction with the other Defendants. Mr. McMenimen recommended and agreed to obtain an insurance policy or policies for the Plaintiffs with a guaranteed minimum $500,000 death benefit and which would become self-funding. Compl. ¶¶ 24, 30, 40, 42. In so doing, he knew the Plaintiffs' purpose in seeking his advice and assistance was to invest their limited assets in such a way that Plaintiff Patricia D. Pietropaolo ("Mrs. Pietropaolo") would be able to carry on financially after the death of her husband, Plaintiff Samuel Pietropaolo ("Mr. Pietropaolo"), an elderly man in poor physical health. Compl. ¶ 22. Inexplicably, however, Mr. McMenimen (who is Mr.

Pietropaolo's nephew) not only failed to follow through on his promise, he also took affirmative steps to assure the Plaintiffs, falsely, that the policy they had requested had been secured. Compl. ¶¶ 48, 53. When the Plaintiffs finally discovered the truth some five years later, i.e., that their policy was worth only $200,000 and would never become self-funding, Mr. McMenimen promised he would fix the problem he had caused. Compl. ¶ 64. Yet, he instead only attempted to cover his own tracks, for example by literally forging e-mails, Compl. ¶ 70, and by purporting to arrange meetings with representatives from Defendant Nationwide[1] which he never in fact made any effort to schedule, Compl. ¶¶ 76-77. Simply put, it is impossible to read the allegations in the Complaint as alleging, "at minimum," that it was Mr. McMenimen – rather than the Plaintiffs – who was "duped," and, as detailed below, such an assertion cannot be seriously advanced as consistent with the Fed. R. Civ. P. 12(b)(6) standard governing motions to dismiss for failure to state a claim.

Although the Plaintiffs are entitled to proceed on their well-pled allegations, it is nonetheless noteworthy that the Answers filed by co-defendants Barry G. Armstrong ("Mr. Armstrong") and Nationwide support the Plaintiffs' allegations against Mr. McMenimen.[2] Mr. Armstrong, for example, asserts as an affirmative defense that "[t]he claims against [him] are barred as they are the result of fraud including but not limited to the forging of documents that purport to establish that [he] played a role in the events detailed in the Complaint." Armstrong Answer at 14. In other words, Mr. Armstrong

---

[1] As noted by defendant Nationwide in its Answer at note 1, it is misnamed in the Complaint as "Nationwide Provident (f/k/a Provident Mutual Life Ins. Company)," whereas its proper name is "Nationwide Life Insurance Company of America." This Defendant is referred to herein as "Nationwide."

[2] That said, the Plaintiffs do not concede the veracity of any portion of any of the Defendants' Answers, nor do they waive any of their claims against any of the Defendants.

contends that the documents Mr. McMenimen provided to Mr. Pietropaolo's son, Samuel

F. Pietropaolo ("Sam P."), purporting to show that Mr. McMenimen, to the extent he

committed any wrongdoing, had only been acting at the direction of Mr. Armstrong, were

forgeries created by Mr. McMenimen. See Compl. ¶ 71 & Ex. H. As for Defendant

Nationwide, it denies in its Answer that its representatives were ever asked to meet with

Mr. McMenimen and Sam P., Nationwide Answer ¶ 77, contrary to Mr. McMenimen's

representations that he arranged or attempted to arrange such a meeting, Compl. ¶ 76.

Hard as he might try, Mr. McMenimen cannot succeed in obfuscating the basic

truth that lies at the heart of the Plaintiffs' well-pled allegations: that he lied from the start

about what he could or would do for the Plaintiffs, and that he made matters worse by

thereafter attempting to cover up his wrongdoing once the Plaintiffs learned they had not

received the benefit of their bargain. Mr. McMenimen's motion should be denied for the

following reasons:

- Mr. McMenimen's argument that he did not receive timely service of a summons and copy of the Complaint overlooks the fact that the time for service was enlarged by the Massachusetts Superior Court in Passetempo, et al. v. McMenimen, et al. (Civil Action No. 04-2661), upon proper motion, twice, *prior* to expiration of the then-operable deadline. (The Plaintiffs' two motions are attached to Mr. McMenimen's Memorandum of Law as Exhibits A and B.) The "good cause" standard of Mass. R. Civ. P. 4(j), which Mr. McMenimen claims the Plaintiffs did not meet, is therefore inapplicable. It is only the more lenient Mass. R. Civ. P. 6(b) "for cause shown" standard governing motions for enlargement that is implicated here, and the Superior Court (prior to removal) allowed the Plaintiffs' two motions because they satisfied that standard.

