UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

———————————————————————
                                                    )
RONALD P. PASSATEMPO, Trustee of the Samuel         )
Pietropaolo Irrevocable Trust, *et al.,*            )
                                                    )
             *Plaintiffs,*                          )
                                                    )        Case No. 05-CV-10118-GAO
        v.                                          )
                                                    )
FREDERICK V. MCMENIMEN III, *et al.,*               )
                                                    )
             *Defendants.*                          )
———————————————————————)

**OPPOSITION OF DEFENDANT FREDERICK V. MCMENIMEN III
TO PLAINTIFFS' AMENDED MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Local Rule 7.1(B)(2), Rule 65 of the Federal Rules of Civil Procedure,

and *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308, 317-

333 (1999), defendant Frederick V. McMenimen III ("Mr. McMenimen") hereby opposes

Plaintiffs' Amended Motion for Preliminary Injunction ("Motion").[1]  In opposition to that

Motion, Mr. McMenimen states that the Court is without jurisdiction to grant the asset

freeze requested by the Plaintiffs, who seek no final relief other than money damages.

Even if such a preliminary injunction were within the Court's equity jurisdiction, moreover,

it would be abusive of the Court's discretion to issue such an order, because the Plaintiffs'

request does not satisfy the well-established test for issuance of preliminary injunctions:

their prospects for success on the merits are minimal; a simple, unliquidated claim for

money damages does not support a finding of "irreparable injury"; the balance of hardships

weighs against such an extraordinary asset freeze; and the public interest would be

subverted by the injunction if it were issued.

---

[1] Filed herewith in support of this Opposition are the Declaration of Frederick V. McMenimen III ("McMenimen Dec.") and the Declaration of William P. Corbett, Jr. ("Corbett Dec.").

I.    **THIS COURT HAS NO AUTHORITY TO ISSUE THE PRELIMINARY INJUNCTION SOUGHT BY THE PLAINTIFFS.**

*Grupo Mexicano* makes clear that this Court does not have jurisdiction to grant the injunction sought by the Plaintiffs. There is no uncertainty or complexity inherent in applying that precedent to these facts. After all, the Plaintiffs seek only money damages from Mr. McMenimen. Their First Amended Complaint ("Complaint") contains no prayers for equitable relief or substantive claims sounding in equity. The Plaintiffs do not claim any lien or equitable interest in any of Mr. McMenimen's assets. They do not identify any specific property of Mr. McMenimen – whom they acknowledge to be a New Hampshire resident (Complaint ¶ 4) – within this Court's *in rem* jurisdiction. Yet the Plaintiffs ask this Court to freeze Mr. McMenimen's assets in the absence of a final judgment holding him liable. (DE #21, #22) Such patent overreaching clashes with *Grupo Mexicano.*

In that case, the Supreme Court was confronted with a simple question: "whether, in an action for money damages, a United States District Court has the power to issue a preliminary injunction preventing the defendant from transferring assets in which no lien or equitable interest is claimed." *Grupo Mexicano,* 527 U.S. at 325-26. "Because such a remedy was historically unavailable from a court of equity," the Supreme Court held that the District Courts have "no authority" to issue a preliminary injunction preventing litigants from disposing of their assets pending adjudication of a pending claim for money damages." *Id.* at 339-40. Justice Scalia, writing for the Court, observed that injunctions of the sort requested by these Plaintiffs were not available in "the English Court of Chancery at the time of the separation of the two countries." *Grupo Mexicano,* 527 U.S. at 318. Because that was when the first Congress adopted the Judiciary Act of 1789, and because that seminal statute is the source of the equity powers wielded by the Federal courts, he reasoned that authority to grant such injunctions was not included in the powers conferred

by the Framers. *Id.,* 527 U.S. at 339-40. He thus concluded that, "[e]ven when sitting as a court in equity," a District Court cannot "craft a 'nuclear weapon' of the law" like the one sought by the Plaintiffs here. *Id.,* at 332.[2]

There is no colorable basis for distinguishing this case from *Grupo Mexicano.* None of the recognized distinctions are present: the plaintiffs have no security interest in any assets of Mr. McMenimen; they identify no property within this Court's *in rem* jurisdiction; and they seek no final relief other than money damages. *See, e.g., Charlesbank Equity Fund II, LP v. Blinds to Go, Inc.,* 370 F.3d 151, 159-61 (1st Cir. 2004) (avoiding *Grupo Mexicano* analysis because of a "salient distinction" and denying injunction under usual standard); *Fairview Mach. & Tool Co., Inc. v. Oakbrook Int'l, Inc.,* 77 F. Supp. 2d 199, 206 (D. Mass. 1999) (Ponsor, J.) (*Grupo Mexicano* not controlling "because the plaintiff has an equitable interest in defendant's assets").

