UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| RONALD P. PASSATEMPO, Trustee of the Samuel Pietropaolo Irrevocable Trust, *et al.*, | ) ) ) ) | |
| *Plaintiffs,* | ) ) | Case No. 05-CV-10118-GAO |
| v. | ) ) | |
| FREDERICK V. MCMENIMEN III, *et al.*, | ) ) | |
| *Defendants.* | ) ) | |

**DECLARATION OF FREDERICK V. MCMENIMEN III**

Pursuant to this 28 U.S.C. § 1746, I make the following declaration in opposition to Plaintiffs' Amended Motion for Preliminary Injunction ("Motion"):

1.  I am a defendant in the captioned action, and I welcome the opportunity – at long last – to refute some of the false accusations that have been made against me. For the sake of brevity, however, I must confine this Declaration to the facts and circumstances most germane to the Motion. Neither the Court nor any of the parties should construe my silence with respect to any allegation made in the First Amended Complaint ("Complaint"), but not specifically addressed in this Declaration, as a concession that such allegation is true or accurate. The fact of the matter is that so much of the 25-page Complaint is untrue that I must limit this Declaration to the matters immediately at hand.

2. For 16 years, I have been a life and accident insurance agent licensed by the Commonwealth's Division of Insurance, and I have also been a representative registered with the National Association of Securities Dealers, Inc. ("NASD"). I also have several other business and professional interests that do not require me to be licensed by or registered with any regulator.

3. Before this civil action was filed, I had never been named as a defendant in any lawsuit, no regulator had ever taken action against me, and no client had ever alleged that I engaged in malfeasance or misconduct.

4. I am the son of Frederick V. McMenimen, Jr., whose sister, Patricia Pietropaolo ("Aunt Pat"), and late brother-in-law, Samuel Pietropaolo ("Uncle Sam"), were named as plaintiffs in this lawsuit.

5. The other plaintiff, Ronald Passatempo ("Attorney Passatempo"), is not a family member. Attorney Passatempo is a longtime friend and law school classmate of another Samuel Pietropaolo ("Cousin Sam"), the son of Aunt Pat and Uncle Sam. I am informed and believe that Attorney Passatempo was designated as the trustee of the Irrevocable Trust which came to own the "Flexible Premium Adjustable Variable Life" policy ("Policy") at issue in this litigation.

6. The Complaint's pervasive implication that I somehow took advantage of the "limited financial planning and investing experience" (*see* Complaint ¶ 41) of my Uncle Sam and Aunt Pat is patently misleading. I never dealt directly with Aunt Pat in connection with the Policy. Nor did I ever deal directly with Uncle Sam concerning the substantive issues alleged in that pleading; my only pertinent contact with Uncle Sam came when I witnessed his signature on the Policy's application. Uncle Sam verified that Cousin Sam had explained the Policy to him, and that he fully understood how it would work.

13-006-001

7. Instead, it was another Samuel Pietropaolo ("Cousin Sam"), the son of Aunt Pat and Uncle Sam, who was the driving force in the operative transaction. Before he was admitted to the Bar in 1996, Cousin Sam worked in the financial services industry. For approximately one year immediately preceding his admission, Cousin Sam worked under my supervision in a branch office of John Hancock Financial Services ("Hancock"). Cousin Sam had a keen understanding of financial matters before joining Hancock, and while he was with that firm, his expertise broadened. He became intimately familiar with all lines of life and accident coverage – including variable life policies (of which the Policy is one) and "pension maximization". Cousin Sam sought licensure by the Commonwealth's Division of Insurance as a life and accident insurance agent; he passed the necessary examinations; and he thereafter became a licensed agent of two Hancock subsidiaries – including the John Hancock Variable Life Insurance Company.

8. It was Cousin Sam who approached me just before Uncle Sam's retirement with the specific intention of rolling his father's pension and existing life insurance policies into a single variable life insurance policy to maximize payments to Aunt Pat if Uncle Sam were to predecease her. Because of Cousin Sam's vast experience and considerable expertise, I did not question his determination to pursue such a strategy. Nor did Cousin Sam ever seek any advice or recommendations from me. My role in the procurement of the Policy was simply as a conduit between the relevant insurers (of which there were three) and Cousin Sam, who – while still a licensed producer – was no longer employed by Hancock or any other insurance company, so he could not procure the Policy himself. As an accommodation, I served as the intermediary between Cousin Sam and the insurers, and I acted at Cousin Sam's direction. I was affiliated with New England Advisory Group, LLC ("NEAG") at the time, and I was an independent broker for several insurance companies.

