## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| RONALD P. PASSATEMPO, TRUSTEE, On behalf of the Samuel Pietropaolo Irrevocable Trust, SAMUEL PIETROPAOLO, GRANTOR to the Samuel Pietropaolo Irrevocable Trust, and PATRICIA D. PIETROPAOLO, BENEFICIARY of the Samuel Pietropaolo Irrevocable Trust, | ) ) ) ) ) ) ) ) ) |  |
| Plaintiffs, | ) ) ) | Civil Action No. 05-10118-GAO |
| v. | ) ) ) |  |
| FREDERICK V. McMENIMEN III, BARRY G. ARMSTRONG, NEW ENGLAND ADVISORY GROUP, LLC, 1717 CAPITAL MANAGEMENT COMPANY, NATIONWIDE PROVIDENT (f/k/a Provident Mutual Life Insurance Company), and NATIONWIDE FINANCIAL SERVICES, INC., | ) ) ) ) ) ) ) ) ) |  |
| Defendants. | ) ) ) |  |

### SECOND AFFIDAVIT OF SAMUEL F. PIETROPAOLO

I, Samuel F. Pietropaolo, do hereby depose and say as follows:

1.     I am compelled to make this second affidavit because the Declaration of

Frederick V. McMenimen III includes many mistruths and mischaracterizations.

2.     I will not recite here the entire chronology of my parents' engagement of Mr.

McMenimen. As Mr. McMenimen stated with respect to his own Declaration, I do

not mean for this Affidavit to be a complete recitation of my recollection of all

relevant events. But Mr. McMenimen's contention that I, acting on my parents'

behalf, never sought any "advice or recommendations" from him, and that "[his] role

in the procurement of the Policy was simply as a conduit between the relevant

insurers," is so grossly untrue that it simply cannot be left unaddressed.
(McMenimen Decl. ("Decl.") ¶ 8.)

3.      After my father retired from the Revere Public Schools and began
contemplating how to structure his finances so that my mother would best be taken
care of following his death, I told him that Mr. McMenimen had told me he was
experienced in "pension maximization," particularly for retiring municipal
employees. My father directed me to seek Mr. McMenimen's advice on his and my
mother's behalf. (Mr. McMenimen is my father's nephew and my cousin.) Mr.
McMenimen agreed to examine my parents' situation and he thereafter advised that
they should cancel my father's two existing John Hancock policies, which included a
combined death benefit of approximately $150,000 (and which cost less than $500
per month). My parents and I had not previously considered canceling those policies;
doing so was entirely Mr. McMenimen's idea. He said he would replace their value
in the new policy he would obtain for them.

4.      Mr. McMenimen advised that to maximize my father's pension, he should
obtain a new life insurance policy with a minimum $500,000 guaranteed death
benefit. He stated to me that he would "shop around" for the policy that best suited
my parents' interests. To that end, he sent various insurance application forms to me
and Ronald P. Passatempo (who became trustee of the trust eventually created to be
the nominal owner of the new policy). Mr. McMenimen provided us with forms for
Mutual of New York ("MONY") and Guardian. My father signed the forms and we
filled in certain personal information as instructed by Mr. McMenimen; but, at Mr.
McMenimen's direction, we left the "coverage requested" sections of the forms blank

We then made copies of the forms and returned them to Mr. McMenimen for his completion and filing. As the attached copies of the MONY and Guardian forms (made before we returned them to Mr. McMenimen) indicate, Mr. McMenimen's assertion that he "never instructed any of the plaintiffs to sign 'certain blank forms' and return them to me to complete their applications" is patently false (Decl. ¶ 14). (See MONY & Guardian forms, with personal data identifiers redacted, attached hereto at Exhibit A. The coverage terms portions of sections B & C of the MONY "New Business Life Application" are blank, as is the "amount applied for" section of the "Authorization to Release MONY Application File to MBI." On the Guardian Application, Sections D & E regarding terms of coverage are blank. See also paragraph 10 below.)

5.    MONY approved my father's application for a policy with a guaranteed $350,000 death benefit. Mr. McMenimen informed us that although this policy was below the $500,000 objective, we should hold it in place as he was still "shopping around" for other policies to meet our goal. Mr. McMenimen thus advised my father to make the initial premium payment for the MONY policy, which he did. In his Declaration, he claims that "Attorney Passatempo declined the MONY policy." (Decl. ¶ 11.) This is misleading. Shortly after my father made his first payment, Mr. McMenimen advised us to "non-take" the MONY policy because, he said, he had determined that we could obtain a more favorable policy from Nationwide. Once again, we followed his instructions. (See fax attached hereto at Exhibit B, which enclosed Nationwide ("Provident") insurance application forms and states, "Please

have Sam [referring to my father] write the letter to me to refund the money from MONY and non take the policy.").

6.      In May 1998, Nationwide rejected my father's application. Mr. McMenimen told me the rejection was a mistake and that he would correct it. Then, in July 1998, he told me he had obtained a policy or policies (which I understood to mean a policy with one or more riders) from Nationwide with a guaranteed death benefit of $500,000 – i.e., the terms he had recommended all along. I should mention that neither the plaintiffs nor I had any idea at this time that Mr. McMenimen worked for Nationwide. He didn't tell us that his employer at the time, New England Advisory Group ("NEAG"), was owned by Nationwide. Instead, he said he was an independent representative who could obtain coverage from a number of companies. In hindsight, it appears that Mr. McMenimen always intended to place my parents with Nationwide. After Nationwide rejected my father's application, Mr. McMenimen remained focused on them and did not consider other insurers.

7.      Though he denies it now, Mr. McMenimen knew at all relevant times that the $500,000 total guaranteed death benefit was (a) what he advised my parents to obtain, (b) what my parents therefore wanted and requested, and (c) what he promised them he would procure and ultimately told us he had procured. In April 2004, when Mr. McMenimen and I met in Billerica and he gave me what he said were NEAG's files regarding the policy, he also gave me a typed form titled "Sam Pietropaolo Time Line" he had prepared outlining for me his version of events through August 2003. (See Exhibit C hereto.) While I don't vouch for its accuracy, the timeline does show that Mr. McMenimen was aware from the beginning that the policy he said he would

obtain was supposed to include a $500,000 death benefit. His July 22, 1998 entry

reads: **"I was notified the policy was issued at a $200,000 base."** (Id. (emphasis

added).) The entry further goes on to state, **"Cant [sic] read my notes as to why**

**Death Benefit so low,"** and then, **"I call Barry indicating we need more Death**

**Benefit as promised by him."** (Id. (emphasis added).) Entries for subsequent days

show that Mr. McMenimen followed up with Barry Armstrong who ultimately

(allegedly) advised him to pay for the policy as it stood and promised to fix things so

that **"[t]he initial statement would reflect the $500K benefit for the trustee."** (Id.

(emphasis added).) Though we weren't privy to these backroom dealings at the time

(and though Mr. Armstrong denies that he had anything to do with the policy in his

Answer to the plaintiffs' Amended Complaint), Mr. McMenimen's timeline at least

accords with the truth of the matter in this basic sense: the entry reflecting that Mr.

Armstrong told Mr. McMenimen in July 1998 that the policy would be worth

$500,000 accords with Mr. McMenimen's July 1998 statement to *us* (and his many

assertions both before and after) that a policy or policies with a guaranteed death

benefit of $500,000 had in fact been obtained.

8.      Regardless of its accuracy, Mr. McMenimen's timeline also underscores that

the July 19, 1998 Policy Illustration attached to his Declaration does not somehow

show, as he contends, that I, Mr. Passatempo and/or my parents knew of our injury at

that time. His timeline reveals that he had Mr. Passatempo sign the illustration

simply to obtain the coverage, which Mr. McMenimen at the time knew included

only a $200,000 death benefit (although we didn't know this) but which he had been

told (by Mr. Armstrong) would soon be transformed into coverage with a $500,000

guaranteed death benefit. The timeline further reflects that a second illustration was sent to Mr. Passatempo in August 1998 showing a $483,500 death benefit. All of this, again, accords with what actually occurred: Without explanation, Mr. McMenimen told Mr. Passatempo to sign and return the illustration to him ASAP. At the same time, he told us that he had arranged for a policy or policies with a guaranteed $500,000 death benefit. Thus, we did not know whether the illustration related to the entire policy or to just one component thereof, and we were repeatedly told that the policy *as issued* would include the $500,000 death benefit. In this regard, I note that the line above Mr. Passatempo's signature on the illustration reads, "I ... understand that the benefits provided to me will be governed by the terms of my policy *as issued*." (Decl. Ex. A at 7 (emphasis added)). To this day, neither Mr. McMenimen nor any of the other Defendants have sent a copy of the policy to me or to the plaintiffs.

9.      Though he denies it in his Declaration (Decl. ¶ 18), Mr. McMenimen also assured us repeatedly that he would remain responsible for the policy. He had us send our premium payments directly to him, and he didn't tell us when he left NEAG in the fall of 1998. (Id. ¶ 17.) (Initially, he had us send premium payments to his attention at his personal office in Exeter, New Hampshire. Later he had us send them to his business office in Peabody, Massachusetts.) Additionally, it is my understanding that Mr. McMenimen has worked in the financial services industry continuously from 1998 to the present, despite his claim in his Declaration that he left the industry, at least for a time, when he left NEAG. (Id.) It seems strange, to say the

least, that he would leave the industry (unbeknownst to us) but still have us send our

insurance premiums to him.

10.    After NEAG agent Jesse McPhail called my father in or around April 2003

and alerted us that the policy included only a $200,000 death benefit, I advised Mr.

McMenimen of this and he immediately and aggressively responded by telling us not

to talk to Mr. McPhail. He said, "You're fucking everything up. Stay out of it and

tell that agent to stop asking about the policy." He instructed us to deal only with him

because, he said, he was the agent responsible for the account. Shortly thereafter, Mr.

McMenimen sent us blank Nationwide forms to effectuate what he said would be a

policy change that would give us the $500,000 guaranteed death benefit we'd thought

we had all along. (He also said he would change the investment scheme of the

mutual fund portion of the policy, which he admitted was too aggressive and not

appropriate for my father's investment goals and risk tolerance.) He had us sign the

forms and return them to him so that, once he "received some direction" from

"underwriting," he would not "have to wait for signatures." (See letter attached

hereto at Exhibit D.) Just like the applications Mr. McMenimen had us fill out when

we were originally applying for insurance back in 1998, Exhibit D belies his sworn

statement that he never had us sign blank forms (Decl. ¶ 14).

11.    Mr. McMenimen states in his Declaration that I "sought to maximize the

value of Uncle Sam's pension and existing life insurance policies by procuring the

variable Policy." (Decl. ¶ 10.) This statement is false in so many ways it is difficult

to know even where to begin. Among other things, it is undercut by the "faxes"

attached to the plaintiffs' Amended Complaint at Exhibit H which, if genuine, show

that he and Mr. Armstrong worked together to develop a complex and non-conventional strategy for my father (to which neither I nor the plaintiffs were privy at the time). All *I* did was seek *Mr. McMenimen's* advice on my parents' behalf as to what they should do with their finances. Contrary to his allegations, I am hardly an insurance expert. I worked for John Hancock for about a year beginning in my third year of law school. We were given several months of training and I became licensed as a part of that training. Mr. McMenimen, who worked in the office when I started and had encouraged me to join, left the office about six months into my tenure. In all, I sold maybe one or two insurance policies while I was there. I don't recall ever selling a variable-type policy. I didn't much like the insurance business, I wasn't particularly good at it, and once I passed the bar exam I left. I learned only enough about insurance to recognize, when my father retired, that he needed advice from an experienced professional. Mr. McMenimen held himself out as such.

12.    What is perhaps most notable about Mr. McMenimen's Declaration is that it appears to put the blame for the deficient policy on me, my parents and Mr. Passatempo. This is an abrupt change of tactics for Mr. McMenimen. In May 2003, soon after Mr. McPhail informed my parents and me that the death benefit was only $200,000, Mr. McMenimen and I met in his office and he said to me: "I'm sorry, I fucked up. I took my eye off the ball." He said he was supposed to have followed the policy and managed my father's account closely. He said he'd forgotten about it and that he was really sorry. Then, after Mr. McMenimen's alleged "re-underwriting" (as he called it) of the policy failed to materialize, Mr. McMenimen and I met in Billerica in April 2004 and he gave me a number of papers. Among

those papers were the mysterious-looking emails and faxes allegedly from NEAG and Barry Armstrong which purport to pin the blame on *them*. (See Amended Complaint Exhibits G and H.) The timeline Mr. McMenimen gave me at our meeting likewise blames NEAG and Mr. Armstrong. (See <u>Exhibit C</u>.) He also continued to accept that he was personally to blame. (See Amended Complaint Exhibit E ("I want to again apologize for this.").) Indeed, at the end of our April 2004 meeting, he said he thought my parents would have a good case against NEAG, and that they could probably sue him successfully too. I remember this vividly because Mr. McMenimen said he'd never been sued before, and he remarked that it would be "funny" if the first lawsuit filed against him was brought by members of his own family.