- Mr. McMenimen's contention that the applicable statutes of limitation have run misapprehends the well-pled facts that they were tolled by the discovery rule and by his own efforts to fraudulently conceal his wrongdoing. In any event, the Complaint was filed before expiration of the Plaintiffs' contract claim.

- Mr. McMenimen's argument that several of the Plaintiffs' tort claims are barred by the economic loss doctrine ignores the well-established exception to that doctrine for negligent misrepresentation claims, as well as guidance from the

Supreme Judicial Court that purely economic damages are recoverable where, as here, a defendant reneged on his promise to obtain an insurance policy. This argument is also unavailing because the Complaint alleges physical injury.

- Mr. McMenimen's argument that the Plaintiffs' emotional distress claims are not "actionable" is belied by the facts: that he knew he was being engaged to ensure that Mrs. Pietropaolo would be well cared for after Mr. Pietropaolo's death; that he knew the Plaintiffs had little investment experience or tolerance for risk, and that Mr. Pietropaolo is an elderly man whose primary interest is his wife's well-being; that, nevertheless, he failed to obtain for the Plaintiffs the insurance policy he had promised them; and that he knew or should have known that, by consequence, Mr. Pietropaolo would (as he did) suffer severe emotional distress.

- Mr. McMenimen's argument that the Plaintiffs' breach of contract claim against him is not "actionable" is contradicted by the case law and the fact that he orally agreed to obtain a policy or policies for them which would include a minimum $500,000 death benefit and which would eventually become self-funding. By failing to do so, he breached that oral contract.

- Mr. McMenimen's contention that the Plaintiffs' churning claim is frivolous cannot stand where he instructed the Plaintiffs to redeem two insurance policies in favor of purchasing a third policy, which included an unguaranteed investment component, and where he was motivated in doing so by his expected commissions. This is particularly so given the Plaintiffs' minimal investment experience and stated low tolerance for risk.

- Mr. McMenimen's argument that the Plaintiffs' federal securities fraud claims fail to satisfy the heightened pleading standard imposed by the Private Securities Litigation Reform Act ignores the overwhelming inference raised by the allegations in the Complaint that Mr. McMenimen's deceit was intentional. The Complaint alleges, for example, that he attempted to conceal his wrongdoing by having the Plaintiffs sign blank application forms, and thereafter by refusing to send them a copy of their policy. It also alleges that he instructed the Plaintiffs not to speak with the insurance agent who alerted them that their policy was worth only $200,000, and that he later fabricated documents in an attempt to shift the blame for his wrongdoing.

## ii. Facts

In the interest of brevity, the Plaintiffs respectfully refer the Court to the factual allegations set forth in the Complaint. Relevant portions thereof are cited below.

### iii. Argument

When considering a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a court must accept all allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff or plaintiffs. E.g., Rockwell v. Cape Cod Hosp., et al., 26 F.3d 254, 255 (1st Cir. 1994). Guided by that standard, Mr. McMenimen's motion to dismiss must be denied in its entirety.

**I.    Mr. McMenimen Was Properly Served With A Summons And Copy Of The Complaint.**

As a preliminary matter, Mr. McMenimen's belabored emphasis on the ninety-day deadline prescribed by Mass. R. Civ. P. 4(j)[3] – which governs the time for service of the summons and complaint and which allows for waiver of the ninety-day deadline only upon a showing of "good cause" – is entirely misplaced. See Memo. at 3-5. In the cases cited by Mr. McMenimen, the respective plaintiffs filed their complaints and then failed to effect service within ninety days. Comm'r of Revenue v. Carrigan, 45 Mass. App. Ct. 309, 310-311 (1998); Hull v. Attleboro Sav. Bank, 33 Mass. App. Ct. 18, 20-21 (1992); Heacock v. Heacock, 30 Mass. App. Ct. 304, 305 (1991); Schuman v. Stanley Works, 30 Mass. App. Ct. 951, 952-953 (1991). As Mr. McMenimen discusses at great length, this is also the situation in our case. Crucially, however – quite *unlike* the situation in our case – each plaintiff in the cases relied upon by Mr. McMenimen also failed to move for an enlargement of the ninety-day deadline prior to the expiration thereof. Id. Had they done so, the "good cause" test under Rule 4(j) simply would not have governed; rather,