The putative distinction offered by the Plaintiffs – that they invoke Rule 64 and not Rule 65 (*see* DE #22 at 7, 16-19) – is, in a word, frivolous. The Plaintiffs' semantic creativity notwithstanding, the Court "must look beyond the nomenclature that parties or trial judges employ and gauge the practical effect of a requested order." *Charlesbank Equity,* 370 F.3d at 157. Here, like the plaintiff in *Charlesbank Equity,* 370 F.3d at 161, the Plaintiffs are not seeking an attachment under Rule 64, nor have they identified any property subject to this Court's *in rem* jurisdiction. Having had *Grupo Mexicano* brought to their attention, the Plaintiffs and their lawyers disingenuously seek to paint a tiger's stripes on a leopard.

---

[2] In reaching that conclusion, Justice Scalia noted that a "more powerful weapon of oppression could not be placed at the disposal of unscrupulous litigants." *Id.,* at 330 (quoting Wait, FRAUDULENT CONVEYANCES, § 73 at 110-11). Justice Scalia's observation is *apropos* of the instant motion.

13-006-001

That attempted transformation is of no significance. Indeed, the party requesting an asset freeze in *Charlesbank Equity* similarly sought to re-characterize its application, arguing as these Plaintiffs do – "that, in cases where the relief sought is in the nature of an equitable attachment, Fed. R. Civ. P. 65 should be read in light of Fed. R. Civ. P. 64 and be construed as importing state-law standards for determining the availability of relief." 370 F.3d at 159.[3] However, the Court of Appeals emphatically dismissed that contention, holding that the law of this Circuit "stands four-square for the proposition that a prejudgment freeze order is in the nature of an injunction and that, therefore, its propriety should be analyzed under the traditional four-part test." *Id.* at 160. The *Charlesbank Equity* panel reasoned:

> [T]he very nature of a freeze order counsels against commingling the jurisprudence of Rule 65 with that of Rule 64. Even though a freeze order may serve many of the same ends as an attachment, the former acts upon a party whereas the latter is directed at specific property. Restraining (or compelling) individual action is especially strong medicine, and courts should hesitate to issue such orders on an interlocutory basis without a showing of urgent need. The traditional four-part standard for preliminary injunctive relief provides a prophylaxis against the hasty or intemperate use of that power. Consequently, sound policy considerations support the imposition of that standard in connection with freeze orders.

*Id.* Such is especially true in cases like *Charlesbank Equity* and this one – where virtually all of the defendant's assets are located outside of Massachusetts.[4] *Id.* at 157. The Plaintiffs' motion presents "a prototypical Rule 65 case – no more and no less." *Id.* at 159-161. *See also R.G. v. Hall,* 37 Mass. App. Ct. 410 (1994) (cited by Plaintiffs) (under Massachusetts law, "[w]hen the form of an injunctive order directed against virtually all the

---

[3] Significantly, *Charlesbank Equity* was a diversity action initially filed in this Court, 370 F.3d at 154-55, so the same Massachusetts standards for which the Plaintiffs now argue would have applied in that case if the First Circuit had credited the movant's contentions concerning Rule 64.

[4] Not coincidentally, all of the remedies enumerated in Rule 64 – "arrest, attachment, garnishment, replevin, sequestration, and other corresponding or equivalent remedies" – apply only to property over which the District Court has *in rem* jurisdiction. Certainly, if the Plaintiffs sought to attach property located within this Commonwealth, Rule 64 would apply. However, the Plaintiffs seek a generalized restraint on Mr. McMenimen, not a seizure of or encumbrance upon specific Massachusetts property. All of Mr. McMenimen's real and personal property is located outside of the Commonwealth. (McMenimen Dec. ¶ 33)

assets of a person or involves a large sum of money ($1,000,000, we think, makes the grade), the order is subject to review according to the standards generally applicable to preliminary injunctions.").

The sole appellate authority on which the Plaintiffs rely for the contrary proposition, *United States v. Rahman,* 198 F.3d 489 (4th Cir. 1999), involved the very distinction noted in *Charlesbank Equity, Fairview Mach. & Tool,* and *Grupo Mexicano* itself (*see* 527 U.S. at 325), but not present here.[5]  At issue was "whether the district court was authorized to enter a preliminary injunction freezing assets ***in furtherance of the alleged equitable relief claimed*** in an action where substantial money damages are also claimed." *Id.* at 495 (***emphasis*** added).  It was "clear" to the Fourth Circuit that *Rahman* – unlike this case – did not "present the pure money damage claim addressed in Grupo Mexicano." *Id.* at 498.  The Rule 64 discussion in *Rahman* also relied upon the very decision reversed by the Supreme Court in *Grupo Mexicano.* 198 F.3d at 500. For these reasons, *Rahman* is inapposite.