9.   Neither Cousin Sam nor any of the plaintiffs reposed any trust or confidence in me concerning the procurement of the Policy.  None of them ever told me that they had done so, nor would I have accepted that responsibility.  Cousin Sam was more than capable of advising his parents concerning their financial affairs.

10.  Cousin Sam asked me to procure the Policy at the height of the stock market "bubble" of the late 1990s.  It is my understanding, based upon conversations with Cousin Sam, that he sought to maximize the value of Uncle Sam's pension and existing life insurance policies by procuring the variable Policy, the value of which would be partly based on equity securities.  In pursuing that strategy, however, Cousin Sam not only ensured that the Policy could benefit from continued increases in the stock market, but he also left his parents exposed to the downside risk inherent in the capital markets.

11.  At the time, two other policies were applied for.  One was with Guardian, and the other was with Mutual of New York ("MONY").  Guardian never issued a policy, and Attorney Passatempo declined the MONY policy – which had lower premiums and a higher guaranteed death benefit, but no "upside" contingent on market performance.  Unlike the Policy that was ultimately procured for Uncle Sam at the direction of Cousin Sam, the MONY policy was not variable.

12.  Market conditions did not keep pace with Cousin Sam's expectations.  Less than a year after the Policy was issued, the NASDAQ crashed, and two years later, corporate scandals and the attacks of September 11 further disrupted the stock market.

13.  As indicated in footnote 1 of the Memorandum of Law in Support of Plaintiffs' Amended Motion for Preliminary Injunction ("Brief"), the plaintiffs claim at least $900,000.00 in damages from me.  However, the commission sent to me after the Policy was issued was less than one percent of that amount (approximately $5,000.00).  To add insult to injury, because Cousin Sam was having financial difficulties at the time, I sent

him the majority of that commission. I never received any renewal commissions. My net compensation in connection with the Policy was less than $1,000.00.

14.   I never instructed any of the plaintiffs to sign "certain blank forms" and return them to me to complete their applications. That was and is not my practice, and Cousin Sam was certainly aware that it would be improper to do so. Indeed, when Cousin Sam worked for me at Hancock, company policy expressly prohibited agents from soliciting forms signed in blank, and he was trained with respect to that policy. Furthermore, Cousin Sam and Attorney Passatempo are both lawyers, so they presumably were aware that it was improper to submit blank documents in the manner they now allege.

15.   I made none of the misrepresentations concerning the substance of the Policy alleged by the plaintiffs.

16.   Indeed, as evidenced by the July 16, 1998 policy illustration signed by Attorney Passatempo (a true copy of which is appended to this Declaration as Exhibit A), Attorney Passatempo acknowledged on July 19, 1998 that he had received a copy of that illustration – an illustration which referenced a "Flexible Premium Adjustable Variable Life" policy with a death benefit of $200,000 and confirmed his understanding "that any non-guaranteed elements illustrated are subject to change and could be higher or lower." In that same document, Attorney Passatempo declared that I told him that the variable elements of the Policy "are not guaranteed."

17.   To my knowledge, Uncle Sam and Attorney Passatempo received copies of the Policy soon after it was issued on July 28, 1998. Neither Cousin Sam nor any of the plaintiffs ever requested a copy directly from me, nor did I ever refuse or disregard such a request. I left NEAG in the autumn of 1998 to assume a position with a company outside of the financial services industry. NEAG remained responsible for servicing the Policy after my departure, pursuant to company policy.

13-006-001

18.     Contrary to paragraph 47 of the Complaint, I never "led the Plaintiffs to believe that [I] would have continuing involvement in managing and monitoring the Policy."