13.    His apologies aside, it was very difficult getting information from Mr. McMenimen during 2004, once we learned that his alleged effort to "re-underwrite" the policy hadn't worked. As the attached emails from that time period show (see <u>Exhibit E</u> hereto), he kept putting me off, blaming NEAG and Nationwide but not providing any details. On April 20, he wrote that he had talked to someone at NEAG who "gave me some additional info which I do not thikn [sic] I shoudl [sic] send electronically at this time." (<u>Id.</u> at p. 8.) On April 27, he wrote that he'd received my father's file from NEAG, but that "[t]he file was sent by a friend to me and I would ask that no one contact NEAG since they did not send it to me directly. It has some interesting information in it. Very interesting." (<u>Id.</u> at p. 13.) He kept telling me that meetings had been set up, that my father's files had been sent to Nationwide, that he had "pushed for an immediate resolution" and that "its [sic] clear where this is headed," but nothing more than his vague promises ever materialized. (<u>Id.</u> at p. 19.)

(And, indeed, Nationwide denies in its Answer to the plaintiffs' Amended Complaint that Mr. McMenimen attempted to arrange any meetings with them to resolve this matter.) This is why my parents and Mr. Passatempo ultimately had no choice but to file suit.

14.     Mr. McMenimen's Declaration suggests that he sent approximately $4,000 to me when I was "having financial difficulties," and that that money represented the majority of the commissions he earned in connection with the policy. (Decl. ¶ 13.) I don't recall ever telling Mr. McMenimen that I was having "financial difficulties" – indeed, I don't recall ever *having* "financial difficulties" worth mentioning – and I certainly don't recall ever receiving a payment from Mr. McMenimen. I truly don't understand what he is talking about here, but I've come to see that it's representative of his approach when faced with facts concerning his own wrongdoing: aggressively blame others, make up facts, and see what he can get away with saying.

15.     As for Mr. McMenimen's assertion that the "only evidence" of his falsification of documents is the affirmative defense asserted by Mr. Armstrong, I note that the documents themselves appear altered on their face and their substance, if true, is helpful to Mr. McMenimen (i.e., they place the direct blame on Mr. Armstrong and NEAG, rather than him). Neither I nor the plaintiffs are vouching for Mr. Armstrong; we think it's clear that he bears responsibility here as well. But if Mr. Armstrong did not create the faxes that Mr. McMenimen claims came from him, then someone else must have. And it was Mr. McMenimen who gave them to me. In April 2004, after Mr. McMenimen said he'd obtained my father's file from NEAG, I asked him repeatedly for a copy and he repeatedly promised to send it to me. On

10

April 27, while he was stalling, he wrote: "There are only 4 pages different from my file. Two have date stamps on letter [sic] sent to me by NEAG. The other two deal with underwriting. Apparently Barry Armstrong pulled some strings to get it underwritten." (Exhibit E at p. 14.) It's curious that the only four documents that were allegedly not in his own files, that he claims to have received from NEAG, and that he delayed sending to me, are the very four documents that appear to have been altered and that shift the blame from him to NEAG and Mr. Armstrong.

16.    As I final matter, I want to note that the plaintiffs did not file this lawsuit to sabotage Mr. McMenimen or destroy his career. We all tried to work with him throughout 2003 and 2004 to figure out what had happened. We knew that the consequences of litigation would be severe for everyone involved, not least the resulting rift between my mother and her brother (Mr. McMenimen's father), and between my family and Mr. McMenimen's. But Mr. McMenimen simply wouldn't cooperate. He put us off and he told us lies. As for me in particular, he claims that I "instructed" the plaintiffs' lawyers to contact one of his clients "as a means of coercing [him] to capitulate to the plaintiff's demands." (Decl. ¶ 29.) As with most of his allegations, this is just not true. In January of this year, a mutual friend of ours (an attorney) told me that one of Mr. McMenimen's former employees told him a complaint had been filed against Mr. McMenimen by one of his New Hampshire neighbors. I asked for more information and he got back to me with additional details: He said the complainant was one of Mr. McMenimen's clients from Massachusetts (so not a New Hampshire neighbor, as he first told me) who coincidentally was a woman Mr. McMenimen had once referred to me for the

drafting of a trust back in the late 1990s. This information seemed believable to me and I passed it on to counsel. Apparently, counsel then called the woman, who told them that she didn't have any problems with Mr. McMenimen. That was the end of the story until a couple of days later when Mr. McMenimen's counsel sent a letter to *my employer* asking them to preserve documents and generally smearing my name and suggesting that I'd engaged in serious wrongdoing. (See Exhibit F hereto.) This is troubling to me since in my nearly 20 working years I've never had any issues with any employer relative to my performance or character.

17.    Mr. McMenimen and the other defendants promised one thing and delivered another. Mr. McMenimen has apologized to me for causing this situation, but he and the other Defendants have nevertheless refused, upon demand, to make my parents whole. Accordingly, my parents and Mr. Passatempo, the trustee, had no choice but to file suit.

Signed under the pains and penalties of perjury this 22nd day of June, 2005.

Samuel F. Pietropaolo

# Exhibit A



The Mutual Life Insurance Company of New York
1740 Broadway
New York, NY 10019

**Mutual of New York**

# New Business Life Application

---

## This application package is to be used for the following transactions:

- Individual Life Insurance including Juvenile and Military applicants
- Purchase Option Elections and Attained Age Term Conversions
- Qualified Corporate/Non-Corporate (Keogh Plans)

## This application is NOT to be used for the following:

- LSWL-Last Survivor Whole Life
- Conversion of Group Insurance
- Original Age Term Conversion, Add On Riders, and other changes to established policies
- SPIA-Single Premium Immediate Annuities
- SPDA-Single Premium Deferred Annuities
- VA-Variable Annuity

## Instructions for completing every Application

Use the following checklist to help verify completion of the application:

☐ Have you used black ink?

☐ Are all required questions properly and completely answered and all required Supplementary forms (ie: consent and replacement) completed and attached?

☐ Are the coverages applied for available under the rules of the Company (MONY or MLOA) to which the application is being submitted?

☐ Has the medical or paramedical examination been arranged if one is required? (Review "Medical Requirements" in the Rates and Data Book)

☐ If a blood test is required, has it been ordered and consent form attached?

☐ Has correct and complete wording been used for all Beneficiary and Rightsholder designations?

☐ If any premium is collected, has it been collected in accordance with the minimum payment under the Temporary Insurance Agreement?

☐ Have you completed the Field Underwriter's Certification accurately and carefully?

☐ Was "MONY's Information Practices and The Underwriting Process" form left with the Proposed Insured?

☐ Have all the forms been correctly signed and countersigned by all proper parties?

☐ Did the applicant/insured initial all changes?

☐ Should a "Mutual Life Insurance Company of New York Special Authorization and Release of Temporary Insurance Agreement" form be completed (depending upon the medical history of the applicant)?

☐ Have you completed the Client Profile?

15234 (5/95)

**Part 1**
**Application to:** *(check one Company and cross out the other)*
☐ The Mutual Life Insurance Company of New York
☐ MONY Life Insurance Company of America (an Arizona Stock Company)

## SECTION A-PERSONAL INFORMATION

**Insured's Name** (Print name as it is to appear on the policy )

| **1.** | First | Middle | Last | Sex | Insurance Age | Birthdate | Birthplace |
|---|---|---|---|---|---|---|---|
| | SAMUEL | | PIETROPAOLO | M | REDACTED | CHI MA / USA |

M/F

| Social Security Number | Driver's License Number | License State | Marital Status (circle one) |
|---|---|---|---|

REDACTED

Insurance state/country

| | | M A | single (married) widowed divorced separated |

**2.** **Address** (for MILITARY personnel, Home = Home of Record; Business = Present Address; Business address will be billed.)

Mailto:  Home ☒  45 Thurlow Avenue, Revere, MA  02151  SUFFOLK

Business ☐

number    street    city    state    zip    county

**3.** **Phone Number - Home** area code 781 # 289-4191    Preferred Calling Time: ☐ AM  3 ☐ PM
(where proposed Insured can be contacted)
Business area code _____ # _____    Preferred Calling Time: ☐ AM ☐ PM

**4.** a) **Occupation:** (exact duties and years) b) **Employer's Name and Address**   c) For Military Business

RETIRED

Branch of Service _____
Pay grade _____
Estimated discharge date ____ (mo /yr )
Is Insured a dependent?   yes ☐   no ☐

**5.** Currently or during the past 12 months, has the Insured:
a) smoked one or more cigarettes?  yes ☒  no ☐
b) used another form of nicotine?  yes ☐  no ☒
If "yes," specify type:  pipe ☐  chewing tobacco ☐
nicotine gum ☐  cigar ☐  other _____

**9.** Will coverage applied for replace or change any life insurance or annuities?  yes ☒  no ☐
If "yes," complete: Life,

| D/B Amount | Company | Issue Year | Policy Number | Group or Annuity |
|---|---|---|---|---|
| $ 7,200 | John Hancock | 64 | 6760237 | Life |
| $ 1,910,000 | John Hancock | 86 | 6584760 | Life |
| $ | | | | |
| $ | | | | |

**6.** Height: 5 ft 7 in.  Weight : 160 lbs
Any weight gain or loss in last 6 months?
Weight gain ☐
Weight loss ☐ _____ lbs.  None ☒
(gain or loss)

**7.** a) Complete if specific Policy Date requested:
Date (mo./day/yr )  _____  OR
b) Date policy to save Insured's age?  yes ☐  no ☐

**8.** Is the Insured now performing all the duties of his or her regular occupation on a full-time basis at the usual place of business?  yes ☒  no ☐
(If "no," explain in Remarks include date of last full-time work )

(Submit replacement form if required.)
Is this a 1035 Exchange?  yes ☒  no ☐

## SECTION B-COVERAGE INFORMATION

**10.** Plan _____  OR
Initial Face Amount $ _____
Amount Purchased
by Premium of _____ (not for Adjustable Life)
Note: Premium stated here must be for frequency given in Question 18
Death Benefit Option (for Adjustable Life only)
Option 1  Option 1 is automatic unless Option 2 is checked.
☐ Option 2
☐ Waiver of Premium (WP)
☐ Accidental Death Benefit (ADB) $ _____
☐ Purchase Option Rider (POR) $ _____
☐ Single Premium GO (AGOR) $ _____
☐ Modal Premium GO (MGOR) $ _____
☐ Rollover/Loan GO (LGOR) $ _____
☐ Exchange Rider
☐ Guaranteed Death Benefit Rider
Age 95 ☐  Later of age 75 or 10 years from issue ☐
☐ Other _____
☐ Children's Term Rider
Name(s) & Date(s) of birth of children-specify medical history in Question 24.

☐ Spouse's Term Rider  Face Amount $ _____

| Spouse's Name | First | Middle | Last |
|---|---|---|---|

(Include maiden name if female)
Birthdate: (mo./day/yr.) _____  Birthplace _____
Social Security Number _____
Driver's License Number _____
License State _____
Occupation (exact duties & years) _____

Currently or during the past 12 months, has the spouse:
a) smoked one or more cigarettes?  yes ☐  no ☐
b) used another form of nicotine?  yes ☐  no ☐
If "yes," specify type:  pipe ☐  chewing tobacco ☐
nicotine gum ☐  cigar ☐  other ☐
Height: _____ ft. _____ in.  Weight: _____ lbs.
Date policy to save Spouse's age?  yes ☐  no ☐

**11.** Automatic Premium Loan if available?  *yes ☐  no ☐
*Not available on qualified retirement plans, or non-cash value plans.