---

[3] As the Court is aware, Mr. McMenimen removed this action from Massachusetts Superior Court on January 19, 2005. He correctly notes in his brief that whether service was properly made prior to removal is governed by the procedural rules of the Commonwealth. Memo. at 3, n.1.

the applicable rule would have been the far more lenient Mass. R. Civ. P. 6(b)(1), which permits enlargement of time for "cause shown ... in [the court's] discretion ... before the expiration of the period originally prescribed or as extended by a previous order." See, e.g., Johnson v. Maynard, 2004 Mass. Super. LEXIS 52 at *3 (Feb. 17, 2004) ("Any harshness of the consequences to a plaintiff for failure to timely serve a defendant under [Rule 4(j)] are mitigated by the liberal time extensions available to the plaintiff under [Rule 6(b)]."); see also Brunelle v. Blaise, 2004 Mass. Super. LEXIS 545 at *15-16 (Nov. 24, 2004) ("Before the 90 days within which service ... must be made under [Rule 4(j)] or any period of extension beyond the 90 days previously allowed by the court, a party may obtain an enlargement of time upon a showing of cause. Mass. R. Civ. P. 6(b)(1).").

Accordingly, it is the Rule 6(b)(1) "for cause" standard that applies here. The Plaintiffs filed their original complaint on July 1, 2004, and then moved on September 23, 2004 – *less than ninety days after filing* – for an enlargement of the ninety-day deadline for service, which motion was allowed because "cause" had been shown. See Memo. Ex. A. The Superior Court set a new deadline of December 29, 2004, and, prior to *that* deadline, the Plaintiffs moved for a second enlargement, also for cause shown, this time for an additional thirty days. See Memo. Ex. B. In the end, Mr. McMenimen was served with a summons and copy of the Complaint on December 28, 2004, prior to the expiration of the deadline established pursuant to the Plaintiffs' first motion for enlargement; thus, their second such motion ultimately proved to be unnecessary. In any event, since service occurred *before* the operable deadline, the law of the Commonwealth is abundantly clear that it is the Rule 6(b)(1) standard rather than the Rule 4(j) "good

cause" standard that governs here. <u>Johnson</u>, 2004 Mass. Super. LEXIS 52 at *3;

<u>Brunelle</u>, 2004 Mass. Super. LEXIS 545 at *15-16.

In <u>Brunelle</u>, the Superior Court explained that when a party moves for

enlargement pursuant to Rule 6(b)(1):

> The trial judge is called upon to exercise discretion. No notice is required to be
> given to the other side and the extension may be granted without motion. In
> practice, this norm is usually satisfied by a showing of good faith and lack of
> prejudice to the adverse party. Commentators assessing the case law interpreting
> the corresponding federal rule describe the discretion as "wide" and the burden on
> the party seeking the extension as limited to showing "some justification" for the
> extension.

<u>Brunelle</u>, 2004 Mass. Super. LEXIS 545 at *16 (quoting WRIGHT & MILLER, FED.

PRACTICE AND PROC. § 1165 at 520-521 (2002)) (internal citations omitted)). Indeed,

"extensions of time in which to make service are matters committed to the sound

discretion of the court." <u>Union Prod. Inc., et al. v. Warner 7 Stackpole, LLP, et al.</u>, 2004

Mass. Super. LEXIS 639 at *5 (Dec. 20, 2004). Mr. McMenimen, in his brief, offers no

basis upon which to upset the Court's "sound discretion" here. This is not a situation

where, but for the extensions granted, the applicable limitation periods would have run.

<u>See</u> <u>infra</u> pp. 9-12. Nor were the Plaintiffs seeking any unfair tactical advantage over the

Defendants (they did not seek, or use, the additional time to destroy documents, no

witnesses went missing in the interim, etc.). <u>Cf.</u> <u>Heacock</u>, 30 Mass. App. Ct. 304

(applying Rule 4(j) "good cause" standard, motion to dismiss allowed where plaintiff

delayed serving complaint accusing former spouse of battery until pending divorce suit

was decided and period for appeal had expired). The Plaintiffs instead provided "some

justification" in their two motions for enlargement, 2004 Mass. Super. LEXIS 545 at *16;

see Memo. Exs. A & B, and there is thus no reason to revisit the Superior Court's
decisions thereupon.