Furthermore, Rule 64 applies only to "remedies providing for seizure" of specific persons or property, not generalized impingements on the freedom of litigants against whom judgment has not been entered.  Prejudgment freeze orders of the ilk sought by the Plaintiffs are not "remedies" under Massachusetts law "providing for seizure," but instead represent an exercise of the equity jurisdiction granted to courts of the Commonwealth by its Legislature.  *See Herman v. Home Depot, Inc.,* 436 Mass. 210, 213 n.6 (2002) (equity jurisdiction comes from G.L. c. 214).  That jurisdictional grant has been construed as expansive enough to allow equitable attachments like the one sought by the Plaintiffs in this case.  *See, e.g., Ottenberg v. Vanguard Fiduciary Trust Co.,* 1995 Mass. Super. LEXIS

---

[5] Curiously, *Rahman* originated in the District of Maryland, but the Plaintiffs cite it for the proposition that "[i]n the District of Massachusetts, one such remedy is the relief the Plaintiffs seek here" (DE # 22 at 17)

716 *11 (authority to issue asset freeze injunctions rooted in Chapter 214's "general equity jurisdiction"). However, unliquidated, unsecured claims like the Plaintiffs' would not warrant such extraordinary relief, even under Massachusetts law. *Hunter v. Youthstream Media Networks, Inc.,* 241 F. Supp. 2d 52 (D. Mass. 2002) (Collings, M.J.).

Regardless, *Grupo Mexicano* makes clear that Congress' parallel grant of equity power to the Federal judiciary was significantly more limited than the Legislature's grant to the Massachusetts courts. 527 U.S. at 317-333. The Rules Enabling Act mandates that all rules of procedure prescribed by the Supreme Court "be consistent with" existing acts of Congress, 28 U.S.C. § 2071(a), and Rule 64 itself recognizes that "any existing statute of the United States governs to the extent to which it is applicable." It was just such a statute – the Judiciary Act of 1789 – on which the Supreme Court rested its *Grupo Mexicano* analysis. Nothing in the Rules Enabling Act purported to augment the equity powers Congress affirmatively conferred upon District Courts during the early days of the Republic. If Congress had intended to allow asset freeze orders of the ilk requested by these Plaintiffs, it would have specifically done so. *See, e.g.,* 15 U.S.C. §§ 77t(b), 78u(e) (allowing preliminary asset freezes in enforcement actions brought by Securities & Exchange Commission); 7 U.S.C. § 13a-1(a) (allowing preliminary asset freezes in enforcement actions brought by Commodity Futures Trading Commission). Rule 64 did not affect the availability of injunctive relief, which remains dependent on "traditional principles of equity jurisdiction" defined by the Judiciary Act of 1789. *Grupo Mexicano*, 527 Mass. at 318-19.

13-006-001

## II.    THE PLAINTIFFS DO NOT SATISFY THIS CIRCUIT'S STANDARD FOR THE ISSUANCE OF PRELIMINARY INJUNCTIONS.

Even in cases that seek more than money damages, thus removing them from the holding of *Grupo Mexicano,* the injunctive relief sought by the Plaintiffs is clearly unavailable.  "The fact that such an order may be within the raw power of a federal court does not end the inquiry."  *Charlesbank Equity,* 370 F.3d at 158.  The usual Rule 65 standards must be applied, "notwithstanding that the sought-after injunction is in the nature of an equitable attachment or freeze order."  *Id.* at 163.  While the issuance of a preliminary injunction is committed to this Court's sound direction, it must weigh four factors:  "(1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions; and (4) the effect (if any) of the court's ruling on the public interest."  *Id.,* at 162 (quoting *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,* 102 F.3d 12, 15 (1st Cir. 1996)).  As discussed more fully below, each of those factors militates against issuance of the injunction sought by the Plaintiffs.