19.     Nor is it true that "for nearly six years" I "actively concealed" from the plaintiffs "the fact that the Policy was worth only $200,000." (Brief at 4)  From July 1998 through April 2003, at which time Cousin Sam approached me to solicit assistance in increasing the Policy's death benefit, I gave no thought whatsoever to the Policy, and I never discussed it with Cousin Sam or any of the plaintiffs during that period.

20.     The plaintiffs received regular quarterly statements from Nationwide Provident, the Policy's issuer, detailing the Policy's value.  In contrast, I received no such statements.  Their knowledge concerning the value of the Policy was superior to mine.  I had no involvement at that time.

21.     Paragraph 46 of the Complaint falsely implies that I pocketed some or all of the premiums paid for the Policy.  Although Attorney Passatempo sent those premiums to my office, all checks were payable to the insurer, to which I forwarded the payments.  Again, my role was only as an intermediary, accommodating family members.

22.     The plaintiffs' contention that I falsified documents – with their only evidence for that allegation being an affirmative defense asserted by one of my co-defendants – is nonsensical.  One the one hand, they vouch for that person's credibility when it serves their interest with respect to the documents, but on the other hand, they accuse him of complicity in fraud.

23.     The fact of the matter is that the documents at issue were included in a file I obtained from defendant NEAG after Cousin Sam began to make inquiries about the Policy in 2003 and 2004 – long before I even suspected that I was in the plaintiffs' cross-hairs.  Because so much time had passed since the Policy was issued, few relevant documents

remained in my possession, so I requested NEAG's file. I gave Cousin Sam copies of all relevant documents I obtained, including those the plaintiffs contend that I forged.

24. The discrepancies in the dates on e-mails appended to the complaint appear to be innocuous products of a computer's miscalibrated clock. They are not forgeries. It would defy logic for me to provide documents to Cousin Sam that were dated AFTER the date on which I gave them to him. Even if I had been so inclined – and I was not – such forgeries would have served no useful purpose for me.

25. I share what Cousin Sam and the plaintiffs depict as their concern for the well-being of Aunt Pat now that Uncle Sam has passed away, but I have done nothing that requires me to be her guarantor.

26. Nor have I done anything to deserve the negative effects this lawsuit has had on my family and business relationships.

27. Ironically, although the plaintiffs accuse me of intentionally inflicting emotional distress upon them, it is they who have done so to me. By making their false claims against me – loosely tossing about allegations of criminal misconduct – their conduct has been extreme and outrageous, and the distress they have caused me is severe.

28. This lawsuit is the only blemish on my file in the Central Registration Depository ("CRD") maintained by the NASD. The CRD is often used by potential clients to investigate financial services professionals with which they are considering doing business. Until I am exonerated, NASD Rule 2130 provides that this lawsuit will remain in my CRD file. It is impossible to assess how many potential clients will decide not to do business with me because of the plaintiffs' false allegations.

13-006-001

29. The plaintiffs' attorneys have even informed at least one current client – a client who had nothing to do with the Policy or the other facts underlying this civil action – about this lawsuit and the allegations that have been made against me. Because that client was one I had referred to Cousin Sam for legal advice, I believe that it was he who instructed counsel to contact that client, and that he intended that contact as a means of coercing me to capitulate to the plaintiffs' demands.

30. I fear that the plaintiffs and Cousin Sam will continue to interfere with my business relationships if this lawsuit is not dismissed presently.

31. The instant Motion is yet another abusive tactic by the plaintiffs. Even in the unlikely event that the plaintiffs prevail on the merits of this lawsuit, I have ample ability to satisfy any judgment that might be entered. Throughout my career in the insurance and financial services industries, moreover, I have been required to carry – and have carried – errors and omissions coverage having policy limits in excess of the amount the plaintiffs seek to freeze with the injunction they request. I have not made – nor do I intend to make – any extraordinary transfers of my assets. I am comfortably solvent, and I do not foresee any circumstances under which I might become insolvent – even if the plaintiffs were somehow able to prevail in this lawsuit.

32. Aunt Pat and Cousin Sam both know that I have ample means to satisfy any such judgment, and I am informed and believe that Attorney Passatempo has similar knowledge.

33. Moreover, I am a New Hampshire resident, and none of my personal or real property is located in the Commonwealth of Massachusetts.