Life Remarks (see Page 4 for additional remarks)

90-412

**12.** **Beneficiary:** for children's or spouse's insurance as provided in contract; for other insurance as follows, subject to policy's beneficiary provisions:

a) ☐　(Name)　　　　　　　(Relationship to Insured)
1st

PATRICIA  PIETROPAOLO / WIFE

if living, if not
2nd

SAMUEL, Vincent Dorothy, Michael　Children
Pietropaolo, equal shares
if living, if not
3rd

if living, if not, Executors or Administrators of:
☐ Insured
☐ Other (use remarks)
(Unless otherwise specified  joint beneficiaries will receive equally. or other survivor(s) will receive the entire proceeds )　**OR**

b) ☐ Trustee(s) specified in 15b

**13.** **Ownership (Rights)-if JUVENILE Insured**
During Insured's lifetime all rights belong to:
a) ☐ Applicant
if living, if not  to
(Name and relationship to Insured)
if living, if not, to the Insured.
b) ☐ Insured (If Insured is a minor  guardianship papers may be required to exercise rights )
c) ☐ Other

**14.** **Taxpayer Identification Number for PolicyOwner (Rightsholder)**
(if other than Insured)　REDACTED

**SECTION C- SPECIAL ELECTIONS**

**19.** **Purchase Option Election:**
(Do not use if increase to existing Adjustable Life )
a) Original Policy Numbers
b) Is purchase made under Advanced Privilege?
yes ☐　no ☐
If "yes," complete below:
(i) Option Date used: (mo /day/yr )
(ii) Event:
☐ Marriage:　(mo /day/yr )
Name of spouse
☐ Birth or Finalized Legal Adoption of child
Name of child
Born:　(mo /day/yr )
Date Adoption finalized:
(mo /day/yr )

**20.** **Qualified Retirement Plan:**

a) Is this policy being applied for under
(i) an Internal Revenue Service Qualified Pension or Profit-Sharing Plan?
yes ☐　no ☐
(ii) a Keogh (HR-10) self-employed plan?
yes ☐　no ☐

**15.** **Ownership (Rights)-if ADULT Insured**
During Insured's lifetime all rights belong to:
a) ☒ Insured, OR
b) ☐ Trustee under

trust or plan dated:　(mo /day/yr.)　☐ OR
c) ☐ Other

Also give final Rightsholder, e g. Insured or Estate of "Other":

**16.** **Dividend Option** (participating policies only)
1. ☐ Additions　2. ☐ Cash
3. ☐ Reduce premium — Balance to:
☐ additions　☐ cash　☐ deposits
4. ☐ Deposits　5. ☐ OYT-Bal to deposits
6. ☐ OYT-Bal to additions　7. ☐ OYT-Bal to red. prem
8. ☐ Reduce loan — Balance to:
☐ additions ☐ cash ☐ red. prem ☐ deposits
9. ☐ Other

**17.** Special Market: GA Method
Tax Plan Number
(if established)
Payroll Allotment Plan Number
(if established)

**18.** Premium Frequency
Ad. Life planned prem. amt.　$
Amount Paid　　　　　　　$
☐ None
Has the Insured received a copy of the Temporary Insurance Agreement?　yes ☐　no ☐

**20.** (continued)
b) Date of Employment: (mo /day/yr )
c) Mailing address of rightsholder

**21.** **Attained Age Term Conversion:**
(Do not use if Increase to existing Adjustable Life.)
a) Original Policy Numbers
b) Conversion From　　Date of Issue
☐ Term Policy　(mo /day/yr )
☐ Term Rider　(mo /day/yr )
☐ Other　　　　(mo /day/yr )
c) Conversion Date　(mo /day/yr.)
(not later than date to which premiums are paid on original policy)

d) Any term balance remaining after conversion shall be:
continued, if allowed ☐　discontinued ☐
(New policy subject to all rights and interests of any assignee of original policy )

e) For Adjustable Life only, apply any Term Conversion credit as:　Dump-in ☐　**OR**　Defer ☐

90-412

**SECTION D-FINANCIAL / MEDICAL INFORMATION.** Questions 22 thru 28 must be answered for all covered Individuals (except for Purchase Option Elections and Term Conversions with no excess).

| 22. | a) Total Individual Life Insurance in force | $ | |
|---|---|---|---|

| | | **Insured** | **Applicant** (if other than Insured) |
|---|---|---|---|
| b) Total Annual Income before Taxes | | | $ |
| | (i) Last Tax year | $ 50,000 | $ |
| | (ii) Current year | $ 50,000 | $ |
| c) Net Worth | | $ 100,000 | $ |

| 23. | a) | Within the past 2 years has any person proposed for insurance: | | |
|---|---|---|---|---|
| | (i) | been convicted of two or more moving violations or driving under the influence of alcohol or drugs; or had a driver's license suspended or revoked? | yes ☐ | no ☒ |
| | (ii) | flown as a pilot or crewmember, or engaged in parachuting, hang gliding, ballooning, motorized-racing or underwater diving below 60 feet? | yes ☐ | no ☒ |
| | (iii) | operated a motorcycle? | yes ☐ | no ☒ |
| | b) | Does any such person presently intend to engage in any activity in 23a(ii) in the future? | yes ☐ | no ☒ |

(If "yes" to any of 23 a(i), a(ii), or b, complete Section E.)

**24.** Has any person proposed for insurance:
(circle the applicable item)
a) ever been medically diagnosed, medically treated for, or had symptoms of heart trouble, heart murmur, chest pain, stroke, high blood pressure, diabetes, cancer or tumor?    yes ☐    no ☒
b) ever used cocaine, heroin, LSD, marijuana or any other narcotic drug or controlled substance except as prescribed by a physician?    yes ☐    no ☒
c) during the past 2 years had a physical exam?    yes ☒    no ☐
   prompted by symptoms?    yes ☐    no ☒
   findings normal?    yes ☒    no ☐
d) during the past 5 years had any illness, surgery, or injury requiring treatment by a physician, hospital or other medical facility?    yes ☒    no ☐
e) during the past 5 years been treated or counseled for mental or emotional trouble, neurological disorder or the use of alcohol or drugs by a physician, counselor, psychologist, hospital or clinic?    yes ☐    no ☒
f) during the past 10 years been diagnosed with or treated for AIDS or HIV infection by a member of the medical profession?    yes ☐    no ☒

(If "yes" to any part of this question, include details in Question 28.)

**25.** Is any person proposed for insurance receiving special training because of physical or mental disability or unable to participate actively at work, school or perform normal activities?    yes ☐    no ☒

(If "yes," give details below.)

**26.** Complete if Insured is now under age 15:
a) State total amount of Insurance in force on the life of applicant or child's parent, if greater    $
b) Are any other children in the family insured for a lesser amount?    yes ☐    no ☐

(If "yes," give details below.)

**27.** Personal Physician Information
Name    DR. PLOVNICK ( HCHP ) ~Herbert~
Address 1Cdy Hall Mall
    Medford MA    02155 - 4765
Phone Number  781  #  381-5100
Date last seen:    (mo./day/yr.) 07 / 97

**28.** Details of all "yes" answers for Question 24. For any checkup or routine examination, indicate what symptoms, if any, prompted it and include results of the examination and any special tests. Include clinic identification number if applicable.

| Question Number (24 a,b,c,d,e, or f) | Person, Illness,Treatment and Number of Attacks (including specific diagnosis and medication) | Onset Date mo/day/yr | Recovery Date mo/day/yr | If disabled, how long? (in months) | Doctor, Clinic or Hospital, Complete Address, and Phone Number | Pre-payment Fee |
|---|---|---|---|---|---|---|
| d | Spinal Stenosis | 4yrs ago | | — | Dr Chernak, Orthopedic Harvard Comm Health Somerville, MA | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**28.** (continued)

| Question Number (24 a,b,c, d,e, or f) | Person, Illness,Treatment and Number of Attacks (including specific diagnosis and medication) | Onset Date mo/day/yr | Recovery Date mo/day/yr | If disabled, how long? (in months) | Doctor, Clinic or Hospital, Complete Address, and Phone Number | Pre-payment Fee |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Life Remarks (continued)

**SECTION E–AUTOMOBILE/AVIATION/AVOCATION INFORMATION** (Complete only if any of question 23 is answered yes.)

Insured ☐    Spouse ☐    Child ☐

**29. Automobile Driving Record**

a) Driver License Nos.
States of ☐ MA    Expiration Dates (mo./yr.) ☐

b) Have you ever been convicted of driving while under the influence of alcohol or drugs?    yes ☐    no ☐
How many times?
Conviction Dates: (mo./yr.)

c) Number of moving violations you have been convicted of in the past 2 years?
How many speeding violations?

| | Speeding Date | Speed Limit | Speed Attained |
|---|---|---|---|
| (mo./yr.) | | | |

d) Have you ever had your driver's license suspended or revoked?    yes ☐    no ☐
If yes:

| | Date Suspended/ Revoked | For how long | Date Restored |
|---|---|---|---|
| (mo./yr.) | | | |

**30. Aviation**

a) Have you flown an aircraft within the past 2 years as a pilot or crew member, or do you intend to do so in the future?    yes ☐    no ☐

b) Date of last flight as pilot?    (mo./yr.)

c) Type of aviation license or certificate now held?
Student ☐    Private ☐    Commercial ☐
Military ☐    Instructor ☐    Other ☐
Date of Issue:    (mo./yr.)
Do you intend to renew?    yes ☐    no ☐

d) Total hours flown as pilot?

e) Have you ever done any test flying, or do you intend to do so?    yes ☐    no ☐
(If 'yes,' explain in 'Remarks')

f) Do you have an Instrument Flight Rating (IFR)?    yes ☐    no ☐

| Type of Flying | Hours Flown Past 12 Months | Probable Flying Hours Next 12 Months |
|---|---|---|
| Scheduled Airlines | | |
| Employer Owned Plane (for business transportation) | | |
| Private Plane (for pleasure or business) | | |
| Nonscheduled Airlines (explain in "Remarks") | | |
| Charter | | |
| Flight instruction as instructor | | |
| Military (include duties and type of aircraft in "Remarks") | | |
| Other flying (explain in "Remarks") | | |

g) If either is necessary under Company rules, which of the following do you prefer?
Full aviation coverage at an extra premium ☐
Restricted aviation coverage without extra premium ☐

**31. Avocations**

a) **Motor Vehicle Racing**
1. Racing Status:    Professional ☐    Amateur ☐
2. Type of vehicle you race:
Stock Car ☐    Sports Car ☐    Other ☐
Dragster ☐    Midget Car ☐
Boat ☐    Motorcycle ☐
3. Exact description of vehicle (Formula 1, Thunderboat, etc.)
4. Type of track:
Paved ☐    Dirt ☐    Other ☐
5. Type of Race:
Speed ☐    Hill Climbing ☐    Other ☐
Rally ☐    Dragstrip ☐
6. Number of Races in last 12 months:
Maximum Speed: ☐ mph
Date of last race:    (mo./yr.)

b) **Underwater Diving**
1. Do you dive for:
Pleasure only ☐    Pleasure and employment ☐
2. Number of dives in last 12 months to:
60ft ☐    61-75ft ☐    76-100ft ☐
101-150ft ☐    over 150ft ☐
3. Date of last dive below 60ft:    (mo./yr.)
4. Do you dive alone?    yes ☐    no ☐

c) **Parachute Jumping**
1. Are you a member of a Parachute Club which adheres to PCA safety rules and regulations?    yes ☐    no ☐
2. Total Number of Jumps made:
3. Date of last jump:    (mo./yr.)

d) **Gliding**
1. Glide Status:    Professional ☐    Amateur ☐
2. Type of aircraft used:
Hang glider ☐    Sailplane ☐    Other ☐
(If sailplane, also complete Question 30)
3. Are you affiliated with a hang glider club?    yes ☐    no ☐
4. Maximum altitude achieved:
to 50ft ☐    over 50ft ☐
5. Total number of flights made:
6. Number of flights in last 12 months:
7. Date of last flight:    (mo./yr.)

e) **Ballooning**
(Complete the following questions and Question 30)
1. Do you fly over:
land only ☐    land and water ☐
2. Type of balloon:    Hot Air ☐    Gas ☐

Do you anticipate future participation in any of the above avocations?    yes ☐    no ☐
Do you anticipate future participation in any other avocation?    yes ☐    no ☐
(If "yes," give details in "Remarks.")

Remarks:

**FOR HOME OFFICE USE ONLY:** Any Home Office corrections and amendments made after the application was signed are shown either in this space or on a separate form requiring signed ratification

I represent the statements and answers in this application to be true and complete to the best of my knowledge and belief. I offer them to the appropriate MONY Company to induce it to issue the policy or policies and to accept the payment of premiums thereunder

**I agree that:** (1) Payment of the first premium, if after the application date below, will mean that I represent that such statements and answers would be the same if made at the time of such payment; (2) no one but an Executive Officer of the Company may change any contract or waive any of its provisions, (3) when coverage takes effect: if a policy is issued exactly as applied for and required cost has been received, the policy will take effect on the date we authorize its delivery or on any later requested Policy Date. If a policy is issued either (a) other than as applied for, or (b) exactly as applied for but any required cost remains unpaid, the policy will take effect on the date it is delivered, provided its delivery and payment of any required cost are made while each person to be insured is living. But, in any case, a policy will not take effect for any of these situations before the date indicated: (a) for a Purchase Option election (Question 19), the Option Date; (b) for the exercise of a Term Conversion (Question 21); (c) for a Government Allotment authorization, its Policy Date. "Required Cost" in the case of a Purchase Option election or a Term Conversion is the full first premium. In any other case, "required cost" is the amount necessary to put the policy in force. 4) Acceptance of any policy issued will ratify any correction in or amendment to the application noted by the Company in the space provided "FOR HOME OFFICE USE ONLY," in Section E of the application. A Copy of the application attached to the policy will be sufficient notice of the change made. If the laws where the application is made so require, any change of amount, class of risk, age at issue, plan of insurance or benefits must be ratified in writing

**Under the penalties of perjury, I certify that:**
- The number shown under Question 1 or 14 on Part 1 of the application is the correct taxpayer identification number of the rightsholder (or the rightsholder is waiting for a number to be issued)
- I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding (does not apply to real estate transactions, mortgage interest paid, the acquisition or abandonment of secured property, contribution to an individual retirement arrangement (IRA), and payments other than interest and dividends.)

**For Underwriting and claim purposes, I permit:**
- Any physician or other medical practitioner, hospital, clinic, other medically related facility, consumer reporting agency, or the Medical Information Bureau (MIB) to give medical record information regarding me to the Company or any of its reinsurers. The data includes findings on medical care; psychiatric or psychological care or examinations; or surgery  Also, any insurer or reinsurer may give the company medical data described above and data about current or pending insurance I may have.
- The Company to get consumer reports; and motor vehicle reports about me.
- Any employer, business associate, financial institution, insurer, government unit or MIB, Inc. to give the Company any data that they may have about my occupation, avocations, driving record, finances, insurance coverage, general reputation and aviation activities (ie: "personal information").