## II.    The Plaintiffs Filed This Lawsuit Prior To The Expiration Of The Applicable Limitation Periods.

As documented in the Complaint, and as will be more fully revealed through
discovery, Mr. McMenimen went to great lengths to conceal the true nature of the
Plaintiff's Nationwide policy from them, i.e., that it was not the policy the Plaintiffs –
relying on Mr. McMenimen's advice and purported "pension maximization" expertise –
had requested. Compl. ¶¶ 23-24. For example, at Mr. McMenimen's direction, the
Plaintiffs signed blank application forms which Mr.McMenimen later completed and
submitted to Nationwide without showing them to the Plaintiffs. Compl. ¶¶ 35-36. Once
their Nationwide policy was issued, moreover – on July 28, 1998 – Mr. McMenimen
repeatedly told the Plaintiffs that the policy's terms were just as he had promised.
Compl. ¶ 53. At the same time, he refused their multiple requests for a copy of the
policy. Compl. ¶ 52. He also instructed them to send their premium payments directly to
him, even after (unbeknownst to them) he had left New England Advisory Group
("NEAG")[4] and was no longer the agent responsible for their policy. Compl. ¶ 46.
Finally, when an NEAG agent named Jesse McPhail ("Mr. McPhail") called Mr.
Pietropaolo in or around April 2003 to tell him his policy had been "orphaned," was
worth only $200,000 and would never become self-funding, Compl. ¶ 56-59, Mr.
McMenimen swung into high gear: he instructed the Plaintiffs not to deal with Mr.
McPhail, Compl. ¶ 61; he by turns apologized and blamed others for "not follow[ing]

---

[4] While NEAG is named as a Defendant in the Complaint, the Plaintiffs have been informed that NEAG is
no longer in existence.

up," Compl. ¶ 63; he said he would submit an Application For Policy Change that would amend the policy to reflect what he had originally promised, Compl. ¶¶ 64-66, and he again provided the Plaintiffs with blank forms to sign for that purpose, Compl. ¶ 65; he thereafter refused their repeated requests, through Sam P., for a copy of the amended policy, Compl. ¶ 67; and, lastly, when it became clear to the Plaintiffs at the end of 2003 that no amendment had been made, Mr. McMenimen blamed the other Defendants, Compl. ¶ 69, fabricated documents to that effect, Compl. ¶ 70, and professed to schedule a meeting with Nationwide representatives that he never actually made any effort to schedule, Compl. ¶¶ 76-77.

As a result of these acts and omissions by Mr. McMenimen, the Plaintiffs had no reason to suspect that anything was awry until at least April 2003, when Mr. McPhail called and informed Mr. Pietropaolo that his Nationwide policy had a death benefit of only $200,000. Immediately thereafter, the Plaintiffs took steps to figure out what had happened: At their direction, Sam P. asked Mr. McMenimen to amend the policy, which he said he would do, and when no such amendment materialized, Sam P. maintained contact with Mr. McMenimen in an effort to discern what had gone wrong. Compl. ¶¶ 56-76. Sam P. eventually met with Mr. McMenimen on April 1, 2004 and Mr. McMenimen provided him various documents purportedly relating to the policy and his efforts to amend it, some of which appeared to Sam P. to have been forged. Compl. ¶¶ 70-72. At that point, the Plaintiffs learned that Mr. McMenimen was not being honest with them and that wrongdoing had occurred. They proceeded to file this lawsuit on July 1, 2004.

Mr. McMenimen now asserts that the Plaintiffs' claims against him are time-barred because the applicable limitation periods began to run on July 28, 1998, the date the Nationwide policy was first issued. Memo. at 6. Even were the Plaintiffs to accept this contention (which they do not), Count IX would be timely because contract claims are subject to a six-year statute of limitations in the Commonwealth of Massachusetts. Mass. Gen. Law c. 260 § 2. But, more fundamentally, the allegations in the Complaint show that *none of the Plaintiffs' causes of action accrued until April 2004*: prior to Mr. McPhail's call in April 2003, that is, the Plaintiffs relied on Mr. McMenimen's assertions and had no reason to suspect that anything was awry. And then, from April 2003 until April 2004, the Plaintiffs' reasonable efforts to investigate were thwarted by Mr. McMenimen's continued, concerted efforts to fraudulently conceal his wrongdoing.