### A.    *The Plaintiffs Will Suffer No Irreparable Injury.*

Even if *Grupo Mexicano* did not create a jurisdictional barrier to the relief sought by the Plaintiffs, their putative injuries are not "irreparable" and a proper basis for injunctive relief.  It is now beyond cavil that, because the Plaintiffs seek nothing but money damages, their putative injuries do not afford a cognizable basis for injunctive relief.  If that issue was ever unsettled in this Circuit, it was definitively resolved last year in *Charlesbank Equity,* 370 F.3d at 162-63.  *See also Inkadinkado, Inc. v. Meyer,* 2003 U.S. Dist. LEXIS 17458 *8 (O'Toole, J.) (denying asset freeze when plaintiff sought only money damages).  If the Plaintiffs prevail, an award of pecuniary damages would make them whole; their legal remedy is adequate.  *Charlesbank Equity,* 370 F.3d at 162.  That the Plaintiffs purport to fear they will be "left with nothing at the end of the day" (*see* DE #22 at 14-15) is an

argument that "can be made by virtually every person who sues another for money damages" and its "very ubiquity indicates why it cannot conceivably be enough to justify the issuance of a prejudgment injunction of this nature." *Id.* at 162-63.

Furthermore, "[t]he irreparable injury requirement" is not satisfied by "unsubstantiated allegations that a defendant may dissipate assets." *Grupo Mexicano,* 527 U.S. at 340. As in *Fidelity Summer Street Trust v. Toronto Dominion (Texas), Inc.,* 2002 U.S. Dist. LEXIS 15276 at *17 (D. Mass.) (O'Toole, J.), the Plaintiffs have not "offered any specific evidence or quantification" of the harms they allege, instead relying "on intuitions and predictions about what will occur if the preliminary injunction is not granted." The Plaintiffs make no specific showing that their alleged injury would be irreparable, and it is axiomatic that "a preliminary injunction is not warranted by a tenuous or overly speculative forecast of anticipated harm." *Ross-Simons,* 102 F.3d at 20. Unlike the defendant in *Teradyne, Inc. v. Mostek Corp.,* 797 F.2d 43, 45 (1st Cir. 1986), for example, there is no evidence that Mr. McMenimen is "actively in the process of liquidating and paying off creditors."

Moreover, as in *In re Websecure, Inc. Securities Litigation,* 1997 U.S. Dist. LEXIS 19600 at *12 (D. Mass.) (O'Toole, J.), Mr. McMenimen "is only one of several defendants from whom the plaintiffs seek to recover their damages." Mr. McMenimen himself has ample means to satisfy any judgment that might issue in this action, buttressed by ample insurance coverage. (McMenimen Dec. ¶ 31) The Plaintiffs have not shown "that they could not fully collect any damages from these sources," so "they have not shown a likelihood of irreparable harm." *Websecure,* 1997 U.S. Dist. LEXIS at *12.

There is likewise no urgency associated with the Plaintiffs' Motion. This action has been pending since July 1, 2004, but the plaintiffs elected not to serve Mr. McMenimen until December 28, 2004 (*see* DE #10 at 3-5) or seek an injunction until May 2, 2005 – a

full ten months after commencing the suit. *Cf. Charlesbank Equity,* 370 F.3d at 163 ("delay between the institution of an action and the filing of a motion for preliminary injunction, not attributable to intervening events, detracts from the movant's claim of irreparable harm"). Indeed, the harm against which the Plaintiffs purportedly seek protection is non-existent, given that the insurance policy at issue has, at the very least, the guaranteed $200,000 death benefit alleged in paragraphs 57 through 59 of the Complaint; depending upon how the markets perform, that death benefit could be considerably higher when paid, even if the plaintiffs are unsuccessful in this lawsuit.

In sum, "[a] preliminary injunction is a potent weapon that should be used only when necessary to safeguard a litigant's legitimate interests." *Charlesbank Equity,* 370 F.3d 151. As in *Charlesbank Equity,* "[t]he instant record reflects no basis for a reasoned belief that such an order is necessary." *Id.*

### B.    The Plaintiffs Will Not Succeed On The Merits.

As this Court has noted, whether the plaintiffs are likely to succeed on the merits is the "touchstone," the "main bearing wall," and the "*sine qua non*" of the preliminary injunction inquiry. *Flynn v. Burman,* 30 F. Supp. 2d 68, 75 (D. Mass. 1998) (O'Toole, J.) (quoting *Philip Morris, Inc. v. Harshbarger,* 159 F.3d 670 (1st Cir. 1998), *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,* 102 F.3d 12, 16 (1st Cir. 1996), and *Weaver v. Henderson,* 984 F.2d 11, 12 (1st Cir. 1993)). As discussed more fully below, the Plaintiffs have come up short in their effort to establish a likelihood of success on the merits; that failure "similarly condemns their request for an injunction to unsuccess." *Flynn,* 30 F. Supp. 2d at 76.