34. None of the plaintiffs has a lien on or equitable interest in any of my personal or real property.

35. If the requested injunction is entered, my business will be significantly disrupted. Most significantly, lenders could deem such an injunction to be an event of default with respect to bank loans and operating lines of credit used by my businesses. The results for my businesses could be catastrophic.

36. For the foregoing reasons, I urge the Court – even if it does not grant my pending motion to dismiss the captioned action – deny the Plaintiffs' Amended Motion for Preliminary Injunction.

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct. Executed on June 1, 2005

_____
FREDERICK V. MCMENIMEN, III

- 9 -

13-006-001

*Exhibit A*

**Provident Mutual Life Insurance Company**

Provident Mutual Life Insurance Company
A Life Insurance Policy Illustration
Flexible Premium Variable Life
*OptionsPlus*

Samuel Pietropoalo

July 16, 1998

*Issued by:*
Provident Mutual Life Insurance Company
1050 West Lakes Drive
Berwyn, PA 19312-2405

*Presented by:*
Frederick V. McMenimen III
28 Front Street
Exeter, NH 03833

> The assumed hypothetical investment rates of return shown are illustrative only and should not be deemed a representation of past or future investment rates of return. Actual investment rates of return may be more or less than those shown and will depend on a number of factors, including the premium allocation chosen by the policyholder. The death benefits, policy account values and cash surrender values for a policy would be different from those shown if the actual rates of return averaged the illustrated return percentages over a period of years, but fluctuated above or below those averages for individual policy years. No representation can be made by Provident Mutual Life Insurance Company or 1717 Capital Management Company that these assumed investment rates of return can be achieved for any one year or sustained over any period of time.

**Provident Mutual Life Insurance Company**

## OPTIONSPLUS
## FLEXIBLE PREMIUM ADJUSTABLE VARIABLE LIFE

Samuel Pietropoalo                                 Male Standard, Age 69

$200,000 Flexible Premium Adjustable Variable Life

| | |
|---|---:|
| Initial Monthly Premium | $1,416.66 |
| Rollover Deposit | $20,000.00 |
| Total Premium Deposit at Issue | $21,416.66 |

| | | | Current Charges | | |
|---|---|---|---|---|---|
| | | | 12.00% Gross (10.88%Net) Hypothetical Investment Return | | |
| End of Year | Age | Planned Annual Premium | Policy Value | Cash Surrender Value | Death Benefit |
|---|---|---|---|---|---|
| 1 | 70 | 37,000 | 28,207 | 20,625 | 200,000 |
| 2 | 71 | 17,000 | 33,115 | 26,513 | 200,000 |
| 3 | 72 | 17,000 | 39,635 | 32,459 | 200,000 |
| 4 | 73 | 17,000 | 45,527 | 38,351 | 200,000 |
| 5 | 74 | 17,000 | 50,617 | 43,441 | 200,000 |
| | | 105,000 | | | |
| 6 | 75 | 17,000 | 54,860 | 47,684 | 200,000 |
| 7 | 76 | 1,042 | 40,787 | 35,046 | 200,000 |
| 8 | 77 | 13,563 | 34,753 | 30,448 | 200,000 |
| 9 | 78 | 17,000 | 27,983 | 25,112 | 200,000 |
| 10 | 79 | 17,000 | 16,396 | 14,961 | 200,000 |
| | | 170,605 | | | |
| 11 | 80 | 17,000 | 1,896 | 1,896 | 200,000 |
| | | 187,605 | | | |

# Provident Mutual Life Insurance Company

## OPTIONSPLUS
## FLEXIBLE PREMIUM ADJUSTABLE VARIABLE LIFE

**Samuel Pietropoalo**                           **Male Standard, Age 69**

$200,000 Flexible Premium Adjustable Variable Life
| | |
|---|---:|
| Initial Monthly Premium | $1,416.66 |
| Rollover Deposit | $20,000.00 |
| Total Premium Deposit at Issue | $21,416.66 |