**I understand that:**
- A photocopy or facsimile transmission copy of this form will be as valid as the original. My consent to get medical record information and personal information about me will end two years from the date shown below. I may at anytime, however, revoke my permission to get any data protected by 42 CFR Part 2 or any other Federal or State law or regulation which provides for such revocation. Any action taken before revocation, however, will be valid.
- I have been given a copy of "MONY's Information Practices and The Underwriting Process," including notices regarding consumer reports, and MIB, Inc. I know that I have a right to get a copy of this form
- My records are protected under federal and state law and cannot be disclosed without my written consent unless otherwise provided by law. I further understand that the specific types of information to be disclosed may, if applicable, include: diagnosis, prognosis, and treatment for physical and/or emotional illness, including treatment of alcohol or substance abuse for any admissions; diagnosis, prognosis, and treatment of HIV infection, including HIV test results; and diagnosis, prognosis and treatment for any communicable disease or serious communicable disease or infection, including sexually transmitted diseases.
- All or part of the data which the Company gets may be sent to MIB. It may also be disclosed to and used by any Company reinsurer, employee or contractor who performs any business service on any insurance I may have applied for or have with the Company

Signed at (City and State) | MEDFORD , MA | on | 9/6 | 19 | 97

X _Samuel Kotrapian_          X _____

Signature of Insured                    Signature of Spouse - if to be Insured

Signature of Applicant (if other than Insured), who agrees to be bound by the representations and agreements in this and in any other part of this application. In the case of the exercise of a purchase option election or a conversion privilege, applicant means the owner of such right (other than the Insured).

X _Samuel Kotrapian_          | 45 THURLOW Ave, Revere, MA 02151 |

Signature of: Applicant ☑   Owner (Rightsholder) ☐          Address

X _____          _____

Signature of Parent or Legal Guardian                    Field Underwriter - Licensed Agent
(if Insured is under age 15)

90-412

**THE MUTUAL LIFE INSURANCE COMPANY OF NEW YORK ("MONY")**
**MONY LIFE INSURANCE COMPANY OF AMERICA ("MLOA")**
**MONY BROKERAGE, INC ("MBI")**

|  | First | Middle | Last |  |  |  |
|---|---|---|---|---|---|---|
| Proposed Insured |  |  |  | Date of Birth: | (mo /day/yr ) | / / |
| Field Underwriter |  |  |  |  |  |  |
| Agency Code # |  |  |  | Amount Applied For |  |  |
| Flat Extra |  |  |  | MONY Action:  Class |  |  |

## AUTHORIZATION TO RELEASE MONY APPLICATION FILE TO MBI

I acknowledge that MONY/MLOA may decline my application for life (or disability) insurance ("MONY Application") or may offer me insurance on a substandard (less favorable) basis.  In such an event, I authorize MONY/MLOA to release and disclose the contents of my application and all underwriting information contained therein to any life or disability income insurance company with whom MONY Brokerage Inc. and T.U.G., Inc. do business ("MBI Selected Insurer"; see reverse side for list).  I understand that this file will contain the types of information described below; except that MONY will not disclose HIV antibody test results that MONY obtains through its own testing requirements.

## PURPOSE AND EFFECT OF RELEASE

By authorizing release of my MONY application file and its contents, I understand that I am authorizing MBI, Inc. to make an informal ("trial") application to an MBI Selected Insurer for an offer of insurance or a more favorable offer of insurance.  I understand that the submission of my MONY application file to MBI and any of its selected insurers will not extend any temporary life insurance coverage, if any, provided under a MONY Temporary Insurance Agreement or Conditional Receipt (Disability Income).  I also understand that MONY's Temporary Insurance Agreement will terminate immediately if I sign a written application with an MBI Selected Insurer.  Finally, I understand that MONY and MBI have no obligation to submit my MONY application to an MBI Selected Insurer; MONY and MBI are free to exercise discretion about the appropriateness of such a submission

## AUTHORIZATION TO OBTAIN ADDITIONAL INFORMATION

I understand that an MBI Selected Insurer and its reinsurers and any consumer reporting agency or insurance support organization may need to collect information on me not available in the MONY application file to evaluate my insurability.  Therefore, I authorize (one or more) health care provider, hospital, clinic, medical facility, insurer, reinsurer, consumer reporting agency, Medical Information Bureau, financial source, employer, or governmental unit to furnish the types of information listed below when this Authorization (or a photocopy or facsimile transmission copy thereof) is presented by MBI or an MBI Selected Insurer listed on the reverse side.

The types of information will include facts about my:  (1) mental and physical health; (2) other insurance coverage; (3) hazardous activities; (4) character; (5) general reputation; (6) mode of living; (7) finances; (8) occupation, and (9) other personal traits.  I further understand that the specific type of information to be disclosed may, if applicable, include:  diagnosis, prognosis, and treatment for physical and/or emotional illness, including treatment of alcohol or substance abuse for any admissions; diagnosis, prognosis and treatment of HIV infection, including HIV test results; and serious communicable disease or infection, including sexually transmitted diseases

I understand that the information practices of the MBI Selected Insurers will generally conform to those of MONY as described in "MONY's Information Practices and the Underwriting Process."  I also understand that I may receive specific details about the practices of any MBI Selected Insurer by contacting it directly or asking MBI to do so

This authorization will be valid for 24 months after the date it is signed.  I understand that I or my authorized representative may receive a copy of this Authorization.  I may at any time, however, revoke my permission to get any data protected by 42 CFR Part 2 or any other Federal or State law or regulation that provides for such revocation.  Any action taken before revocation, however, will be valid.

Signed at (City and State) _____ on _____, 19___

X _____      X _____
Signature of Insured                                    Signature of Applicant

**SEE REVERSE SIDE**
**FOR LIST OF MBI SELECTED INSURERS**

# Client Profile

Your accurate and complete answers to the following questions will provide valuable feedback information for sharpening your individual marketing efforts, as well as those of your Agency and Mutual Of New York.

1. **Age of client\***
   - A ☐ Less than 35
   - B ☐ 35-44
   - C ☐ 45-54
   - D ☐ 55-65
   - E ☒ Over 65

2. **Marital status**
   - A ☐ Single
   - B ☒ Married

3. **Age of client's youngest child**
   - A ☐ Under age 6
   - B ☐ Age 6-18
   - C ☒ Over 18
   - D ☐ No Children

4. **Estimated total annual household income**
   - A ☐ Under $25,000
   - B ☐ $25,000 – $34,999
   - C ☒ $35,000 – $49,999
   - D ☐ $50,000 – $74,999
   - E ☐ $75,000 – $99,999
   - F ☐ $100,000 And Over

5. **Employment status of client**
   - A ☐ Business Owner/Partner
   - B ☐ Self-employed
   - C ☐ Employee
   - D ☐ Armed Forces
   - E ☒ Retired
   - F ☐ Other

6. **Occupational category**
   - A ☐ Medical Professional
   - B ☒ Other Professional
   - C ☐ Executive
   - D ☐ All other occupations

7. **Source of sale**
   (check *all* that apply)

   - **Current Mutual Of New York customer:**
     - A ☒ Personal client
     - B ☐ Orphan

   - **New Mutual Of New York customer:**
     - C ☐ Immediate family of *MONY* client
     - D ☐ Referred lead from *MONY* client
     - E ☐ Purchased from list or directory
     - F ☐ Employer sponsored
     - G ☐ Seminar
     - H ☐ Target mail
     - I ☐ Telemarketing service
     - J ☐ Co-op advertising
     - K ☒ Other source

8. **Number of interviews to close sale**
   - A ☐ One
   - B ☐ Two
   - C ☒ Three or more

9. **Was a MONY sales brochure used?**
   - A ☐ Yes
   - B ☒ No

10. **Primary purpose of coverage**
    (check *all* that apply)

    - **Personal**
      - A ☐ Death protection
      - B ☐ Cash accumulation
      - C ☐ College funding
      - D ☒ Retirement
      - E ☐ Estate planning
      - F ☐ Charitable
      - G ☐ Mortgage payoff
      - H ☐ Other personal purpose of coverage

    - **Business**
      - I ☐ Buy out funding
      - J ☐ Key person replacement
      - K ☐ Deferred compensation
      - L ☐ Executive bonus
      - M ☐ Salary continuation
      - N ☐ Qualified Employee Benefit
        (e.g., 401(k), Pension, Profit Sharing)
      - O ☐ Other business purpose of coverage

11. **If business sale, type of company**
    - A ☐ Sole Proprietorship
    - B ☐ Partnership
    - C ☐ S-Corporation
    - D ☐ C-Corporation
    - E ☐ Non-Profit Organization
    - F ☐ Other

12. **If business sale, number of employees**
    - A ☐ Less than 10
    - B ☐ 10-100
    - C ☐ Over 100

---

*FOR HOME OFFICE AND AGENCY ADMINISTRATIVE USE*

Please input policy number(s) associated with this Client Profile.

1. ☐☐☐☐☐ - ☐☐ - ☐☐
2. ☐☐☐☐☐ - ☐☐ - ☐☐
3. ☐☐☐☐☐ - ☐☐ - ☐☐
4. ☐☐☐☐☐ - ☐☐ - ☐☐
5. ☐☐☐☐☐ - ☐☐ - ☐☐

Questionnaire version   |0|6|

---

\* Your client is the premium payer for personal sales and the business owner for business market sales.

**FIELD UNDERWRITER'S CERTIFICATION**

| INSURED'S NAME | First | Middle | Last |
|---|---|---|---|
| | Samuel | | Pietrofaolo |

1. Details of Amount of Insurance in force on Insured.

| ISSUE YEAR | COMPANY | LIFE INSURANCE | ACCIDENTAL DEATH | INSURANCE TYPE (Personal, Business, Group, Creditor, or Other) |
|---|---|---|---|---|
| 1964 | John Hancock | $ 7,200 | $ | Personal |
| 1966 | John Hancock | $ 140,000 | $ | " |
| | | $ | $ | |
| | | $ | $ | |
| | | $ | $ | |

**2. Premium**

Annual cost of Insurance owned and applied for:
$ _____

Who will pay? $ _____

Frequency: Annual ☐  Semi-Annual ☐  Quarterly ☐  Monthly ☐

Was Select Premium Discount
quoted on Insured?  Yes ☐  No ☐
quoted on Spouse?  Yes ☐  No ☐
Were Preferred Premiums
quoted on Insured?  Yes ☐  No ☐

**3.** Is Insured(s) a citizen of the U.S.?  Yes ☒  No ☐
If no, date of entry to the U.S.? _____ (mo/yr)
Type of VISA:  Permanent ☐  Temporary ☐

**4.** If Children's Term Rider requested, is any child to be insured a foster child?  Yes ☐  No ☐

**5.** How many years have you known Insured(s)
a) Years _____  How well:  well ☒  not well ☐
b) In the presence of the Insured have you asked each question on the application exactly as written and recorded the answers completely and accurately? (If "no," explain in remarks.)  Yes ☒  No ☐
c) Have you seen the proposed Insured(s) for coverage today? (If "no," explain in remarks.)  Yes ☒  No ☐

**6.** Do you have any reason to believe the following of the Insured(s)
a) height and/or weight appear different than stated?  Yes ☐  No ☒
b) know of any reason why he/she might not qualify for insurance at standard premium rates (consider health, occupation, finances, character, habits, reputation, avocation)?  Yes ☒  No ☐
c) medical history appears different than stated?  Yes ☐  No ☒
d) smokes or uses another form of nicotine?  Yes ☒  No ☐
(If any of these are "yes," explain in remarks.)

**7.** Does this application involve replacement or change of existing Life Insurance or Annuities? (Include replacement forms if appropriate.)  Yes ☐  No ☐
*Refer to Condensed Underwriting Guide for Age & Amount requirements.*

**8.** Medical Requirements:
Was an APS ordered?  Yes ☐  No ☐
Was an exam ordered?  Yes ☐  No ☐
If "yes", date arranged: _____ (mo/day/yr)
Paramedical ☐   Class 1 ☐   Class 2 ☐

**8. Continued**
If required due to age and amount, have you arranged for:
EKG  Yes ☐  No ☐
Exercise EKG  Yes ☐  No ☐
Home Office specimen  Yes ☐  No ☐
Blood Test  Yes ☐  No ☐
(Submit consent form with the application.)

**9.** If any of (a) or (b) is answered "yes", please furnish the requested information in Remarks or a supplementary letter.
a) Is this business Insurance?  Yes ☐  No ☒
If "yes" explain (i) purpose, (ii) how amount was determined, (iii) details of coverage issued or applied for on other members of the firm, (iv) if all members are not covered, why not?
If face amount exceeds $500,000, attach current balance sheet and earnings statement for the firm.
b) Is this Creditor insurance?  Yes ☐  No ☒
If "yes" explain (i) purpose of loan, (ii) date made, (iii) initial loan amount, (iv) terms of repayment.