Mr. McMenimen argues, of course, that the so-called "discovery rule" does not apply here because, after July 28, 1998, the Plaintiffs' claims were never "inherently unknowable." Memo. at 6 (citing Friedman v. Jablonski, 371 Mass. 482 (1976)). However, in Friedman, the Supreme Judicial Court explained that a claim only ceases to be inherently unknowable "when a buyer learns of the misrepresentation or reasonably should have learned of the misrepresentation." 371 Mass. at 485-486. The plaintiffs in that case had been told that an "artesian well" lay on the property at issue, when it was actually a part of a neighboring parcel. Id. at 487. The Court held that the complaint "[did] not show that, as a matter of law, the plaintiffs reasonably could have known the true facts about the well by the time of the sale of the premises." Id. In this regard, it reasoned that "[t]he location of the well was a matter unlikely to be discovered by a title search." Id. Similarly, here, at the time Mr. McMenimen obtained the Nationwide policy

for the Plaintiffs – and then when, for nearly five years, he concealed the true nature of that policy from them and induced their reliance upon his professed expertise – they simply had no cause to suspect that anything was amiss. They did what any reasonable person in their place would have: they listened to and relied upon the advice and assertions of their insurance agent and financial adviser. There were no "storm warnings" of any kind until Mr. McPhail's April 2003 call, notwithstanding Mr. McMenimen's contention to the contrary. Memo. at 6; see, e.g., Pruner v. Super. Ct., 382 Mass. 309, 312 (1981) ("a plaintiff's cause of action does not necessarily accrue when the defendant commits the negligent act, but rather accrues on the happening of an event likely to put the plaintiff on notice" (internal quotes omitted)).

Furthermore, Mr. McMenimen claims "[t]here are no allegations [in the Complaint] that [he] positively acted to conceal [the Plaintiffs'] causes of action from them." Memo at 7. As discussed above, supra pp. 9-10, this simply is not true. Thus, even after Mr. McPhail's call, all of the Plaintiffs' claims were tolled by Mr. McMenimen's fraudulent concealment until at least April 2004. Significantly, it should be noted here that, for this reason, the Plaintiffs' allegations of securities fraud under section 10(b) of the Securities Exchange Act of 1934, Compl. ¶¶ 124-131, are not barred by the five-year statute of repose which applies to such claims, 28 U.S.C. §1658(b); see, e.g., Quaak v. Dexia, S.A., 2005 U.S. Dist. LEXIS 2152 at *20-21 (D. Mass., Feb. 9, 2005) ("Under Section 10(b), the statute of repose runs from the date of the last fraudulent misrepresentation …"); Cont'l Bank, Nat'l Ass'n v. Ludlow, 777 F. Supp. 92, 102 (D. Mass. 1991) (same).

**III.    The Plaintiffs' Tort Claims Are Not Barred By The Economic Loss Doctrine.**

Mr. McMenimen also opines that "it is now axiomatic in this Commonwealth that 'purely economic losses are unrecoverable in tort and strict liability actions in the absence of personal injury or property damages.'"  Memo. at 8 (quoting FMR Corp. v. Boston Edison Co., 415 Mass. 393, 395 (1993)).  What he conspicuously neglects to mention, however, is that "[a]n exception to the [economic loss] doctrine permits recovery for economic losses resulting from negligent misrepresentation." Nota Constr. Corp. v. Keyes Assocs., 45 Mass App. Ct. 15, 20 (1998).  This is yet another example of the oversimplifications and mischaracterizations that run throughout Mr. McMenimen's brief.