There are numerous fatal defects in the Plaintiffs' theories of liability, but the most glaring is the staleness of their claims against Mr. McMenimen. Their Complaint is emblematic of the very problems Congress and the Massachusetts Legislature sought to

prevent when they adopted the governing statutes of repose, which "although affording plaintiffs what the legislature deems a reasonable time to present their claims, … protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise." *Tagliente v. Himmer,* 949 F.2d 1, 7-8 (1st Cir. 1991) (quoting *United States v. Kubrick,* 444 U.S. 111, 117 (1979)). "Such statutes 'promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." *Burnett v. New York Central R. Co.,* 380 U.S. 424, 428 (1965). Such concerns are especially significant in this case, where the alleged "victim" passed away on April 1, 2005 – little more than three months after Mr. McMenimen was served with the Complaint but nearly seven years after the operative transaction. (DE #14)[6] Fundamental fairness and judicial economy require that the courthouse doors be closed to these Plaintiffs – each of whom "has slept on his rights." *Id.*

### 1.    The State Law Claims Are Barred By A Statute Of Repose.

Because G.L. c. 175, § 181 specifically addresses claims like those asserted by the Plaintiffs in this case, it operated to bar each of the state law causes of action pled in the Complaint – regardless of whether the Court accepts any of Mr. McMenimen's other arguments concerning the futility of those theories – nearly four years before the Plaintiffs saw fit to foist them upon the defendants and the courts. That statute provides:

---

[6] Several claims did not survive Uncle Sam's death. *See Sheldone v. Marino,* 398 Mass. 817, 819 (1986) ("actions seeking the vindication of personal rights, in the absence of a statute, do not survive while those seeking redress for damage to property do survive"); G.L. c. 228, § 1 (survival statute). The other two Plaintiffs – Aunt Pat and Attorney Passatempo – lack standing to pursue many of those claims in their own right. *See Klein v. Catalano,* 386 Mass. 701, 714 (1982) ("a third party cannot effectively vindicate the rights of others," and "a plaintiff who lacks individual standing may not assert the rights of others before the court.") However, because no representative has yet sought to substitute himself for Uncle Sam, these issues are not yet ripe for consideration. Once the Plaintiffs take a position as to which claims survive and which Aunt Pat and Attorney Passatempo have standing to assert in their own right, this issue must be revisited.

> The insured under any policy of life … insurance … who was induced to procure it by any [misrepresentations to insured] by an officer or agent of the company issuing or executing it may recover from such company all premiums paid on such policy or contract less any indebtedness to the company thereon or secured thereby and less any payments otherwise made by the company thereon, in an action brought within two years after the date of issue thereof.

G.L. c. 175, § 181.  Mr. McMenimen is alleged to have been an agent of the company issuing the "Flexible Premium Adjustable Variable Life" policy ("Policy") at issue in this lawsuit (*see* Complaint ¶¶ 4, 8, 83, 88, 98, 106, 111, 115, 120, 127, 133, 138), so he is certainly within the class of persons the Legislature sought to protect.  Accordingly, not only does the statute essentially limit the Plaintiffs' monetary "upside" to a mere fraction of what they claim in their Complaint, but it also makes clear that any civil action should have been commenced on or before July 28, 2000.

Because G.L. c. 175, § 181 runs from a definitely established event – the policy's July 28, 1998 "date of issue" – it is a statute of repose, not a statute of limitations, and the date on which the Plaintiffs learned of their putative causes of action is of no consequence. *Nissan Motor Corp. v. Commissioner of Revenue,* 407 Mass. 153, 157-58 (1990).  Such a statute "completely eliminates a cause of action" after the specified period expires. *Klein,* 386 Mass. at 708.  "The injury need not have occurred, much less have been discovered" to extinguish an otherwise viable claim. *Id.* at 702.  The statute sets:

> an absolute time limit on the liability of those within its protection and to abolish a plaintiff's cause of action thereafter, even if the plaintiff's injury is not discovered, until after the statute's time limit has expired.

*McGuinness v. Cotter,* 412 Mass. 617, 622 (1992).

The essence of the Plaintiffs' Complaint is fraudulent inducement of their purchase of the Policy, and the suit was not commenced before July 28, 2000, so G.L. c. 175, § 181 bars their state law claims.  That the Plaintiffs purport to shoehorn those claims into various statutory, contract and tort theories has no bearing on which statute of limitations or repose to apply.  Nor does it matter that they elected not to seek recovery under this most specific

- 11 -

of statutes. Litigants cannot "escape the consequences of a statute of repose" merely by affixing a different label to their claims; the Court "must look to the 'gist of the action.'" *Anthony's Pier Four, Inc. v. Crandall Dry Dock Engineers, Inc.*, 396 Mass. 818, 823 (1986) (quoting *Hendrickson v. Sears,* 365 Mass. 83, 85 (1974)). "[T]he essential nature of the right asserted" determines the appropriate statute. *Micera v. Neworld Bank,* 412 Mass. 728, 731 (1992). The general statutes of limitations for contract, tort and consumer protection claims must yield to the specific statute of repose promulgated for situations like this. *Lavecchia v. MBTA,* 441 Mass. 240, 243 (2004).