| | | | Guaranteed Charges | | | Current Charges | | |
| | | | 0.00% Gross (-1.33% Net) Hypothetical Investment Return | | | 12.00% Gross (10.69% Net) Hypothetical Investment Return | | |
| End of Year | Age | Planned Annual Premium | Policy Value | Cash Surrender Value | Death Benefit | Policy Value | Cash Surrender Value | Death Benefit |
|---|---|---|---|---|---|---|---|---|
| 1 | 70 | 37000 | 11570 | 5989 | 200000 | 26207 | 20625 | 200000 |
| 2 | 71 | 17000 | 1390 | 0 | 200000 | 33115 | 26513 | 200000 |
| 3 | 72 | 17000 | 0 | 0 | 0 | 39635 | 32459 | 200000 |
| 4 | 73 | 17000 | 0 | 0 | 0 | 45527 | 38351 | 200000 |
| 5 | 74 | 17000 | 0 | 0 | 0 | 50617 | 43441 | 200000 |
| 6 | 75 | 17000 | 0 | 0 | 0 | 54860 | 47684 | 200000 |
| 7 | 76 | 1042 | 0 | 0 | 0 | 40787 | 35046 | 200000 |
| 8 | 77 | 13563 | 0 | 0 | 0 | 34753 | 30448 | 200000 |
| 9 | 78 | 17000 | 0 | 0 | 0 | 27983 | 25112 | 200000 |
| 10 | 79 | 17000 | 0 | 0 | 0 | 16396 | 14961 | 200000 |
| 11 | 80 | 17000 | 0 | 0 | 0 | 1896 | 1896 | 200000 |

### Summary Values at Age(s) 70

| 1 | 70 | 37000 | 11570 | 5989 | 200000 | 26207 | 20625 | 200000 |

# Provident Mutual Life Insurance Company

## OPTIONSPLUS
## FLEXIBLE PREMIUM ADJUSTABLE VARIABLE LIFE

Presented by:  Frederick V. McMenimen III.
Prepared for:   Samuel Pietropoalo, Male Standard, age 69, Special Premium Class F.

Face amount: $200,000                                    Premium Mode: Monthly (APP)
Planned Monthly Premium: $1,416.66                        Riders: None

This personalized sales illustration has been produced especially for you based on the information you have provided as to age, sex, premium classification, and insurance needs.

The illustration shows how the policy account values, cash surrender values and death benefits change with (1) the investment experience of the contract based on hypothetical gross annual investment return assumptions and (2) guaranteed vs. Current charges and deductions. The maximum cost of the insurance rates are based on the Commissioners 1980 Standard Ordinary Smoker or Nonsmoker Mortality Table.

The policy values assume a premium allocation strategy of:

**Sentinel Advisors Growth   100%**

The allocation of cash values among the separate accounts or guaranteed account affects policy values, since the charges assessed against each account vary.

The columns under the heading "Guaranteed" assume that throughout the life of the policy, the monthly charge for cost of insurance is based on the maximum level permitted under the Policy (based on the 1980 CSO Smoker/Nonsmoker Table), a Premium Expense Charge of 5.00%, maximum monthly administrative fee of $12 and an initial monthly administrative charge of $17.50 for the first 12 months; the columns under the heading "Current" assume that throughout the life of the Policy, the monthly charge for cost of insurance is based on the current cost of insurance rate, a Premium Expense Charge of 3.50%, current monthly administative fee of $7.50 and an initial monthly administrative charge of $17.50 for the first 12 months.

**Provident Mutual Life Insurance Company**

## OPTIONSPLUS
## FLEXIBLE PREMIUM ADJUSTABLE VARIABLE LIFE

The amounts shown in all tables reflect an averaging of certain other charges described below that may be assessed under the Policy, depending upon how premiums are allocated. These other charges are not applicable to the Guaranteed Account. The total of the asset charges reflected in the Current and Guaranteed illustrations, including the mortality and expense risk charge, is 1.18% and 1.33%, respectively. This total is based on the current level of charges as follows:

- A daily charge for mortality and expense risks equivalent to an annual rate of 0.75% (could increase to 0.90% which is reflected in the Guaranteed Illustrations).

- The level of investment advisory fees paid by the Portfolios of the Funds which are indirectly borne by the assets of the Separate Accounts chosen.