**10.** Has an APS, Inspection Report or other evidence been submitted for a Disability Insurance Policy in the past 6 months?  Yes ☐  No ☐
If "yes" Policy Name(s) and Policy Number(s): _____

**11.** Is this a part of a qualified Retirement Pension Plan?  Yes ☐  No ☐
If "yes", is it a:
MONY Prototype ☐
Custom Designed Plan ☐
Is it an Established or New Plan?
a) Established Plan
(i) Plan Number: _____
(ii) Reason for application:
New Entrant ☐   Increase in Benefits ☐
b) New Plan
(i) Plan Effective Date: (mo/day/yr) _____
(ii) Has signed Trust (or Adoption Agreement if Prototype) and Fiduciary disclosure notice (Form 3050) been sent to Home Office?  Yes ☐  No ☐
(iii) Does Plan require purchase of uniform amount or formular amount of life insurance on all employees?  Yes ☐  No ☐
If "no", is: Purchase Optional ☐   Amount Optional ☐
Other ☐  (Explain below)

Remarks:
6B = Insured Smokes
6D

I hereby certify that I have truly and accurately recorded on this application the information supplied by the Insured and the applicant.

Date _____ (mo/day/yr)   Signature X _____

Endorsement of Manager or Sales Manager. Were you present when this application was written?  Yes ☐  No ☐
If no, have you reviewed the application with Field Underwriter and are you convinced he/she asked all questions as printed and recorded as given?  Yes ☐  No ☐

Date _____ (mo/day/yr)   Signature X _____   Sales Mgr. ☐   Mgr. ☐

| | | | |
|---|---|---|---|
| 1 (Primary) | | | |
| 2. | | | |
| 3. | . | | |
| 4. | | | |
| 5. | | | |
| 6. | | | |
| 7. | | | |
| 8. | | | |
| 9. | | | |
| 10. | | | |

If not located at main agency, phone number where Field Underwriter can be contacted:  area code [＿＿＿] # [＿＿＿＿＿＿]

**TO BE COMPLETED BY AGENCY ADMINISTRATIVE PERSONNEL**

Type of submit:                          Full ☐    Shared ☐

Policy Number [＿＿＿＿＿＿＿＿]

Agency of record

Agency of credit (if other)            %Credit

County Code for Premium Payor
(required for AL, GA, KY, LA, and SC only)

Name of county [＿＿＿＿＿＿＿＿＿＿]

Cross-Referenced to Policy Numbers:

Has a Disability Insurance case been, or will one
be underwritten within 6 months?              Yes ☐  No ☐
Will policy be premium financed?              Yes ☐  No ☐
    If "yes", is agent qualified for
    premium financing                          Yes ☐  No ☐
    If "yes", market class:                    1 ☐    3 ☐

Commission own family?                                Yes ☐  No ☐
Are all Field Underwriters Properly Licensed in the
State that the Application is Signed?                 Yes ☐  No ☐
Do all Field Underwriters have Non-Med Privilege?
                                                      Yes ☐  No ☐

**REGISTERED     REPRESENTATIVE     INFORMATION**
(Must be completed for Flexible Premium Variable Life product)
Are all Registered Representatives properly licensed in the
state that the Insured, or Rightsholder if applicable, resides in
and the state that the application is signed?   Yes ☐  No ☐
Registered Representative Contract Date: [＿＿/＿＿/＿＿]
Do all Registered Representatives have Non-Med
Privilege?                                       Yes ☐  No ☐

**TERM    CONVERSION    INFORMATION**
Premium paid to:                        (mo/day/yr)
            amount:$[＿＿＿＿]mode: [＿＿＿＿]
Was cash received with application?            Yes ☐  No ☐
    1) Total cash received with app    [$＿＿＿＿＿]
-MINUS-
    2) Scheduled premium(s) collected          [＿＿＿＿＿]
        (# of Scheduled Premiums = [＿＿])
-EQUALS-
CASH TO BE APPLIED AS DUMP-IN          [＿＿＿＿＿]
(TC credits should NOT be included in this amount)

Do you know of any record of assignment or release of any assignment within the past 60 days?
                                     Yes ☐  No ☐    Date:(mo/day/yr) [＿＿/＿＿/＿＿]

I have  reviewed  all  unanswered  questions.    I  certify  that  the  above  data  is  correct  and  complete.

X [＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿]
    Signature of Administrative Person

**Administrative  Instruction  to  Home  Office  and  Enclosures:**

Is an exam being sent with app?                    Yes ☐  No ☐
    If "yes" is it a Medical or a Paramedical?      Med ☐  Para ☐
    If "yes", Exam date:          (mo/day/yr)
Medical Information attached?                       Yes ☐  No ☐
Inspection attached?                               Yes ☐  No ☐
APS copies attached?                              Yes ☐  No ☐
Field Underwriter letter attached?                 Yes ☐  No ☐
Sales Proposal for required state?                 Yes ☐  No ☐
Replacement letter to be sent to
replaced company?                                 Yes ☐  No ☐
Comparison information statement
requested?                                        Yes ☐  No ☐
Sales Illustration attached?                       Yes ☐  No ☐

Any unnumbered forms?    Yes ☐      No ☐
Other form(s) attached (list form number):

| | | | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

COMMENTS:




**Application to:**
(Check one)

☐ The Guardian Life Insurance Company of America ("The Guardian")
☐ The Guardian Insurance & Annuity Company, Inc. ("GIAC")

CV 86069

**PART I, Page 1**    (In this Application, "the Company" is the insurer checked above.)

| | Sex | Birthdate | Soc Sec No |
|---|---|---|---|

**Section A: Proposed Insured**
1. Print full name of Proposed Insured

SAMUEL PIETROPAOLO

Sex: M    Birthdate: Mo. Day Yr.    Soc Sec No: REDACTED

☐ Single ☒ Married ☐ Widowed ☐ Divorced ☐ Separated
Place of Birth _____ CAMBRIDGE _____ MA _____    Age at nearest birthday _____ 69 _____
                        City                State

2. Home Address _____ 45 Thurlow Avenue _____ Revere _____ MA _____ 02151 _____
                              Street                      City           State        Zip
   How long at this address? _5+_ If less than 5 years, please furnish previous address in question 8 of Agent's Certificate.

3. Business Information _____ Retired _____
                          Name of Employer/Nature of Business                                    Occupation

| # of Years Employed | Street | City | State | Zip |
|---|---|---|---|---|

**Section B: Policy Owner**
1. The Proposed Insured shall own the Policy:   Yes ☒ No ☐
2. If yes, send premium notices to Proposed Insured's:  ☒ Home  ☐ Business, at the address shown in Section A above
3. If no, the owner shall be (please include relationship to Proposed Insured): _____

4. Address _____
            Street          City          State          Zip

5. Owner's Social Security or Tax I.D. # REDACTED

**Section C: Beneficiary** Print full name and relationship to Proposed Insured. (Unless otherwise indicated, all Primary Beneficiaries who survive the Insured shall share equally. If no Primary Beneficiary survives the Insured, benefits will be paid in equal shares to the Contingent Beneficiaries, if surviving the Insured, unless otherwise specified)

1. Primary Beneficiary

   PATRICIA PIETROPAOLO, wife

2. Contingent Beneficiary  SAMUEL, VINCENT, DOROTHY, MICHAEL PIETROPAOLO, children

**Section D: Coverage Requested**
**APPLICATION SUPPLEMENT MUST ALSO BE COMPLETED IF APPLYING FOR VARIABLE LIFE INSURANCE.**
Plan of Insurance _____ Face Amount $_____

| | Amount | | | Amount | Period |
|---|---|---|---|---|---|
| ☐ Waiver of Premium (W) | | ☐ 20 Year Level Term Rider (BG) | $ ___ | | |
| ☐ Accidental Death Benefit (ADB) | $ ___ | ☐ Decreasing Term (FI) (per month) | $ ___ | | |
| ☐ Guar. Purchase Option (GIO) | $ ___ | ☐ Spouse's Decreasing Term (SIR)* | $ ___ | | |
| ☐ Guar. Double Purchase Option | | ☐ Spouse's Level Term Rider (SLT)* | $ ___ | | |
| ☐ Guar. Single Purchase Option | | ☐ Children's Level Term Rider* | $ ___ | | |
| ☐ 10 Year Annually Renewable Term (RTR-10)$ ___ | | ☐ Accelerated Benefit Rider | | | |

*Spouse's or Children's Insurance Rider Supplement to Application (form P14) must also be completed

☐ Beneficiary Insurance Option (DG): List names and amounts
  for any Designated Lives. Complete a separate application
  for each Designated Life.

| Name of Designated Life | Amount | | | Amount | Payment |
|---|---|---|---|---|---|
| | $ ___ | ☐ Paid-Up Additions Rider (PUA)** | $ ___ | $ ___ | |
| | $ ___ | ☐ Paid-Up Insurance Rider (PUI)** | $ ___ | $ ___ | |
| | $ ___ | ☐ Paid-Up Insurance Rider (PUI) for | | $ ___ | |
| | $ ___ | Modified Premium Whole Life** | | | |
| | $ ___ | ☐ Other _____ | $ ___ | | |
| | $ ___ | _____ | $ ___ | | |
| | | _____ | $ ___ | | |
| | | _____ | $ ___ | | |

** "Amount" is the face amount purchased in the first policy year. For PUI riders, "Payment" is the Equivalent Annual Deposit (EAD), excluding waiver. For PUI, the EAD is the annual rider premium, not the amount of each modalized payment. For PUI for Modified Premium Whole Life, the EAD is payable beginning in the fifth policy year. For PUA, "Payment" is the first year purchase payment.

PART I, Page 2    Application to The Guardian or GIAC, as shown on Part I, Page 1.

## Section E: Dividends (for participating policies only)

☐ A-Paid in cash

☐ B-Reduce premiums

☐ C-Left at interest
(Complete W-9 Form
if elected)

☐ D-Paid-up additional
insurance†.

☐ K-Deferred additional
insurance

☐ S†-Dividends values used to offset
annual premium  Available
only if a PUA or PUI rider
is requested.

☐ S†-With Target Face Amount not
to exceed $ _____

☐ Other _____

One year term insurance addition†

☐ Q-One year term insurance not to exceed
Target Face Amount of $_____

Not in excess of cash value:

☐ F-Balance paid-up additional      ☐ G-Balance to reduce
insurance                                          premium

Not in excess of twice face amount of basic policy:

☐ L-Balance paid-up                       ☐ P-Balance to reduce
additional insurance                         premium

†Does not apply to term insurance

## Section F: Premium Payment    Premiums shall be payable (please check one):

☐ Annually

☐ Semi-annually

☐ Quarterly

☐ Single premium

☐ Guard-O-Matic (monthly check plan)
Submit GOM form R 223 and a void check.

☐ Other _____

## Section G: Automatic Premium Loan

The automatic premium loan provision (if available) will be made effective (please check one):          ☐ Yes   ☐ No

## Section H: Remarks or Additional Instructions

## Section I: Amendments or Corrections (for Home Office or Executive Office use only)

| Section J: (All questions apply to Proposed Insured.) | Yes | No | PLEASE FURNISH COMPLETE DETAILS FOR ALL QUESTIONS ANSWERED "YES." IDENTIFY QUESTION NUMBER. |
|---|---|---|---|
| 1.  a) Do you intend to change your occupation? | ☐ | ☒ | |
| b) Do you intend to reside or travel outside of the U.S.? | ☐ | ☒ | |
| 2.  a) Do you drive a motor vehicle? If yes, give Driver's License Number REDACTED State _____ | ☒ | ☐ | |
| b) Within the past 3 years, have you been convicted of any motor vehicle moving violations or had your driver's license suspended or revoked? (If yes, complete Driving Supplement.) | ☐ | ☒ | |
| 3.  Do you plan to participate in or have you within the past 3 years, participated in auto, boat, snowmobile or motorcycle racing, skin or scuba diving, parachuting or skydiving, hang gliding or mountain or rock climbing? (If yes, complete Avocation Supplement.) | ☐ | ☒ | |
| 4.  Have you, within the past 3 years, engaged in or do you plan to engage in aerial flights, except as a fare paying passenger? (If yes, complete Aviation Supplement.) | ☐ | ☒ | |
| 5.  Have you ever applied for any life or health insurance which resulted in your being turned down, asked to pay an extra premium, or issued a reduced amount? | ☐ | ☒ | |
| 6.  a. Have you smoked cigarettes in the past twelve months? | ☒ | ☐ | Smoke cigarettes |
| b. Do you now use tobacco in any form? If yes, specify. | ☒ | ☐ | |

PART I, Page 3    Application to The Guardian or GIAC, as shown on Part I, Page 1.

| | | Yes | No | PLEASE FURNISH COMPLETE DETAILS FOR ALL QUESTIONS ANSWERED "YES." IDENTIFY QUESTION NUMBER. |
|---|---|---|---|---|
| **Section J: (Continued)** | | | | |
| 7. | Have you, within the last 12 months—<br>a) been treated for or had any known heart attack, stroke or cancer?<br>b) had an electrocardiogram because of chest pain or any other physical problem or taken medication for elevated blood pressure? | ☐<br>☐ | ☒<br>☒ | |
| 8. | During the past 10 years, have you been diagnosed by or received treatment from a member of the medical profession for Acquired Immune Deficiency Syndrome (AIDS), AIDS Related Complex (ARC), or any disorder of the immune system? | ☐ | ☒ | |
| 9. | Do you plan to apply for or are you currently applying for any other life insurance? | ☐ | ☒ | |
| 10. | If this insurance is issued, will you discontinue or change in any way any other life insurance or annuities in force on your life or will you pay premiums on any insurance in force on your life by means of a policy loan or series of policy loans? (If yes, complete disclosure statement.) | ☒ | ☐ | I would like to cancel my existing policies and replace with this proposal |

11. Please list below total amount of life insurance in force on your life. Indicate if plan is individual or group. If none, check here ☐.

| Name of Company | Year Issued | Amount | Plan | Accidental Death Amount |
|---|---|---|---|---|
| John Hancock | 1964 | 10,000 | Whole Life at 85 | |
| John Hancock | 1986 | 99,000 | whole life, expand estate | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**IF QUESTION 7 (A), 7 (B), OR QUESTION 8 OF SECTION J IS ANSWERED YES, THE AGENT/DEALER IS NOT AUTHORIZED TO TAKE MONEY OR DELIVER A CONDITIONAL RECEIPT AND THE CONDITIONAL RECEIPT SHALL BE INEFFECTIVE.**

PART I, Page 4    Application to The Guardian or GIAC, as shown on Part I, Page 1.