Of the ten Counts in the Complaint, then, the economic loss doctrine might arguably apply to just three of them: Count I (negligence); Count II (fraud); and Count IV (breach of fiduciary duty).  Yet as to each, the Supreme Judicial Court has called the applicability of the doctrine into question in cases such as this one.  In Campione v. Wilson, the Court noted with approval the conclusion of the court below that "an insured ... would have a claim against an insurance broker for excess liability incurred as a result of the broker's negligence." 422 Mass. 185, 189 (1996).  And in Rae v. Air-Speed, Inc., the Court explained:

> The "well-settled rule [is] that an insurance agent or broker who, with a view to compensation for his services, undertakes to procure insurance for another, and through his fault and neglect fails to do so, will be held liable for any damages resulting therefrom." **Massachusetts law, in accordance with the general rule, clearly permits a potential insured ... to recover in tort for the failure of an insurance agent to perform his duty to obtain an insurance policy.**

386 Mass. 187, 192 (1982) (quoting Annot., 64 A.L.R.3d 398, 404, 410 (1975)) (emphasis added); see, e.g., Rayden Eng'g Corp. v. Church, 337 Mass. 652, 660 (1958)

("Recovery can be had in tort for failure of an agent to perform a duty to obtain an insurance policy."). The Rae Court concluded that the plaintiff in that case "possibly may recover against [the defendant] under either a contract or a negligence theory, or both." Id. at 196; see infra pp. 16-17 (regarding the Plaintiffs' contract claim).

Furthermore, assuming *arguendo* that the economic loss doctrine does apply to some small portion of the Plaintiffs' claims, Mr. McMenimen also ignores the fact that the Complaint *does* allege personal injury to Mr. Pietropaolo, namely anxiety, restlessness, sleep deprivation, loss of appetite and increased smoking. Compl. ¶¶ 118, 123.

## IV.    The Plaintiffs' Emotional Distress Claims Are Properly Pled.

Counts V and VI of the Complaint allege intentional infliction of emotional distress and negligent infliction of emotional distress, respectively. Compl. ¶¶ 114-123. As Mr. McMenimen accurately notes, Memo. at 9, the Complaint only alleges such distress on the part of Mr. Pietropaolo: As a result of the Defendants' acts and omissions, Mr. Pietropaolo has suffered from repeated episodes of anxiety and restlessness, leading to sleep deprivation, loss of appetite and increased frequency of smoking. Compl. ¶¶ 118, 123. His distress has only been compounded by his general poor health, of which Mr. McMenimen is, and has been, aware.

Mr. McMenimen argues, however, that with respect to Count V (intentional infliction of emotional distress), the Plaintiffs' "allegations are utterly threadbare and unworthy of the deference ordinarily given to well-pleaded allegations." Memo. at 9. In Agis v. Howard Johnson, Co., the Supreme Judicial Court set forth the requisite elements of the cause of action:

14

> It must be shown (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous, was beyond all possible bounds of decency and was utterly intolerable in a civilized community; (3) that the actions of the defendant were the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe and of a nature that no reasonable man could be expected to endure it.

371 Mass. 140, 144-145 (1976) (internal citations omitted). Mr. McMenimen's posturing aside, the Complaint is hardly "threadbare" when it comes to documenting each of these elements. The Complaint alleges that, at minimum, Mr. McMenimen *should* have known that his behavior would lead to emotional distress on the part of Mr. Pietropaolo. At the time he instructed the Plaintiffs to sell Mr. Pietropaolo's existing policies in favor of a new, variable insurance policy – and then when he failed to obtain the very policy he had recommended – Mr. McMenimen knew of the Plaintiffs' limited means, Compl. ¶ 25; he knew they had come to him to discern how best to invest their assets so that Mrs. Pietropaolo would have enough money to live on after Mr. Pietropaolo's death, Compl. ¶ 22; and he knew Mr. Pietropaolo was an elderly man with little investment experience and a low tolerance for risk, Compl. ¶¶ 12, 25, 41; see, e.g., Boyle v. Wenk, 378 Mass. 592, 596 (1979) ("Conduct otherwise reasonable may become tortious when directed at an individual known to be particularly susceptible to infliction of emotional distress.") For all of these reasons, Mr. McMenimen should have known that by putting the bulk of Mr. Pietropaolo's assets into jeopardy – and, as a consequence, by casting a cloud of uncertainty over the future wellbeing of Mrs. Pietropaolo, his wife – Mr. Pietropaolo would likely suffer emotional distress as a result.