Though not presented with the precise issue of whether G L. c. 175, § 181 is a statute of repose, as opposed to a statute of limitations, *Slingsby v. Metropolitan Ins. Co.,* 2001 Mass. App. Div. LEXIS 7, is otherwise on all fours with this case. In *Slingsby,* an agent of the defendant insurance company sold the plaintiff three variable life policies. The plaintiff thereafter asserted several tort and statutory theories of liability against the insurer. A justice of the Massachusetts District Court dismissed the claims pursuant to G L. c. 175, § 181, and – holding that "[i]t is the gravamen of the complaint" (and not the labels placed upon claims by the plaintiff) that warrants application of that statute – the District Court's Appellate Division affirmed the dismissal. *Slingsby,* 2001 Mass. App. Div. LEXIS at 5. The same outcome resulted when similar claims were asserted in *Grande v. PFL Life Ins. Co.,* 2000 Mass. App. Div. LEXIS 96 *5-6. See also Loguidice v. Metropolitan Ins. Co.,* 336 F.3d 1, 4-6 (1st Cir. 2003) (affirming summary judgment based on *Grande* and *Slingsby* without reaching issue of whether G.L. c. 175, § 181 controlled); *Wilson Farm, Inc. v. Berkshire Life Ins. Co.,* 2002 Mass. Super. LEXIS 376 *19 n.4 (Brassard, J.) (applying G L. c. 175, § 181 to tort claim without reaching issue of whether it is a statute of repose).

Because G.L. c. 175, § 181 is a statute of repose, circumstances that might toll a statute of limitations, like fraudulent concealment, have no bearing on its application. *Sullivan v. Iantosca,* 409 Mass. 796, 798 (1991). Insofar as the Plaintiffs' state law claims are concerned, G.L. c. 175, § 181 forbids the Court from considering whether they "did not discover or reasonably could not have discovered" the harms they allege before the two-year period specified in the statute of repose had expired, and neither the fraudulent concealment provisions of G.L. c. 260, § 12 nor any related common law estoppel rule can prevent the statute of repose from barring the Plaintiffs' claims. *Sullivan,* 409 Mass. at 798; *Lemrise v. Koska,* 1996 Mass. Super. LEXIS 169 at *6 (Garsh, J.).

Even if a statute of repose could be tolled under G.L. c. 260, § 12, moreover, the general rule is that the defendant must have actively concealed the cause of action for a claim to be tolled, and Mr. McMenimen did no such thing. (McMenimen Dec. ¶¶ 19-24) Breach of a fiduciary duty of disclosure "is a substitute for the active fraud normally required to constitute fraudulent concealment within the Massachusetts tolling statute," *Burns v. Massachusetts Institute of Technology,* 394 F.2d 416, 419 (1st Cir. 1968), but Mr. McMenimen was not the fiduciary of these Plaintiffs. (McMenimen Dec. ¶¶ 6-18) It was Cousin Sam – and not Mr. McMenimen – who "helped [his] parents with respect to their decisions about [his] father's pension options and obtaining insurance so as to provide for [his] mother upon [his] father's death." (DE #22 at ex. B ¶ 2) Cousin Sam purported to "communicate on [his parents'] behalf" with Mr. McMenimen "in connection with the events underlying the Complaint." (*Id.* ¶¶ 2, 4). While making florid assertions about Uncle Sam's "limited financial planning and investing experience" (Complaint ¶ 41) – Cousin Sam's extensive experience and expertise with respect to such matters belies their arguments. Given that Cousin Sam – an attorney, experienced financial professional, and licensed agent of the John Hancock Variable Life Insurance Company (Corbett Dec. ex. A,

13-006-001

C & E) – represented the Plaintiffs in their dealings with Mr. McMenimen, they could not, as a matter of law, have reasonably relied on the alleged nondisclosures. *Tagliente,* 949 F.2d at 14.