- Expenses charged against the Portfolios of the Funds which are indirectly borne by the assets of the Separate Accounts chosen.

- A transaction charge against the Zero Coupon Bond Separate Account (if chosen) of 0.25% for Current illustrations to recover the transaction charge paid by PMLIC (could increase to 0.50% which is reflected in the Guaranteed Illustrations).

The policy loan rate charged is 6%. When a policy loan is taken, the collateral for the policy loan is transferred to the Loan Account. The Loan Account earns interest at a current rate of 4.5%. Beginning at the later of the tenth policy year or the anniversary nearest age 65, the current interest rate credited to the Loan Account will increase to 5.5%. The interest rate on the Loan Account is guaranteed to be at least 4%.

The hypothetical values shown in the tables do not reflect any charges for federal income taxes, since Provident Mutual is not currently making such charges. However, if in the future such charges are made, the gross annual investment rate of return would have to exceed the stated investment rates by a sufficient amount to cover the tax charges in order to produce death benefits, policy account values, and cash surrender values illustrated.

The assumed hypothetical investment rates of return shown are illustrative only and should not be deemed a representation of past or future investment rates of return. Actual investment rates of return may be more or less than those shown and will depend on a number of factors, including the premium allocation chosen by the policyowner. The death benefits, policy account values, and cash surrender values for a policy would be different from those shown if the actual rates of return averaged the illustrated return percentages over a period of years, but fluctuated above or below those averages for individual policy years. No representation can be made by Provident Mutual Life Insurance Company or 1717 Capital Management Company that these assumed investment rates of return can be achieved for any one year or sustained over any period of time.

**Provident Mutual Life Insurance Company**

## OPTIONSPLUS
## FLEXIBLE PREMIUM ADJUSTABLE VARIABLE LIFE

You have elected the Accelerated Death Benefit Rider. There is no premium charge for this optional rider. Either of two events can trigger payment of the benefit under the rider. These are a terminal illness or permanent confinement in a nursing care facility. In either event, the policyowner can elect to have a portion of the death benefit paid as a lump sum or in twelve or twenty-four level monthly payments. For more details, see the Required Disclosure Form and the Accelerated Death Benefit Rider brochure.

This proposal may not fully reflect your actual tax situation. We suggest that you consult your professional tax advisors regarding the interpretation of current and proposed tax laws.

**ILLUSTRATIONS MUST BE ACCOMPANIED OR PRECEDED BY A CURRENT PROSPECTUS.** You should refer to the prospectus for additional information. The Prospectus includes illustrations of Death Benefits, Cash Surrender Values, and Accumulated Premiums (accumulated at 5% interest compounded annually).

This product is underwritten by Provident Mutual Life Insurance Company and distributed by 1717 Capital Management Company, P.O. Box 15626, Wilmington, DE 19850. As of the 1996 edition of Best's Insurance Report, Provident Mutual received A.M. Best's Excellent (A) rating for financial strength.

This illustration assumes that $20,000.00 was rolled over into the policy as part of a 1035 exchange in year 1 with a basis of $20,000.00.

For presentation in the state of MA by Registered Representative Frederick V. McMenimen III.

# Provident Mutual Life Insurance Company

## OPTIONSPLUS
## FLEXIBLE PREMIUM ADJUSTABLE VARIABLE LIFE

**Samuel Pietropoalo**        **Male Standard, Age 69**

| | | |
|---|---|---|
| $200,000 | Flexible Premium Adjustable Variable Life | |
| | Initial Monthly Premium | $1,416.66 |
| | Rollover Deposit | $20,000.00 |
| | Total Premium Deposit at Issue | $21,416.66 |

## SIGNATURE PAGE

I certify that this illustration has been presented to the applicant and that I have explained that any non-guaranteed elements illustrated are subject to change. I have made no representations that are inconsistent with the illustration.

_____         7/19/98
Frederick V. McMenimen III                     Date

I have received a copy of this illustration and understand that any non-guaranteed elements illustrated are subject to change and could be higher or lower. Frederick V. McMenimen III has told me they are not guaranteed.

I also understand that the benefits provided to me will be governed by the terms of my policy as issued.

X _____         7/19/98
Applicant/Owner Name                         Date