---

**Section K: Representations of Proposed Insured**

I (We) have paid $_____ to the Agent/Dealer named below as the first premium for the insurance applied for, excluding any optional, alternate or additional contract(s). I (We) acknowledge having received the conditional receipt for this insurance. I (We) fully understand and accept its terms.

I (We) have read the above questions and answers and agree that they are complete and true to the best of my (our) knowledge and belief. I (We) agree a) that this Application (Part I, pages 1, 2, 3 and 4; Part II) and any supplement to the application, if required, shall form a part of any Policy issued; b) that no information acquired by any Representative of the Company shall bind the Company unless it shall have been set out in writing in this Application; and c) that only the President, a Vice President, or a Secretary of the Company has the authority to bind the Company by any promise or statement or to waive or modify any of the Company's requirements. I (We) further agree that no insurance shall take effect (except as provided in the Conditional Receipt if an advance payment has been made and acknowledged above and such Receipt issued) unless and until the Policy has been delivered to and accepted by me (us) and the first premium paid during the lifetime and prior to any change in the health of the Proposed Insured as described in this Application.

Changes or corrections made by the Company and noted in Section I above are ratified by the Owner upon acceptance of a contract containing this Application with the noted changes or corrections. In those states where written consent is required by statute or State Insurance Department regulation for amendments as to plan, amount, classification, age at issue, or benefits, such changes will be made only with the Owner's written consent.

Dated at _____ on _____ 19 _____    _____
              City and State             Mo   Day    Year         Signature of Proposed Insured

_____
Signature of Applicant/Owner if Other than Proposed Insured

_____    _____
Soliciting Agent/Dealer – Please print         Signature of Soliciting Agent/Dealer–Witness

---

### TO BE COMPLETED IN EVERY CASE.
### AUTHORIZATION TO OBTAIN INFORMATION

**Investigative consumer report. I authorize** The Guardian Life Insurance Company of America or The Guardian Insurance & Annuity Company, Inc. to obtain or have prepared an investigative consumer report as described in the notice given to me.

**Medical records and other information. I authorize** any physician, medical practitioner, hospital, clinic, other health facility, consumer reporting agency, the Medical Information Bureau, insurance or reinsurance company, or employer to release any and all medical and non-medical information in its possession about me or my minor children to The Guardian or GIAC, or its legal representatives. Medical information means all information in the possession of or derived from providers of health care regarding the medical history, mental or physical condition, or treatment of me or my minor children. **I agree** that this authorization shall be valid for two and one half years from the date shown below and that a copy of the authorization shall be as valid as the original. **I know** that I may request and receive a copy of this authorization.

**I understand** The Guardian or GIAC will use the information obtained by this authorization to determine eligibility for insurance or eligibility for benefits under an existing policy. The Guardian or GIAC will not release any information obtained to any person or organization *except* to reinsurance companies, the Medical Information Bureau, or other persons or organizations performing business or legal services in connection with my application, claim, or as may be lawfully permitted or required, or as I may further authorize.

**I acknowledge** receipt of The Guardian's or GIAC's notice regarding its Insurance Information Practices, the Fair Credit Reporting Act, the Medical Information Bureau, and Medical Records.

Signed this _____ 6ᵗʰ _____ day of ___ September ___ 19 97 ___

x _____    _____
      Signature of Proposed Insured         Signature of spouse if proposed for insurance

---

P1-89 Rev.

Application to:    ☐ THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA ("The Guardian")
☐ THE GUARDIAN INSURANCE & ANNUITY COMPANY, INC. ("GIAC")
(Check one)

PART II                         **Non-Medical Supplement**  Dr H (617 381 5100)

| | | |
|---|---|---|
| 1 a Name and address of your personal physician DR NAME PLOVNICK , HCHP | | Proposed Insured |
| (If none, so state) _36 City Hall Mall, Medford, MA_ 02155-4764 | | Height __5__ ft. __7__ in. |
| b. Date and reason last consulted? _need new primary care physician_ | | Weight __160__ lbs. By Scale ☐ Estimated ☒ |
| c  What treatment or medication was given or recommended? __—__ | | Weight change past year __/__ ☐ Gain ☐ Loss __0__ lbs. Explain below. |

2. Have you ever had or been treated for:

| | Yes | No | DETAILS of "YES" ANSWERS. |
|---|---|---|---|
| a. dizziness, convulsions, paralysis or stroke; mental or emotional problems; any disease or disorder of the brain or nervous system? | ☐ | ☒ | IDENTIFY QUESTION NUMBER, CIRCLE APPLICABLE ITEMS: |
| b. shortness of breath, persistent hoarseness or cough; asthma, emphysema, tuberculosis; any other disease or disorder of the lungs or respiratory system? | ☐ | ☒ | |
| c. chest pain or discomfort, palpitation, elevated blood pressure, rheumatic fever, heart murmur or any other disease or disorder of the heart or blood vessels? | ☐ | ☒ | Include diagnoses, dates, durations and names and addresses of all attending physicians and medical facilities. |
| d. ulcer, indigestion, hernia, colitis or any other disease or disorder of the stomach, intestines, rectum, liver, gall bladder, pancreas or spleen? | ☐ | ☒ | |
| e. sugar, pus, albumin or blood in the urine; venereal disease; any disease or disorder of the kidneys, bladder, prostate, genital organs, breasts? | ☐ | ☒ | |
| f. diabetes; thyroid or other glandular disease or disorder? | ☐ | ☒ | |
| (g.) arthritis, gout or any disease or disorder of the joints, muscles, bones or spine? | ☒ | ☐ | Spinal Stenosis, 4 yrs ago onset DR CHERNACK, HCHP, Somerville, MA |
| h. cancer or tumor of any kind, growth, unexplained bleeding? | ☐ | ☒ | |
| i  anemia or other disease or disorder of the blood? | ☐ | ☒ | |
| (j.) any disease or disorder of skin, ears, eyes, nose or throat or any impairment of sight or hearing? | ☒ | ☐ | Wears reading glasses |
| k. any injury, disease, deformity, abnormality or disorder not listed above? | ☐ | ☒ | |

| | Yes | No | |
|---|---|---|---|
| 3. Have you ever used drugs other than as prescribed by a physician, or been advised to have counseling or treatment for alcohol or drug use? | ☐ | ☒ | |
| 4. Are you now under observation, receiving treatment, or taking medication? | ☒ | ☐ | |
| 5. Other than above, have you within the past five years: | | | |
| (a.) had a checkup, consultation, illness, injury, surgery? | ☒ | ☐ | Annual Physical check old Dr - DR Paul Cacciola, HCHP |
| b. been a patient in a hospital, clinic, sanatorium, or other medical facility? | ☐ | ☒ | new Dr - Dr Plovnick, HCHP |
| (c.) had electrocardiogram, x-ray, other diagnostic test? | ☒ | ☐ | MRI for Spinal Stenosis |
| d. been advised to have any diagnostic test, hospitalization, or surgery which was not completed? | ☐ | ☒ | |
| 6. a  Have you ever had any tumor or disorder of reproductive organs? | ☐ | ☒ | |
| b  Have you ever had any complications of pregnancy? | ☐ | ☒ | |
| c. Are you now pregnant? If "Yes," give expected delivery date. | ☐ | ☒ | |
| 7. Do you have a family history of: diabetes, cancer, high blood pressure, heart disease, mental illness or suicide? | ☒ | ☐ | Maternal Aunt died heart disease |

| 8 | Age if Living | Cause of Death | Age at Death |
|---|---|---|---|
| Father | | Congestive Heart Failure | 89 |
| Mother | | Kidney failure (?) | 70 |
| Brothers and Sisters __2__ No. Living __2__ No. Dead _____ | | | |

I represent that all the statements and answers above are complete and true to the best of my knowledge and belief.

Dated at __Medford MA__ on __6__ (day) of __7__ (month) __1997__ (year).

_____    _____
Soliciting Agent/Dealer (Witness)    Signature of Proposed Insured

P1-89 Rev.

# **Exhibit B**

# Fax Transmission

**Date:** Wednesday, April 29, 1998          **Time:** 9 32:00 PM          3     **Pages**

**To:**     Ronald Passatempo
             Attorney

**phone:**
   **fax:**  781-395-7732

**From:**  Frederick V  McMenimen III

**phone:**  603-773-9831
   **fax:**  603-775-0601

**Re:**     Hi Ron!

           1) You sign the page as Applicant for Provident   Please fax
           this back to me at 603-775-0601 and to Provident at
           617-964-8431
           2) Please have Sam P  sign page two for John Hancock  Fax
           this back to me and mail the original ASAP
           3) Please have sam send the check payable to Provident for
           $1000 00 to me ASAP
           4) Please have Sam write the letter to me to refund the money
           from MONY and non take the policy

# Exhibit C

Sam Pietropoalo
Time Line

The following is a time line and compiled notes with regards to this case. They have
been dictated and transcribed for review.

March 5, 1998 Original Application for $500,000 to Provident ( enclosed)
March 12, 1998 New Business Application for $500,00 ( Enclosed)
March 12, 1998 Memo regarding underwriting ( Enclosed)
March 18, 1998 Inspection form for $500,000 ( Enclosed)
April 1, 1998 Medical sent to HO by Rick McMenimen
April 7, 1998 Rick meets with Barry to discuss cases on Sam P. and Pat Mekshes
April 8, 1998 Barry advises case will be underwritten and cancel other policies
applications
May 7, 1998 Barry calls to discuss case. He will follow up with underwriting.
May 12, 1998 Dana Darlington informs me that policy was declined. Barry calls to tell
me that was his fault and he would handle it.
May 12, 1998 Barry Armstrong calls and says the case is all set with some minor
changes.
June 10, 1998 I meet with Barry in his office after the show to discuss several cases. He
explains Sam P. case will be rated BUT he has a way to make it work. He will send
illustrations.
June 18, 1998 Barry comes to my office in NH to discuss several cases. He reviews Sam
P. case and wants to modify because it is rated. He has a plan to start at approx 400,000
death benefit and with the dump in get to approx $500K. However the annual premium
is to high. Its over 20K. He leaves to modify it again with a dump in.
June 25, 1998. Barry calls from out of town. States the policy will be issued at $326,563
plus a dump in to get to get to $450,000. With positive investments it will get to $500K
quickly. Barry advises I have the premium paid asap to cover insurability.
July 8, 1998 Barry calls and wants a form showing evidence of insurability and faxes it to
me. ( Enclosed)
July 10, 1998  Sam P. Signs form ( Enclosed)
July 22, 1998 I was notified the policy was issued at a $200,000 base.
July 22, 1998 Fax from NEAG illustration. Signed by all. My notes indicate this was
done to get coverage since bound. Cant read my notes as to why Death Benefit so low.
July 22, 1998 I call Barry indicating we need more Death Benefit as promised by him.
July 27, 1998 fax from Barry Armstrong ( Enclosed) It shows 17K premium BUT no
dump in. He says he will re run and send with 37K going into the policy in year 1.
Death Benefit will be close to $500K. Illustration dated April. He tells me he is back
dating to use an earlier version of software since the policy will be issued in Feb or
March.
July 27, 1998 memo and illustration from Barry Armstrong ( Enclosed)

July 31, 1998 I called Barry and he told me that the policy would only work with a base of $200K but that the over funding of premium plus the 37K in year 1 would inflate the death benefit to almost 500K. He would send info. He advised I pay for the policy and he will forward a statement. The initial statement would reflect the $500K benefit for the trustee.

August 5, 1998 policy paid with 1035 from John Hancock and a monthly premium. Barry says illustration sent to trustee reflecting $483, 500 initial death Benefit.

September 3, 1998 I call Barry to follow up. He resends a fax sent to me earlier explaining the death benefit and what the situation is. ( Enclosed)

September 10, 1998 I call Barry again looking for copy of illustration which he faxes. Second Time ( Enclosed)

At this point I think the policy is going well. Soon after I part ways with NEAG. I stop getting any correspondence. I assume all is in order until notified by Sam in 2003.