His distress, furthermore, is both sufficiently severe to support the Plaintiffs' intentional infliction of emotional distress claim, and sufficiently physical in nature to

support their claim for negligent infliction of emotional distress. With respect to the latter, it is true that the "objective symptomatology" necessary to sustain the claim must be "substantiated by expert medical testimony." Payton v. Abbot Labs, 386 Mass. 540, 556 (1982). But at this stage in the litigation, it would be improper to dismiss Count VI for lack of such substantiation, which will be forthcoming as the case progresses. Suffice it to say that the stress Mr. Pietropaolo has suffered as a result of the Defendants' wrongdoing has led to significant physical consequences, irrespective of his other medical difficulties. With respect to the severity of Mr. Pietropaolo's distress, the Supreme Judicial Court has described the intentional infliction of emotional distress cause of action as providing "relief for serious invasions of mental and emotional tranquility." Agis, 371 Mass. at 143. As asserted in the Complaint, Mr. McMenimen, through his acts and omissions, has impinged upon Mr. Pietropaolo's "mental tranquility" first and foremost by jeopardizing the ability of his wife to take care of herself after his death. In other words, the very purpose of the Plaintiffs' engagement of Mr. McMenimen in the first place was to ensure that Mr. Pietropaolo invested his money prudently given his desire that Mrs. Pietropaolo be able to carry on financially after his passing. Compl. ¶¶ 18, 20, 22. Mr. McMenimen has frustrated this purpose and Mr. Pietropaolo has suffered emotional distress as a result.

## V.    The Complaint Asserts An Actionable Breach Of Contract Claim.

"[A]n insurance broker's failure to perform ... in obtaining coverage for its client may support a claim for breach of contract." Cape Site Mgmt. Assocs. v. Inland Underwriters Ins. Agency, Ltd., 61 Mass. App. Ct. 14, 17 (2004). Mr. McMenimen's contention that "the operative contract" was between the Plaintiffs and Nationwide is

therefore plainly unavailing, for while the Nationwide policy is certainly *a* contract at

issue in this case, the Plaintiffs also entered into an oral contract with Mr. McMenimen

whereby he agreed, *inter alia*, to obtain an insurance policy or policies with a minimum

guaranteed death benefit of $500,000 and which would become self-funding.  As the

Supreme Judicial Court held in <u>Campion v. Wilson</u>:

> When an insured makes an agreement with a broker calling for the purchase of
> particular coverage, the insured may reasonably rely on the broker's superior
> expertise and may assume that the broker has performed his duty.  Accordingly, a
> "broker cannot claim that the oral contract to procure insurance was merged into
> the written policy."

422 Mass. 185, 195-196 (1996) (quoting 16A J.A. APPLEMAN & J. APPLEMAN,

INSURANCE LAW AND PRACTICE § 8843, at 228 (1981)) (internal citations omitted).

   Thus, with respect to the oral contract between Mr. McMenimen and the

Plaintiffs, the Complaint properly alleges his offer and the Plaintiffs' acceptance thereof,

Compl. ¶¶ 20-44; consideration in the form of commissions, Compl. ¶¶ 73-74, and

recognition at NEAG for bringing in new business, Compl. ¶ 71 & Ex. H; Mr.

McMenimen's breach, Compl. ¶ 55; and, finally, the Plaintiffs' damages, Compl. ¶ 136,

which include but are not limited to the difference in value between the policy obtained

and the policy promised.

## VI.    The Complaint Asserts An Actionable Churning Claim.

   Mr. McMenimen also posits that the Plaintiffs' churning claim is "frivolous"

because this lawsuit concerns "the sale of a single insurance policy." Memo. at 11.[5]

Once again, he reveals only a part of the story.  As the Complaint expressly describes,

---

[5] Note that Mr. McMenimen does not argue that the sale of a variable insurance policy can *never*, as a
general matter, give rise to a proper churning or other securities fraud claim.  Nor could he.  <u>See</u> <u>S.E.C. v.</u>
<u>Variable Annuity Life Ins. Co. of Am., et al.</u>, 359 U.S. 65 (1959).