In any event, as this Court has noted, "a [f]iduciary's lie or failure to disclose significant information is relevant only if it actually conceals an injury from the plaintiff." *Hodas v. Sherburne, Powers & Needham, P.C.,* 938 F. Supp. 60, 64 (D. Mass. 1996) (O'Toole, J.), *aff'd* 114 F.3d 1169 (1st Cir. 1997). There is no tolling if a plaintiff "had knowledge of the facts or a means of discovering them under circumstances which should have put him on inquiry." *Falk v. Levine,* 66 F. Supp. 700, 703 (D. Mass. 1946). These plaintiffs had such knowledge even before the Policy was issued. Attorney Passatempo acknowledged on July 19, 1998 that he had received a copy of a policy illustration dated July 16, 1998 – an illustration which referenced a "Flexible Premium Adjustable Variable Life" policy with a death benefit of $200,000 and confirmed his understanding "that any non-guaranteed elements illustrated are subject to change and could be higher or lower." (McMenimen Dec. Ex. A at 6) In that selfsame document, Attorney Passatempo declared that "Frederick V. McMenimen III has told me [those elements] are not guaranteed." (*Id.*)

When this illustration was delivered to Attorney Passatempo, the Plaintiffs were on notice of their putative injury, "because all they had to do was read it to know that it was something other than what they had anticipated." *Fay,* 307 F. Supp. 2d at 291. *See also Lewis v. Dime Sav. Bank of NY,* 1996 Mass. Super. LEXIS 79 at *11-12 (Neel, J) (before expiration of statute of limitations, plaintiffs "had information from which, upon inquiry, they would have been able to" ascertain alleged fraud). The cover page of that illustration also made this disclaimer:

> The assumed hypothetical rates of return shown are illustrative
> only and should not be deemed a representation of past or future
> investment rates of return.  Actual investment rates of return may
> be more or less than those shown and will depend on a number
> of factors, including the premium allocation chosen by the
> policyholder.  The death benefits, policy account values and cash
> surrender values for a policy would be different from those
> shown if the actual rates of return averaged the illustrated return
> percentages over a period of years, but fluctuated above or below
> those averages for individual policy years.

(McMenimen Dec. Ex. A at 1)  Even if he failed to read the illustration and disclaimer,

Attorney Passatempo is charged with knowledge of their contents.  *Kravetz v. United States*

*Trust Co.,* 941 F. Supp. 1295, 1305 (D. Mass. 1996) (Wolf, J.).  Moreover, as a lawyer with

an MBA (Corbett Dec. ex. B & D), Attorney Passatempo surely appreciated the meaning

and significance of his acknowledgments and the quoted disclaimer, as well as the

attributes of a variable life insurance policy.  *See also Romani v. Shearson Lehman Hutton,*

929 F.2d 875, 879 (1st Cir. 1991) (such documents "clearly 'bespeak caution'" and "are not

the stuff of which securities fraud claims are made); *J. Geils Band Employee Benefit Plan*

*v. Smith Barney Shearson, Inc.,* 76 F.3d 1245, 1256 (1st Cir.), *cert. denied,* 519 U.S. 823

(1996) (receipt of prospectuses put plaintiffs on inquiry notice of alleged

misrepresentations).

Even if Mr. McMenimen had been the Plaintiffs' fiduciary, moreover, they had a

duty to apply their common sense to the available facts.  *Maggio v. Gerard Freezer & Ice*

*Co.,* 824 F.2d 123, 129 (1st Cir. 1987).  The Plaintiffs' own complaint further establishes

beyond any good faith dispute that, soon after the Policy was issued, they possessed

sufficient information for the statute to start running.  Because the Plaintiffs allege (albeit

falsely (McMenimen Dec. ¶ 17)) that "[t]he final Policy and its terms were never delivered

to the Plaintiffs", and that despite requests "[o]n numerous occasions . . . for a copy of the

Policy . . . . [n]one of the Plaintiffs ever received a copy of the Policy from Mr.

McMenimen or from any other Defendant" (Complaint ¶¶ 51-52), "[i]t would be

- 15 -

incredible" to assume that the Plaintiffs – who could have approached the insurer directly after requests for copies of the Policy were allegedly rebuffed – could not have verified its contents. *Micromuse, Inc. v. Micromuse, PLC,* 304 F. Supp. 2d 202, 212 (D. Mass. 2004) (Stearns, J.). The Plaintiffs' complete inaction for a half-decade after facing those "great glowering clouds" was not "reasonable diligence," preventing them from successfully arguing that Mr. McMenimen's alleged deceptions tolled the statute of repose. *Kennedy v. Josephthal & Co., Inc.,* 814 F.2d 798, 802-03 (1st Cir. 1987).