Sam calls with concerns regarding statements and Death Benefits when his father takes ill.

Spring 2003  I speak to Paul Tomasini at NEAG. He is a former associate at Mass Mutual. He send statements on the account.

May 22, 2003 Paul sends me in force ledgers and forms for the policy. He says Barry does not want me to have it but does it for me as a friend. I review and ask for more scenarios.

June 2, 2003 Paul send more illustrations. He then chats with underwriting and comes up with a plan to convert cash value to death benefit./ he forwards me forms to do so.

June 10, 2003  Paul works to fix what appears to be both underwriting and paperwork issues.

June 11, 2003 Paul advises that changes can be made on the anniversary date only and to get forms signed asap

July 5, 2003 Forms are signed and sent to Paul as requested.

July 5, 2003 Forms signed and sent to Paul Tommassini to make up shortfall in Death Benefit. Includes change in portfolio and death benefit option. ( Enclosed)

August 20, 2003  I call Paul after my vacation and his to follow up. He sends me the email enclosed.

# Exhibit D



Sam,

      I hope all is well.  Here is whats enclosed:

1) Info on how to reach me
2) Red sox Tickets / games available.  $156 per game.  Let me know via email which games asap.
3) Life app for you.  I noted the sections you should complete and where to sign.  You DO NOT have to fill out the other sections.  I will fill in my part when I am back.
4) I have 4 documents for your Dad and Ron to sign.  I have noted the spots.  Once the actuary and my contact follow up we can fill out the forms as they direct.  I am waiting for how they want that done.  By signing now as soon as I get back it will be done.  I will not have to wait for signatures.  They have reopened your Dads file and awaiting underwriting to give some direction.  They sent for MIB.  They may ask for an APS (Attending physicians statement) before a medical has to be done.  In fact he may not have to take a medical.  Lets hope so.  Looks good so far.  They are also running calculations on which portfolio will help us out the most.  They are going to email me when they get all of this from underwriting etc.  I can get email while on vacation so I will check it daily and follow up with you.
5) Could you please email <u>Customllc@aol.com</u> so I will have the correct address for you!

If you need anything else please email me!  Thanks!

# **Exhibit E**

## Pietropaolo, Sam

| | |
|---|---|
| **From:** | Pietropaolo, Sam |
| **Sent:** | Thursday, March 18, 2004 7:55 PM |
| **To:** | 'Rick, Shawna McMenimen (coachmcm@aol.com)' |
| **Subject:** | Insurance Policy - S. Pietropaolo |

Rick:

Thanks for the call earlier today and I am glad to hear that your sister-in-law health's is improving a bit. Next Wed (3/24/04) works for me to get together. Please give me a time (preferably before 3PM). I realize that this meeting is a long time coming, but since your work on my Dad's case last July to get his policy back in order, I really need the following matters closed:

1. Signed Copy of the Insurance Policy.

2. Written confirmation from Nationwide Provident of my Dad's policy's death benefit. As of our previous discussions that value should be close to or exceeding the original $500,000 original target. However, my concern is that his last quarterly statement still reports only a face value of $200,000 with a minimal cash value to the policy - no report of PUA (paid up additions) as switched over to last June/July timeframe.

3. My Dad's contract has been classified as a MEC and he has not been required to make payments this year. We need a report from Nationwide explaining (a) how long the MEC will be in place; (b) when my Dad may need to start paying premiums again, (c) while not paying confirm that his overall DB is around the $500K level; (d) proposal s to see if he starts paying less than the $1,525.92 what impact on the growth of the DB (death benefits).

I look forward to seeing you next week and finally bringing closure and relief to my folks.

Thanks.
Sam

P.S. - How did your team do in the H.S. tournament?


Samuel F. Pietropaolo
Phone: 508-293-6462
Fax: 508-435-5995
Email:pietropaolo_sam@emc.com
176 South Street, Mail Code B1/B45
Hopkinton, MA 01748
*******************************************************************

The information transmitted via this e-mail is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you received this e-mail in error, please contact the sender and delete the material from any computer.

## Pietropaolo, Sam

**From:** Pietropaolo, Sam
**Sent:** Wednesday, April 14, 2004 12:10 PM
**To:** 'COACHMCM@aol.com'
**Subject:** RE: Nationwide Provident Meeting

Rick,

Thanks.
Sam

> -----Original Message-----
> **From:** COACHMCM@aol.com [mailto:COACHMCM@aol.com]
> **Sent:** Wednesday, April 14, 2004 12:08 PM
> **To:** Pietropaolo_Sam@emc.com
> **Subject:** Re: Nationwide Provident Meeting
>
> ill call thurs am and follow up...im in a mtg all day today!

## Pietropaolo, Sam

**From:** Pietropaolo, Sam
**Sent:** Thursday, April 15, 2004 10:59 AM
**To:** 'COACHMCM@aol.com'
**Subject:** RE: MTG

Rick - I need to review my calendar; but I don't understand as you stated Nationwide was coming up here the week of May 2nd. If Mon/Tues do not work for them, what else for that first week in May is open. We are trying to be flexible and accommodating, but, I really do not want to push out another week   (I am involved in all day meetings on May 6th; but otherwise would be able to juggle my calendar to get this meeting completed another day that week). My concern is we go out yet another week in what has become a protracted process to get this matter resolved and we risk further delays in getting this all corrected for my Dad. This delay is weighing on him. Please let me know what other day during the week of May 2nd that Nationwide can meet us.

Regarding NEAG:

1. Thanks for requesting a copy of the file from them.

2. I would like to compare that to what you have in your file for my Dad. Please send me your file as we discussed.

3. I assume you can send me copies from your file today or tomorrow. I would ask you press NEAG for their copies to be sent out this week as well. There should be no reason they can not get us that info since you have been in contact with Brenneman at NEAG and this file should be available.

Also, who is coming to this meeting. Who will be representing NEAG and who will be representing Nationwide?

I would like to be prepared for this meeting and obviously need to know who has what documents, emails, letters, etc. so we can all get on the same page as to what happened here and what steps Nationwide/NEAG will need to take to correct the errors. I do not want to be surprised at this meeting.

For convenience, here is my home address for mailing your file contents and the NEAG file:

110 Maple Street
Carlisle, MA 01741

Are you around next week or are you guys away on vacation (It is school vacation week in MA not sure if NH follows; but I recall you guys usually take a cruise before getting into the spring/summer sport schedule).

I in meetings most of today.

Talk to you later.


Thanks
Sam


Samuel F. Pietropaolo

Phone: 508-293-6462
Fax: 508-435-5995
Email:pietropaolo_sam@emc.com


4/21/2004

176 South Street, Mail Code B1/B45
Hopkinton, MA 01748
***********************************************************************

The information transmitted via this e-mail is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you received this e-mail in error, please contact the sender and delete the material from any computer.

-----Original Message-----
**From:** COACHMCM@aol.com [mailto:COACHMCM@aol.com]
**Sent:** Thursday, April 15, 2004 10:09 AM
**To:** Pietropaolo_Sam@emc.com
**Subject:** MTG

How is Tuesday May 11 at 930am in my office?  Both of your dates would not work but they offered this one!  I also have requested a copy of my file from NEAG for us to review.  Please advise asap so I can lock it in!  Thanks

## Pietropaolo, Sam

**From:**    Pietropaolo, Sam
**Sent:**    Friday, April 16, 2004 10:44 AM
**To:**    'COACHMCM@aol.com'
**Subject:** RE: (no subject)

Rick -

Thanks and I look forward to reviewing those copies. In the old file any copy of an original policy as well as the application and/or illustrations? Hopefully, Nationwide confirms a date for us before next week.

You guys going anywhere interesting? Cruise?

If you don't speak live...I have great trip.

My apologies for the quick note, but I am running off to a couple of meetings.

Thanks.
Sam


-----Original Message-----
**From:** COACHMCM@aol.com [mailto:COACHMCM@aol.com]
**Sent:** Friday, April 16, 2004 10:39 AM
**To:** Pietropaolo_Sam@emc.com
**Subject:** (no subject)

I just left the storage area and pulled some old files. I found the origional illustrations and some notes from Armstrong. I will work on them this weekend. You will get this stuff before I leave next week for your review while I am away!


Thanks

## Pietropaolo, Sam

**From:** COACHMCM@aol.com
**Sent:** Friday, April 16, 2004 8:38 AM
**To:** Pietropaolo_Sam@emc.com
**Subject:** Follow up

I have asked for something earlier if possible. That was my mistake. I gave you bad dates for when I passed them to you. They are not coming to Massachusetts until the 5th or 6th. I looked at the wrong week. I have asked for something Thursday or Friday that week.

When I get my original NEAG file I will pass it right along. I am in the process of typing out my notes and a time line to pass to you with all that I have. I am going to storage this weekend to find my old files and see if anything is present.

I want to again apologize for this. I along with you thought based on the emails and forms that it was all set. I am very frustrated and angry that I was presented with something that someone else did not follow up. I want to insure you that your dad should not worry. IT WILL be handled properly and I would NEVER let you , your mom or dad be harmed by this in any way. I think its best said that family takes care of family and this will be settled right away. I am not going to let NEAG and their actions or lack of actions have a negative impact on family. I feel sick about it. I will push as hard as I can on this. I will be away over vacation but I think when everyone meets and sits down it will be handled quickly. I dont think we should make more of it than it is at this time. If we push to hard then I think it will take longer and if more people get involved it will bog down. They are willing to listen and then if we dont get immediate results we should push. I truly feel we will get a quick resolution. It will get resolved and I am sorry. I will write back as soon as I hear back from them today!

## Pietropaolo, Sam

**From:** COACHMCM@aol.com

**Sent:** Friday, April 16, 2004 10:52 AM

**To:** Pietropaolo_Sam@emc.com

**Subject:** Re: (no subject)

ill be away starting next thurs..leaving next sunday on a cruise....i will follow up later today!  I have not gotten through the whole file yet.  Ill update you!

## Pietropaolo, Sam

**From:** COACHMCM@aol.com

**Sent:** Tuesday, April 20, 2004 5:02 PM

**To:** Pietropaolo_Sam@emc.com

**Subject:** Dates

I have not heard back but wanted you to know I did follow up today!  I will follow up on Wed.  Also my asst is on vacation however I have dictated to her a time line for your review and asked her to copy you on all documents in my file.  I did find the original apps and notes from Barry Armstrong.  I did not find the original policy.  I also spoke to another former NEAG advisor at the sox game Saturday.  He gave me some additional info which I do not thikn I shoudl send electronically at this time. We can discuss when you get a chance!

Thanks

## Pietropaolo, Sam

**From:** COACHMCM@aol.com

**Sent:** Wednesday, April 21, 2004 7:20 PM

**To:** Pietropaolo_Sam@emc.com

**Subject:** MTG

Friday May 7, 9am in my office.  We should meet a day or 2 before to review.  Im not sure who is coming yet they are going to email that to me.  Im still working on the file.  Im actually still at work here tonight.  Call my cell Thursday when you get a chance to discuss!

Thanks

## Pietropaolo, Sam

**From:**    Pietropaolo, Sam
**Sent:**    Thursday, April 22, 2004 9:44 AM
**To:**    'COACHMCM@aol.com'
**Subject:** RE: Address

Rick -

The home address is:

Sam Pietropaolo
110 Maple Street
Carlisle, MA 01741

Thanks.
Sam


-----Original Message-----
**From:** COACHMCM@aol.com [mailto:COACHMCM@aol.com]
**Sent:** Wednesday, April 21, 2004 9:11 PM
**To:** Pietropaolo_Sam@emc.com
**Subject:** Address

Could you please send me an address again to send this package.  It is 48 pages long. I am still awaiting
the NEAG version of the file BUT I excahnged VM today and a friend is going to pull it for me asap.

Thanks

**Pietropaolo, Sam**

| | |
|---|---|
| **From:** | Pietropaolo, Sam |
| **Sent:** | Thursday, April 22, 2004 5:46 PM |
| **To:** | 'COACHMCM@aol.com' |

**Subject:** RE: Address

Rick - Thanks for the update. How do you like the new boat...did you just pick it up...give me the details when we speak.

Thanks.
Sam

-----Original Message-----
**From:** COACHMCM@aol.com [mailto:COACHMCM@aol.com]
**Sent:** Thursday, April 22, 2004 5:28 PM
**To:** Pietropaolo_Sam@emc.com
**Subject:** Re: Address

i just got this now. I am home. I was working on the boat. Im not going back to the office BUT I will have my asst send this to you when she returns Monday! Thanks and ill cal youon Friday!

## Pietropaolo, Sam

| | |
|---|---|
| **From:** | Pietropaolo, Sam |
| **Sent:** | Monday, April 26, 2004 9:53 AM |
| **To:** | 'COACHMCM@aol.com' |

**Subject:** RE: Your Dad

Rick -

Thanks for the update.  I you are able before you leave, I would appreciate a copy of the NEAG file to review while you are away as well.  If not, will you have NEAG send a copy out to me directly.  We are meeting next week and just want to have time to review and digest everything by the weekend so we can discuss it when you return.  The weeks are pretty hectic (as they are for you) so I really would appreciate having both the NEAG file and your file by the weekend to review.