17

Mr. McMenimen first instructed the Plaintiffs to sell Mr. Pietropaolo's two existing John Hancock insurance policies. Compl. ¶¶ 32-34. In so doing, he was motivated by his desire to earn commissions on the new policy he would then direct the Plaintiffs to purchase, Compl. ¶ 73, and he misled the Plaintiffs regarding, *inter alia*, (1) the extent of his experience advising clients with respect to so-called "pension maximization," Compl. ¶ 23; (2) the desirability, in light the Plaintiffs' stated objectives, experience and tolerance of risk, of canceling Mr. Pietropaolo's existing policies and purchasing a variable life insurance policy, Compl. ¶¶ 22, 25, 34; and (3) the nature of the policy he would actually obtain for the Plaintiffs, Compl. ¶ 42. Mr. McMenimen, in conjunction with the other Defendants, then went on to obtain a variable life insurance policy with a death benefit of only $200,000 and no possibility of becoming self-funding, Compl. ¶ 59, despite his promise to the Plaintiffs that he would obtain a policy or policies that *would* eventually become self-funding and that would have a minimum guaranteed death benefit of $500,000, Compl. ¶ 42. Again, Mr. McMenimen was apparently driven by his desire to receive commissions, not simply in connection with the purchase of the new policy but also in connection with any future trading activity in the investment component of that policy. Compl. ¶ 73.

In his brief, Mr. McMenimen relies on Judge Gertner's statement in <u>United States v. Trask</u>, 143 F. Supp. 2d 88, 89 (D. Mass. 2001), that "'[c]hurning occurs when a broker causes transactions to be made in a customer's account that are excessive in amount and frequency, given the nature of that account." By advising the Plaintiffs to redeem Mr. Pietropaolo's two John Hancock policies and then advising them to purchase a new variable life insurance policy, which included an unguaranteed investment component,

Mr. McMenimen did just that. Moreover, he omits from his brief the sentence immediately following the above quotation: "The core of the [churning] accusation is that the broker is trading the account for his own benefit and gain, to maximize his commissions, rather than for the benefit and gain of the customer." Id. at 89. This describes Mr. McMenimen's behavior to a tee, and it is precisely how the Plaintiffs have characterized his acts and omissions in their Complaint.

**VII.    The Complaint Alleges Scienter With Sufficient Particularity.**

Finally, with respect to the Plaintiffs' federal securities fraud claims, Mr. McMenimen charges that the Complaint includes only "catch-all" allegations regarding his fraudulent intent, contrary to the particularity requirement imposed by the Private Securities Litigation Reform Act ("PSLRA"). Memo at 11-12 (citing Baron v. Smith, 285 F. Supp. 2d 96, 107 (D. Mass. 2002)); see 15 U.S.C. § 78u-4(b)(2). First, to the extent Mr. McMenimen argues otherwise, it should be noted that "[t]he PSLRA did not alter the substantive definition of scienter as set forth in prior securities fraud case law," which includes "certain kinds of recklessness." Baron, 285 F. Supp. 2d at 107. More significantly, as detailed above, supra pp. 9-10, the Complaint clearly *does* allege "facts giving rise to a strong inference," 15 U.S.C. § 78u-4(b)(2), that Mr. McMenimen intentionally misled the Plaintiffs regarding, *inter alia*, the nature of the insurance policy he obtained for them. In this regard, while Mr. McMenimen notes that he provided Sam P. with a "Policy Schedule" showing a face value of $500,000 and that the Plaintiffs attached this document as an exhibit to their Complaint, Compl. ¶ 54 & Ex. C, he ignores the crucial and related fact that the Complaint also alleges that he literally *forged* documents in an effort to conceal his wrongdoing, e.g., Compl. ¶ 70.

### iv. Request For Oral Argument

The Plaintiffs respectfully request to be heard on their Opposition To Defendant

Frederick V. McMenimen III's Motion To Dismiss.

### v. Conclusion

WHEREFORE, for the reasons set forth herein, the Plaintiffs respectfully request

that Mr. McMenimen's Motion To Dismiss be denied in its entirety.

Respectfully submitted,

Plaintiffs RONALD P. PASSATEMPO,
TRUSTEE, On behalf of the Samuel
Pietropaolo Irrevocable Trust, SAMUEL
PIETROPAOLO, GRANTOR to the Samuel
Pietropaolo Irrevocable Trust, and
PATRICIA D. PIETROPAOLO,
BENEFICIARY of the Samuel Pietropaolo
Irrevocable Trust,

By their counsel:

/s/ David M. Burkoff
Howard M. Cooper (BBO #543842)
David M. Burkoff (BBO #657447)
Todd & Weld LLP
28 State Street
Boston, MA 02109
(617) 720-2626

Dated: March 16, 2005