 2. **The Federal Claims Are Barred By A Common Law Repose Rule.**

The Plaintiffs' argument that the statute of repose does not bar their stale claims under the Federal securities laws is likewise wrong is grossly misplaced. They essentially argue that every post-transaction falsehood by a potential defendant starts the applicable limitations or repose period anew. The current statute applicable to Federal securities fraud claims, 28 U.S.C. § 1658(b), specifically sets the repose date as "5 years after [a] violation" – not 5 years after an alleged attempt to conceal a potential cause of action. As the Supreme Court made clear less than two months ago, there are six necessary elements of a private fraud claim under the Federal securities laws "(1) *a material representation (or omission)*…; (2) *scienter...;* (3) *a connection with the purchase or sale of a security...;* (4) *reliance...;* (5) *economic loss...*; and (6) *loss causation...*" *Dura Pharmaceuticals, Inc. v. Broudo,* 125 S. Ct. 1627, 1631 (2005) (*emphasis* in original). Of particular emphasis in that decision were the elements of "economic loss" and "loss causation" – "a causal connection between the material misrepresentation and the loss." *Id.* Even if the Plaintiffs could establish the first four elements with respect to the post-1998 statements, they cannot establish the last two. It is therefore unsurprising that the cases cited by the Plaintiffs refer to actionable misconduct, not alleged concealment of existing claims. *See also Klehr v.*

13-006-001

*A.O. Smith Corp.,* 521 U.S. 179, 188 (1997) (rejecting similar "last predicate act" tolling argument in civil RICO case).

In any event, that statute of repose is less than 3 years old, having been adopted as Section 804 of the comprehensive Sarbanes-Oxley Act of 2002, Pub. L. 107-204, and the Plaintiffs' claims under the Federal securities laws had been time-barred for a year before Sarbanes-Oxley was enacted.  Before July 2002, every lawsuit instituted pursuant to Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10(b)(5), had to be "commenced within one year after the discovery of the facts constituting the violation and within three years after such violation."  *Lampf, Pleva, Lipkind, Prupis & Pettigrow v. Gilbertson,* 501 U.S. 350, 364 (1991).  "Because the purpose of the 3-year limitation is clearly to serve as a cutoff," the Supreme Court held "that tolling principles do not apply to that period."  *Id.* at 363.  When it enacted Sarbanes-Oxley, Congress did not intend to revive actions that were already time-barred, and its extended limitations and repose periods are not applied retroactively.  *Swack v. Credit Suisse First Boston,* 2004 U.S. Dist. LEXIS 22749 at *18 (D. Mass.) (Woodlock, J.).  The alleged violation took place on July 28, 1998, the date of the Policy's issuance, so *Lampf, Pleva* operated to bar the Plaintiffs' Federal securities fraud claims on July 28, 2001.

### C.     *The Requested Injunction Would Seriously Injury Mr. McMenimen.*

"At the present time, and on the information presently available," the requested injunction "is too drastic a remedy" – especially given that the Plaintiffs have not offered anything more than conjecture and "fears" of irreparable harm.  *Websecure,* 1997 U.S. Dist. LEXIS 19600 at *12.  This lawsuit, based as it is on false, legally-insufficient allegations, has already caused Mr. McMenimen serious harm.  (McMenimen Dec. ¶¶ 26-30)  If

13-006-001

granted, the asset freeze requested by the Plaintiffs would do additional violence to his

business interests.  (*Id.* ¶ 35)

> **D.    *No Public Interest Would Be Served By The Requested Injunction.***

As in *Websecure,* "no significant public interest" would be affected adversely if

the Court, as it should, denies the Plaintiffs' motion.  1997 U.S. Dist. LEXIS at *13.  In

contrast, one of the most fundamental – even sacred – interests recognized in our

Republic would be subverted by the requested asset freeze.  "No person shall be . . .

deprived of . . . property, without due process of law."  U.S. CONST. amdt. V.  Yet that is

precisely what the requested asset freeze would effectuate – a deprivation of Mr.

McMenimen's property rights, before there has been any finding of liability, without any

lien or equitable claim by the Plaintiffs to that property, and despite clear precedent

(including *Grupo Mexicano* and *Charlesbank Equity*) prohibiting such an imposition.

CONCLUSION

For the foregoing reasons, Mr. McMenimen respectfully requests that the Court

deny the Plaintiffs' motion.

Respectfully submitted,

FREDERICK V. MCMENIMEN, III

By his attorney,

*/s/ William P. Corbett, Jr.*
_____
William P. Corbett, Jr. (BBO #561201)
THE CORBETT LAW FIRM
  *A Professional Corporation*
85 Exchange Street, Suite 326
Lynn, Massachusetts 01901-1429
(781) 596-9300

Dated:  June 1, 2005

13-006-001