Thanks.
Sam

> -----Original Message-----
> **From:** COACHMCM@aol.com [mailto:COACHMCM@aol.com]
> **Sent:** Saturday, April 24, 2004 5:58 PM
> **To:** Pietropaolo_Sam@emc.com
> **Subject:** Your Dad
>
>    Although we are leaving in the am I received info today from NEAG which supports the mistake.  I am bringing that info with me to review.  As for my file it is being sent to you by my asst when she returns from vacation Tues or Wed.  She will overnight to your home.  It is sitting on my desk.  That will give you time to review before I return and we can meet.  She has been away and did not work thursday or friday and I have been gone since Wed frm the office.  I just spoke to her by phone.    If you need anything email me.  I have limited access while I am away!

**Pietropaolo, Sam**

| | |
|---|---|
| **From:** | COACHMCM@aol.com |
| **Sent:** | Tuesday, April 27, 2004 4:09 PM |
| **To:** | Pietropaolo_Sam@emc.com |
| **Subject:** | Re: FW: Your Dad |

I just got the email from Debbie. I will call her on Wednesday. It is 48 pages and I did leave it. I will follow up. As for the NEAG file I have it with me and will bring it to you next Monday. The file was sent by a friend to me and I would ask that no one contact NEAG since they did not send it to me directly. It has some interesting information in it. Very interesting. Thanks and ill follow up.

## Pietropaolo, Sam

| | |
|---|---|
| **From:** | COACHMCM@aol.com |
| **Sent:** | Tuesday, April 27, 2004 10:42 PM |
| **To:** | Pietropaolo_Sam@emc.com |
| **Subject:** | follow up |

Heres what I will do.  I checked here and I cant send a fed x from Antigua on Wed but they tell me I can on thurs in St Lucia.  I will send you the file and what I have.  There are only 4 pages different from my file.  Two have date stamps on letter sent to me by NEAG. The other two deal with underwriting.  Apparently Barry Armstrong pulled some strings to get it underwritten.  My file has much more info with original copies of apps, memos, etc. I will call Debbie and get that to you.  I did not think she was in until Wed.  I will try and send this file on Thursday.  Plan on mtg Tues or Wed to go over verything before friday.  I can come to you if need be or meet you on your way to work!  Thanks.

## Pietropaolo, Sam

**From:**   Pietropaolo, Sam
**Sent:**   Tuesday, May 04, 2004 11:55 AM
**To:**   'COACHMCM@aol.com'
**Subject:** FW: Follow up

Rick -

I received your UPS package today with information regarding my Dad's policy. I will review the files tonight. Are you still planning to meet with me tomorrow in Hopkinton? What time?

Also, are we confirmed for Friday. I need to make plans to be out of the office Friday morning for this meeting, but I have not heard back from you as to confirmation from NEAG and Nationwide. I would like to know who will be attending our meeting and what position they hold at each company (NEAG and Provident).

Finally, I am confused by your e-mail comment the other day regarding NEAG and getting information from them "confidentially" and did not hear back from you yesterday. I know you have been working with NEAG all along on my Dad's case and most recently you sent a letter in March 2004 to Tom Brennaman at NEAG.

Is there a problem with NEAG? Has Brennaman responded to you at all regarding this matter?

These are the types of things we need to discuss prior to Friday's meeting.

Look forward to hearing back from you.

Sam


-----Original Message-----
**From:** Pietropaolo, Sam
**Sent:** Monday, May 03, 2004 9:35 AM
**To:** 'COACHMCM@aol.com'
**Subject:** RE: Follow up

Rick -

Please forward the 2 files (NEAG and yours) to my home address below. Please send it for morning delivery. As soon as you speak with Nationwide please confirm who is attending from Nationwide and from NEAG. By the way, why did NEAG send the file to you "confidentially" aren't they coming to Friday's meeting?

You mentioned last week wanting to get together this week before the meeting. Let me know if Wed. still works for you.

The home address:

110 Maple Street
Carlisle, MA 01741

Hope you guys had a nice vacation.
Talk to you soon.

Sam

-----Original Message-----
**From:** COACHMCM@aol.com [mailto:COACHMCM@aol.com]
**Sent:** Monday, May 03, 2004 8:25 AM
**To:** Pietropaolo_Sam@emc.com
**Subject:** Follow up

I am back from the short vacation.  I returned to find that your copy of your Dads file was returned to me from one of our brokers.  Apparently Debbi got it mixed in with some other files sent to the Concord office.  It is here in full.  I also have the copy of the NEAG file sent to me confidentially. I could not send from St Lucia or Barbados with guarantees of delivery within 2 days so I just brought it home.   I will have it overnighted  to you right now if you send Debbi an address to do so.  I will follow up with a confirm on Friday etc later on after I make some calls.  Again sorry for the delay!  I will keep you posted!

## Pietropaolo, Sam

**From:**     Pietropaolo, Sam
**Sent:**     Thursday, May 06, 2004 11:35 AM
**To:**       'COACHMCM@aol.com'
**Subject:** RE: Follow up

Rick - I too am in meetings all day and have not looked at your sample letter from yesterday.  Please send me a final copy of what you sent to Patty Chase.

What is the address and phone number for Patty Chase.  The "610-889-1716" number does not work plus it is a Pennsylvania phone number not Ohio which is where you said Patty as Sr. Manager of Nationwide is located and from where this matter will be handled.

I want to forward the contact info over to Ron today.

Thanks.
Sam

> -----Original Message-----
> **From:** COACHMCM@aol.com [mailto:COACHMCM@aol.com]
> **Sent:** Thursday, May 06, 2004 10:53 AM
> **To:** Pietropaolo_Sam@emc.com
> **Subject:** Follow up
>
> Provident received my package at 1003 this am.  When they call me i will follow up.  I have 2 seminars today so I will be in and out !
>
>
> Thanks

## Pietropaolo, Sam

**From:** COACHMCM@aol.com

**Sent:** Wednesday, May 26, 2004 9:20 PM

**To:** Pietropaolo_Sam@emc.com

**Subject:** Your Dad

I hope you and SUe are doing well. Wanted to inform you that Nationwide/Provident, my broker dealer now and I are all communicating. All parties have my file and its moving forward. Based on the feedback given to me it should be resolved shortly. I have another follow up call from them on Tuesday as Im out the rest of this week with Scotts surgery. We probably will not be down the beach house. Ill follow up after the conference call on Tuesday!

## Pietropaolo, Sam

**From:**   Pietropaolo, Sam
**Sent:**   Tuesday, June 01, 2004 12:45 PM
**To:**   'COACHMCM@aol.com'
**Subject:** RE: Call

Rick -  Thanks for your e-mail below.  What's the sense your getting on this one?  What do you mean "it is clear where this is heading"?   What is Nationwide Provident telling you there position is?

How is NEAG weighing in and have you seen the additional file information?

Hope Scott's surgery went well.  Was it hockey related?  We stayed local over the weekend as well.

Talk to you
Sam

        -----Original Message-----
        **From:** COACHMCM@aol.com [mailto:COACHMCM@aol.com]
        **Sent:** Tuesday, June 01, 2004 10:58 AM
        **To:** Pietropaolo_Sam@emc.com
        **Subject:** Call

        I have just gotten off the phone with the compliance office at my broker dealer as written to you last week.  They are working with Nationwide and their represenatives to resolve your matter.  Everyone is now in the loop and has a copy of my complete file and additional files from NEAG.  If you want to discuss this you can call me anytime.  Based on the responses this morning its clear where this is headed.  I have pushed for an immediate resolution.  I hope all is well with you all and again my sincere apologies.

**Pietropaolo, Sam**

| | |
|---|---|
| **From:** | Pietropaolo, Sam |
| **Sent:** | Thursday, June 03, 2004 4:03 PM |
| **To:** | 'COACHMCM@aol.com' |
| **Subject:** | Nationwide |

Rick -

Ron left me message that you and he did hook up today regarding my Dad's matter. Ron mentioned that your broker/dealer and you agree that my Dad was wronged here and that you will be preparing an affidavit for him detailing the events relative to my Dad's policy. This will help support his efforts in correcting this situation with Nationwide. As you guys discussed, it appears that despite the common understanding that $500K was the benefit required based on his pension maximization review, Nationwide is posturing to rely on the $200K policy it believes was issued and delivered and thus likely not do anything about this situation. Your affidavit will be important.

I am anxious to here how your call goes tomorrow with your broker/dealer and (while I realize you are busy) I ask that you get your statement to Ron tomorrow so he can continue to advance this matter.

Thanks.
Sam

Phone: 508-293-6462
Fax: 508-435-5995
Email:pietropaolo_sam@emc.com
176 South Street, Mail Code B1/B45
Hopkinton, MA 01748
***************************************************************************

The information transmitted via this e-mail is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you received this e-mail in error, please contact the sender and delete the material from any computer.

**Pietropaolo, Sam**

**From:**    COACHMCM@aol.com
**Sent:**    Monday, August 16, 2004 1:00 PM
**To:**      Pietropaolo_Sam@emc.com
**Subject:** (no subject)

I hope all is well. I wanted you to know that I received a call from Provident / compliance today and you or Ron should be hearing from them in the next couple of days. It appears that things are looking better. I will keep you posted and would appreciate it if youd let Ron know.

'

# Exhibit F

# THE CORBETT LAW FIRM
*A Professional Corporation*

March 25, 2005

*BY FACSIMILE & FIRST CLASS MAIL*

Paul T. Dacier, Senior Vice President &
  General Counsel
EMC CORPORATION
176 South Street
Hopkinton, Massachusetts 01748

RE:    *Request for Preservation of Documents and Data*

Dear Mr. Dacier:

I write on behalf of Frederick V. McMenimen III ("Mr. McMenimen"), a defendant in *Passatempo v. McMenimen,* et al., Case No. 05-CV-10118-GAO ("Lawsuit"), which is pending in the U.S. District Court for the District of Massachusetts, and which Mr. McMenimen recently moved to dismiss.

EMC Corporation ("EMC²") is not a party to that lawsuit, nor do I have any reason to believe that EMC² should be joined as a party. However, if Mr. McMenimen's motion to dismiss is denied, he will name an EMC² employee, Samuel F. Pietropaolo, Esquire ("Mr. Pietropaolo"), as a third-party defendant. Though we do not believe that Mr. McMenimen's claims against Mr. Pietropaolo arise from his duties at EMC², it is likely, for example, that Mr. Pietropaolo from time to time used your company's telephone and computer equipment to further the scheme giving rise to his liability.

Because Mr. McMenimen's motion to dismiss is partly based on the Private Securities Litigation Reform Act of 1995, discovery will not commence until that motion is adjudicated. It is therefore necessary to ensure that no discoverable information is lost or destroyed during the period while that motion is pending.

Accordingly, I ask that you take all practicable steps necessary to ensure that potentially-discoverable materials in the possession, custody or control of EMC² are preserved. Such materials include (but are not necessarily limited to) records concerning communications between Mr. Pietropaolo and any of the following persons or entities:

Ronald Passatempo, Esquire,
Frederick V. McMenimen, III
Samuel Pietropaolo (Mr. Pietropaolo's father),
Patricia D. Pietropaolo (Mr. Pietropaolo's mother),
Mr. Barry G. Armstrong,

EMC CORPORATION
March 25, 2005
Page 2 of 2

1717 Capital Management Company,
Nationwide Financial Services, Inc.,
Nationwide Provident f/k/a Provident Mutual Life Ins. Co.,
Todd & Weld, LLP,
Howard Cooper, Esquire,
David Burkoff, Esquire,
the Massachusetts Division of Insurance, and
New England Advisory Group, LLC.

Also included in the range of potentially-discoverable material are documents in Mr. Pietropaolo's office, files or computer equipment which refer or relate to any of the foregoing persons or entities.

It is my expectation that electronically-stored information will be an important and irreplaceable source of discovery and/or evidence in the Lawsuit. As a consequence, the subpoena *duces tecum* to be served upon EMC² if the motion to dismiss is denied will specifically seek information from the computer, telephone and other information technology systems used by Mr. Pietropaolo or to which he has had access. We plan to request information that includes (but is not necessarily limited to) e-mail and other electronic communications, word processing documents, spreadsheets, databases, calendars, telephone bills and logs, contact manager information, internet usage files, and network access information. Our requests will extend to things like wireless telephones and "Blackberry"-type devices used by Mr. Pietropaolo.

As you know, the laws and rules prohibiting the spoliation of evidence apply to electronically-stored information in the same manner that they apply to other evidence. Due to its format, moreover, electronic information is easily deleted, modified or corrupted. Accordingly, please advise EMC²'s agents and employees to take every reasonable step to preserve such information (even data that are remotely stored or backed up) until the final resolution of the Lawsuit. In particular, I ask that EMC² discontinue its data destruction and media recycling practices insofar as they relate to Mr. Pietropaolo or any of the persons and entities specified above.

Thank you for your anticipated cooperation. Do not hesitate to send an e-mail to WPC@BostonBarristers.com or telephone me at (781) 596-9300 if this letter is in any way unclear.

Very truly yours,

William P. Corbett, Jr.

WPC/13-006-001
cc: Mr. Frederick V. McMenimen III