UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| RONALD P. PASSATEMPO, TRUSTEE, )<br>On behalf of the Samuel Pietropaolo )<br>Irrevocable Trust, SAMUEL PIETROPAOLO, )<br>GRANTOR to the Samuel Pietropaolo )<br>Irrevocable Trust, and PATRICIA D. )<br>PIETROPAOLO, BENEFICIARY of the )<br>Samuel Pietropaolo Irrevocable Trust, )<br>　)<br>Plaintiffs, )<br>　)<br>v. )<br>　)<br>FREDERICK V. McMENIMEN III, BARRY )<br>G. ARMSTRONG, NEW ENGLAND )<br>ADVISORY GROUP, LLC, 1717 CAPITAL )<br>MANAGEMENT COMPANY, NATIONWIDE)<br>PROVIDENT (f/k/a Provident Mutual Life )<br>Insurance Company), and NATIONWIDE )<br>FINANCIAL SERVICES, INC., )<br>　)<br>Defendants. )<br>　) | Civil Action No.<br>05-10118-GAO |

**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM OF LAW
IN FURTHER SUPPORT OF THEIR OPPOSITION TO DEFENDANT
FREDERICK V. McMENIMEN III'S MOTION TO DISMISS**

Plaintiffs Ronald P. Passatempo and Patricia D. Pietropaolo ("Plaintiffs")[1] respectfully submit this Supplemental Memorandum of Law pursuant to the Court's request at the May 31, 2005 hearing on Defendant Frederick V. McMenimen III's ("Mr. McMenimen") Motion to Dismiss. Specifically, at the hearing, the Court directed Plaintiffs and Mr. McMenimen to each brief the "particular question" of "whether the

---

[1] The third Plaintiff in this matter, Samuel Pietropaolo, passed away on April 1, 2005. As Plaintiffs have noted previously, they will timely substitute the person appointed as executor of Mr. Pietropaolo's estate as a party once such appointment is made.

Federal claims are barred by the Sarbanes-Oxley statute of repose or not." (See Certified Transcript (Docket No. 30).) The short answer to this question is that they are not.

As explained below, the applicable five-year repose period, set forth in the Sarbanes-Oxley Act of 2002, Pub. L. 107-204, § 804, 116 Stat. 745, 801 (2002), began to run in connection with Mr. McMenimen's *first* violation of Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) ("Section 10(b)"), and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), in April 2003 at the earliest. Then, when Mr. McMenimen violated Section 10(b) and Rule 10b-5 *again*, in or about June 2003, the Sarbanes-Oxley statute of repose began to run at that time with respect to that separate and distinct violation. Plaintiffs filed suit in July 2004, well within five years of both April and June 2003. In addition, Plaintiffs also relied on Mr. McMenimen's misrepresentations when making their monthly premium payments, which totaled more than $100,000. A portion of each such payment funded the investment component of their insurance policy; thus, each month's payment constituted a separate "purchase" for purposes of Section 10(b) and Rule 10b-5. Accordingly, the Sarbanes-Oxley repose period began to run with respect to each month's payment when that payment was made, at the earliest. For all of these reasons, elucidated below, Plaintiffs' federal securities law claims are not barred by the applicable five-year statute of repose.

In addition, because Mr. McMenimen's Supplemental Memorandum ("McMenimen Supp. Memo.") (Docket No. 27) extends beyond the Court's requested analysis of Sarbanes-Oxley to include, most significantly, argument with respect to Massachusetts General Law chapter 175, section 181, Plaintiffs are compelled to include

herein a brief examination of that statute as well. Like the Sarbanes-Oxley statute of repose, G.L. c. 175, § 181 does not bar any of Plaintiffs' claims. It is a statute of limitations rather than a statute of repose, and it was tolled by Mr. McMenimen's continued fraudulent conduct through at least April 2003.

## Argument

1. **Plaintiffs' Federal Securities Claims Are Not Barred By The Applicable Statute Of Repose.**

A. **Mr. McMenimen, In Conjunction With The Other Defendants,[2] Committed At Least Two Separate And Distinct Violations Of The Federal Securities Laws.**

The Court is by now likely familiar with the events that gave rise to this litigation. (See generally Compl. ¶¶ 10-79; Second Affidavit of Samuel F. Pietropaolo ("Second S.F.P. Aff.") ¶¶ 3-17.) Accordingly, Plaintiffs set forth only a brief outline of the relevant facts below.[3]

In 1998, Mr. McMenimen misrepresented to Plaintiffs that the Nationwide variable life insurance policy he had procured for them included a $500,000 guaranteed death benefit. (Compl. ¶¶ 48, 53; Second S.F.P. Aff. ¶¶ 6, 7.) For the ensuing several years, although he was their fiduciary, he continued to make misrepresentations and

---

[2] Because the pending motion to dismiss was filed by Mr. McMenimen, and for the sake of brevity, Plaintiffs refer herein to wrongdoing on the part of Mr. McMenimen. Of course, Plaintiffs allege in this lawsuit that the other Defendants are equally responsible for the wrongdoing which occurred, and they do not waive such allegations by referring solely to Mr. McMenimen in this brief. In this regard, Mr. McMenimen's reference to a "piscatorial odor of fraudulent joinder" by Plaintiffs is altogether mystifying. (McMenimen Supp. Memo. at 10, n.6.) Plaintiffs' "reliance" on the Answer of Defendant Barry Armstrong is hardly "odd." (Id.) Mr. Armstrong essentially claims in his Answer that he had nothing whatsoever to do with procuring Plaintiffs' Nationwide policy, while certain documents Mr. McMenimen provided to Samuel F. Pietropaolo purport to demonstrate that Mr. Armstrong played a prominent role. (See, e.g., Amended Complaint ("Compl.") Ex. H.) It follows that at least one of the Defendants has not been forthright, and Plaintiffs have only pointed this out to the Court in certain of their previous filings.

[3] It also bears mention at the outset that, since the pending motion is a motion to dismiss, the Court must accept all well-pled facts as true for purposes of evaluating the issues discussed herein.

otherwise conceal from them that their policy in fact included a death benefit of only $200,000. (Id.) He never sent them a copy of their policy. (Compl. ¶ 51.) Plaintiffs meanwhile made monthly premium payments of approximately $1,592, a portion of which funded their policy's investment component. (Compl. ¶ 46.) In April 2003, New England Advisory Group ("NEAG") agent Jesse McPhail revealed the true nature of Plaintiffs' policy to them, although when they relayed Mr. McPhail's message to Mr. McMenimen, he told them Mr. McPhail was mistaken and that they should not speak to him. (Compl. ¶¶ 60-61; Second S.F.P. Aff. ¶ 10.)

Ultimately, Mr. McMenimen did concede that Plaintiffs' policy was not as he had promised. (Compl. ¶ 63; Second S.F.P. Aff. ¶ 10.) In or about June 2003, he thus agreed to secure for them the guaranteed $500,000 death benefit they had requested (upon his advice) at the start, and subsequently he told them, falsely, that this is what he had done. (Compl. ¶¶ 64-66; Second S.F.P. Aff. ¶ 10.) Eventually, it became clear that Mr. McMenimen had not followed through on this promise, and after receiving nothing but lies and fabrications from Mr. McMenimen by way of "explanation," Plaintiffs proceeded to file suit in July 2004. (Compl. ¶¶ 68-79; Second S.F.P. Aff. ¶¶ 13, 15-17.)

Counts VII and VIII of Plaintiffs' Amended Complaint allege violations, *inter alia*, of Section 10(b) and Rule 10b-5. Section 10(b) provides, in pertinent part, that it shall be unlawful,

> To use or employ, *in connection with the purchase or sale of any security* ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b) (emphasis supplied). Rule 10b-5 in turn renders it unlawful,

> (a) [t]o employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, *in connection with the purchase or sale of any security*.

17 C.F.R. § 240.10b-5 (emphasis supplied). Variable insurance policies constitute "securities" for purposes of Section 10(b) and Rule 10b-5. Securities and Exchange Commission v. Variable Life Ins. Co. of America, 359 U.S. 65 (1959).

Mr. McMenimen's *first* violation of Section 10(b) and Rule 10b-5 was "in connection with" the purchase of the deficient Nationwide policy in July 1998 and his subsequent misrepresentations regarding its terms. Subsequently, as noted, Plaintiffs were eventually informed that the policy was far less valuable than Mr. McMenimen had maintained it was. Thereafter, Mr. McMenimen committed *another* violation of the federal securities laws, this time "in connection with" his agreement in or about June 2003 to once again obtain for Plaintiffs a minimum guaranteed death benefit of $500,000.

In addition, as discussed below, Plaintiffs also made monthly premium payments in reliance on Mr. McMenimen's fraudulent acts and omissions. Thus, each such payment (which, in part, funded the investment component of their policy) gave rise to a *further* violation of Section 10(b) and Rule 10b-5.

**B.     The Fact That Mr. McMenimen Never Actually Secured The Additional Coverage He Agreed To Secure In Or About June 2003 Does Not Upset The Conclusion That Such Agreement, And His Misrepresentations In Connection Therewith, Constitute A Violation Of The Federal Securities Laws That Is Separate And Distinct From His Other Violations.**

Mr. McMenimen contends that "there was 'no purchase or sale of any security' after July 28, 1998 – when the Policy was issued," and thus that "there could be no 'violation' of Section 10(b)(5) or Rule 10b-5" in connection with his subsequent promise

5

– after Plaintiffs learned that their policy was not up to par – to secure in some fashion a $500,000 death benefit for them. (McMenimen Supp. Memo. at 7.) This argument is misguided, first and foremost, for the simple reason that the words "in connection with" which precede "the purchase or sale of any security" in both Section 10(b) and Rule 10b-5 "indicate[] that Congress intended to protect against fraud *in agreements to buy or sell, as well as with respect to completed sales*, provided damages could be shown." Commerce Reporting Co., Inc. v. Puretec, Inc., 290 F. Supp. 715, 718 (S.D.N.Y. 1968) (emphasis supplied); see Lawrence v. Securities and Exchange Commission, 398 F.2d 276, 279-280 (1st Cir. 1968) ("Fraudulent representations as to securities not yet issued offer fully as much reason for invoking the protection of the securities laws."); see also 15 U.S.C. § 78c(13) (defining the terms "buy" and "purchase" to include "any *contract* to buy, purchase, or otherwise acquire" (emphasis supplied)); Wharf Holdings Ltd. v. United Int'l Holdings, Inc., 532 U.S. 588, 595 (2001) (finding no "convincing reason to interpret the Act to exclude oral contracts as a class").

Contrary to Mr. McMenimen's argument, then, it is inapposite that he did not follow through on his pledge to obtain further coverage for Plaintiffs in or about June 2003, as it is simply "unnecessary to prove a consummated, or closed, purchase or sale as condition to the institution" of suit under Section 10(b) and Rule 10b-5. Commerce Reporting, 290 F. Supp. at 718. Mr. McMenimen's unfulfilled promise, that is, was sufficient to form the basis of a separate and distinct violation.[4] See Feldberg v.

---

[4] Mr. McMenimen also contends, without elaboration, that his promise in or about June 2003 to obtain further coverage for Plaintiffs did not result in the requisite "economic loss" and "loss causation" under Section 10(b). (McMenimen Supp. Memo. at 8 (citing Dura Pharmaceuticals, Inc. v. Broudo, 125 S. Ct. 1627, 1631 (2005).) In Dura, the Court held that it is insufficient to allege that a security's price was inflated at the time of purchase, since, for example, that security might be resold soon thereafter at the same price. Economic loss only occurs upon the sale for less, when and if it takes place, and causation is more tenuous at that time. 125 S. Ct. at 1631-1632. However, the instant circumstances hardly fit into the Dura

6

O'Connell, 338 F. Supp. 744, 746 (D. Mass 1972) ("[I]t does not appear that in every case the sales transaction must have actually been consummated."); Commerce Reporting, 290 F. Supp. At 718 ("[I]t is unnecessary to prove a consummated, or closed, purchase or sale as condition to the institution" of suit under Section 10(b).); Goodman v. H. Hentz & Co., 265 F. Supp. 440, (N.D. Ill. 1967) (same); M. L. Lee & Co., Inc. v. American Cardboard & Packaging Corp., 36 F.R.D. 27, 30-31 (E.D. Pa. 1964) ("[T]he conclusion is inescapable that a defrauded person has valid claim under Section 10(b) and Rule 10b-5 where the fraud was in connection with a contract to purchase or sell securities."); see also Walling v. Beverly Enterprises, 476 F.2d 393, 396 (9th Cir. 1973) ("Entering into a contract for sale with the secret reservation not to fully perform it is fraud cognizable under § 10(b).").[5]

In summary, Mr. McMenimen entered into an agreement with Plaintiffs in or about June 2003 to secure for them a $500,000 death benefit. He then said he had secured it, although in actuality he had not. These acts and omissions by Mr. McMenimen constitute a violation of Section 10(b) and Rule 10b-5 notwithstanding the fact that he never followed through and actually secured the promised death benefit.

---

mold. Plaintiffs here contracted with Mr. McMenimen for a $500,000 insurance death benefit, not tradable on an exchange like the shares at issue in Dura. Mr. McMenimen did not actually procure that death benefit for them, but he misrepresented to them both that he would and that he did. Their loss in connection with Mr. McMenimen's agreement to purchase in or about June 2003 is therefore, at minimum, the difference between the death benefit promised and the death benefit they had at the time, and it was decidedly caused by Mr McMenimen's own acts and omissions.

[5] On a related point, Mr. McMenimen cites Howe v. Bank for Int'l Settlements, 194 F.Supp.2d 6 (D Mass 2002), for the proposition that "where the later misrepresentation did not motivate any purchase or sale, there could be no 'violation' of Section 10(b)(5) or Rule 10b-5." (McMenimen Supp. Memo. at 7.) But in Howe, the Court reasoned that "the only 'purchase or sale' to which the plaintiff [could] turn" to escape his statute of limitations problems was a "mandatory share redemption ... [t]he problem, of course [being] that the plaintiff had no choice in the matter" and so there was not "any investment decision to make." Id. at 25. Here, Plaintiffs made an "investment decision" in or about June 2003: they entered into an agreement with Mr McMenimen whereby he would obtain further coverage for them such that they would have a $500,000 guaranteed death benefit.

7

Moreover, they are distinct from his misrepresentations in connection with his actual procurement of a policy for Plaintiffs in July 1998. His fraud there related to the terms of the policy he did in fact obtain for them, while his fraud post-June 2003 related to his promise to secure *additional* coverage which would ensure Plaintiffs the $500,000 death benefit they had been expecting from the start.

C. **In Addition, Each Monthly Premium Payment Made By Plaintiffs, And Mr. McMenimen's Misrepresentations In Connection Therewith, Constituted A Separate And Distinct Violation Of The Federal Securities Laws.**

As noted above, Plaintiffs have made monthly premium payments totaling more than $100,000. (Compl. ¶ 46.) A portion of each of these payments was applied to the investment component of their policy; accordingly, each such payment was made "in connection with the purchase" of one or more securities. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. Given that Plaintiffs paid their premiums in reliance upon Mr. McMenimen's misrepresentations that their policy included a $500,000 death benefit (and, conversely, given that Plaintiffs would *not* have made such payments had they known the policy was not as Mr. McMenimen had promised), it follows that each monthly payment gave rise to a separate and distinct violation of Section 10(b) and Rule 10b-5. See Variable Life Ins. Co. of America, 359 U.S. at 69 (variable policies are cognizable securities under the federal securities laws since "premiums collected are invested to a greater degree in common stocks and other equities").

D. **The 5-Year Sarbanes-Oxley Repose Period Applies To Each Of Mr. McMenimen's Federal Securities Law Violations, Not The Three-Year Repose Period Of Lampf.**

Prior to passage of the Sarbanes-Oxley Act in 2002, Section 10(b) claims were subject to a three-year statute of repose per the Supreme Court's decision in Lampf,

Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 364 (1991). Sarbanes-Oxley lengthened that period to five years from the date of the Section 10(b) "violation." 28 U.S.C. § 1658(b). In his Supplemental Memorandum, Mr. McMenimen does not seem to dispute the fact that, as a general matter, the Sarbanes-Oxley repose period applies to suits filed after the Act's passage in 2002; he only takes issue with its application to claims that had already become stale under Lampf. (McMenimen Supp. Memo. at 3-6.) His argument, in other words, is that the three-year Lampf repose period began to run in connection with Plaintiffs' federal securities law claims in July 1998, and thus it had already expired by the time Sarbanes-Oxley became law. (Id.) "Sarbanes-Oxley," he argues, "did not rekindle extinguished claims." (Id. at 4.)

However accurate this statement of the law may be, it misses the point, since Plaintiffs' claims were not already "extinguished" when Sarbanes-Oxley came into effect. *First*, the statute of repose began to run with respect to Mr. McMenimen's misrepresentations concerning the policy he procured in 1998 in April 2003 at the earliest, when Mr. McPhail called and told Plaintiffs they only had a $200,000 death benefit. Prior to that time, as alleged in the Amended Complaint (Compl. ¶¶ 48, 53), Mr. McMenimen had maintained that their death benefit was worth $500,000. See Quaak v. Dexia, S.A., 2005 U.S. Dist. LEXIS 2152 at *20-21 (Feb. 9, 2005) ("Under Section 10(b), the statute of repose runs from the date of the last fraudulent misrepresentation ..."). *Second*, this same argument holds for Plaintiffs' reliance on Mr. McMenimen's misrepresentations in connection with their premium payments made prior to April 2003. *Finally*, the statute of repose as applied to Mr. McMenimen's later misrepresentations – both (a) in connection with Plaintiffs' premium payments post-April 2003, part of which

funded the investment portion of their policy, and (b) in connection with his agreement to procure new coverage for Plaintiffs in or about June 2003 (which would have provided the $500,000 death benefit they sought) – could only logically have begun to run, at the earliest, in April and June 2003 respectively. Thus, since the statute of repose had not even begun to run – with respect to *any* of Mr. McMenimen's Section 10(b) violations – when Sarbanes-Oxley became law in 2002, it is the Sarbanes-Oxley five-year repose period that governs.

E.   **Plaintiffs Filed Suit Before The Sarbanes-Oxley Repose Period Had Run.**

Following from the above, the math is straightforward. Plaintiffs' federal securities law claims are subject to a five-year statute of repose. At the earliest, that repose period began to run in April 2003 with respect to one violation by Mr. McMenimen, and it began to run at a later date with respect to the others. Plaintiffs filed suit in July 2004, well within five years of April 2003. Their federal claims are therefore not barred by a statute of repose.

2.   **Plaintiffs' State Law Claims Are Plainly Not Barred By Massachusetts General Law Chapter 175, Section 181. The Court Should Therefore Reject Mr. McMenimen's Call For Certification To The Supreme Judicial Court.**

Mr. McMenimen argues with misplaced assuredness that once the Court decides that Plaintiffs' federal securities law claims are barred by the applicable statute of repose, dismissing this lawsuit in its entirety will be as "easy" as applying the G.L. c. 175, § 181 "statute of repose" to their remaining, state law claims. Once again, Mr. McMenimen is wrong. As detailed in Plaintiffs' Proposed Reply in Further Support of their Amended

10

Motion for Preliminary Injunction (Docket No. 32),[6] *first*, G.L. c. 175, § 181 is a statute of limitations rather than a statute of repose and, *second*, even assuming it applies to all of Plaintiffs' state law claims[7] it was tolled until April 2003 at the earliest, when Mr. McPhail informed them that their policy's death benefit was only $200,000.

First, most fundamentally, G.L. c. 175, § 181 is a statute of limitations rather than a statute of repose. The statute provides, in pertinent part:

> The insured under any policy of life or endowment insurance or the holder of any annuity or pure endowment contract who was induced to procure it by any action in violation of this section by an officer or agent of the company issuing or executing it may recover from such company all premiums paid on such policy or contract less any indebtedness to the company thereon or secured thereby and less any payments otherwise made by the company thereon, in an action brought within two years after the date of issue thereof.

G.L. c. 175, § 181 (2005). Much as he may try to downplay it, none of the cases concerning statutes of repose upon which Mr. McMenimen attempts to rely include discussion of G.L. c. 175, § 181 specifically. They all relate to other, unrelated repose statutes. See, e.g., Nett v. Bellucci, 437 Mass. 630 (2002) (concerning G.L. c. 231, § 60D and G.C. c. 260, § 4); McGuinness v. Cotter, 412 Mass. 617 (1992) (concerning G.L. c. 231, § 60D); Sullivan v. Iantosca, 409 Mass. 796 (1991) (concerning G.L. c. 260, § 2B); Nissan Motor Corp. v. Commissioner of Revenue, 407 Mass. 153 (1990) (concerning G.L. c. 62C, § 37). The more relevant cases, on the other hand – i.e., those which *do* concern G.L. c. 175, § 181 specifically – consistently treat it as a statute of limitations. See Slingsby v. Metro. Life Ins. Co., 2001 Mass. App. Div. LEXIS 7 at *6 (Apr. 4, 2001)

---

[6] While Plaintiffs would prefer to simply refer the Court to their argument concerning G.L. c. 175, § 181 in their proposed reply brief, since the Court has not yet had the opportunity to rule on their request for leave to file their reply (Docket No. 31) they must of necessity include the analysis set forth below.

[7] Plaintiffs do not concede this. Moreover, to the extent it *does* apply, since they have not yet received a copy of their Nationwide policy, Plaintiffs do not concede that the G.L. c. 175, § 181 limitations period has begun to run at all.

11

(discussing "the two year limitations period of § 181"); Grande v. PFL Life Ins. Co., 2000 Mass. App. Div. LEXIS 96 at *4 (Mass. App. 2000) (discussing "the G.L.c. 175, § 181 two year statute of limitations"); Wilson Farm, Inc. v. Berkshire Life Ins. Co., 2002 Mass. Super. LEXIS 376 at *19 (Oct. 31, 2002) (Brassard, J.) ("G.L.c. 175, § 181 governs claims of misrepresentation in connection with the sale of insurance, and contains a two-year statute of limitations.").[8]

Nevertheless, Mr. McMenimen engages in a detailed discussion of (and attaches) Judge Freedman's summary judgment decision in Loguidice v. Metro. Ins. Co., Civil Action No. 97-10060-FHF, slip op. (D. Mass. Oct. 11, 2002). (See McMenimen Supp. Memo. at 14-15 & appendix 1.) In a footnote, he suggests that "[a]lthough Judge Freedman characterized G.L. c. 175, § 181 as a 'statute of limitations' ... [he] *treated* it as a statute of repose." (Id. at 15, n.10 (emphasis supplied).) What Mr. McMenimen does not mention is that, in the course of considering the plaintiffs' subsequent appeal of Judge Freedman's decision, the First Circuit both "characterized" *and* "treated" G.L. c. 175, § 181 as a statute of limitations, i.e., the Court entertained (but did not endorse, on the facts) the plaintiff's equitable tolling arguments, which it plainly would not have done had it considered the law to be a statute of repose. Loguidice v. Metro. Life Ins. Co., 336

---

[8] To be sure, it is both appropriate and logical to determine whether a given Massachusetts statute is one of repose or of limitation based upon how the Courts of the Commonwealth have treated it in the past. See, e.g., Post v. Belmont Country Club, Inc., 60 Mass. App. Ct. 645, 654 (Mass. App. Ct. 2004) (citing case law referring to G.L. c. 197, § 9 as a statute of limitation in support of conclusion that it sets forth period of limitation rather than repose). Indeed, this approach is embodied in the basic and fundamental rule of *stare decisis*, which guides the adjudication of disputes in both the federal and Massachusetts courts. See, e.g., Vasquez v. Hillery, 474 U.S. 254, 265-266 (1986); Stonehill College v. Mass. Comm'n Against Discrimination, 441 Mass. 549, 562 (2004) ("[a]dherence to the principle of stare decisis provides continuity and predictability in the law"). Here, as discussed above, the case law teaches that G.L. c. 175, § 181 *is*, and therefore should be applied as, a statute of limitations.

F.3d 1, 6-7 (1st Cir. 2003); see Sullivan, 409 Mass. at 798 (tolling theories are not applicable to statutes of repose).

That the Courts have consistently treated G.L. c. 175, § 181 as a statute of limitations is no surprise given that most (although not all) Massachusetts statutes including repose periods include periods of limitation as well. See, e.g., G.L. c. 231 § 60D (medical malpractice claims brought by minors "must be commenced within three years from the date the cause of action accrues ... but in no event shall any such action be commenced more than seven years after occurrence of ... the alleged cause of the injury"); G.L. c. 260, § 2B (tort claims concerning improvements to real property "shall be commenced only within three years next after the cause of action accrues; provided, however, that in no event shall such actions be commenced more than six years after" the property is either opened for use or substantially completed and occupied by the owner); G.L. c. 260, § 4 (medical malpractice claims "shall be commenced only within three years after the cause of action accrues, but in no event shall any such action be commenced more than seven years after ... the alleged cause of injury"); see also Post, 60 Mass. App. Ct. at 654 ("There is no language in [G.L. c. 197, § 9] indicating a legislative intent to create a statute of repose, contrast G.L. c. 260, § 2B, and G.L. c. 231, § 60D ... which contain the language 'but in no event shall actions be commenced more than seven years after occurrence of the act ...'"). By comparison, the text of G.L. c. 175, § 181 includes only one temporal period: cases falling under the statute's ambit must be filed "within two years after the date of issue" of the subject insurance policy. G.L. c. 175, § 181.

The Court should not be swayed by Mr. McMenimen's suggestion that the statute is one of repose simply because, as he puts it, it runs from a "specific trigger" rather than from "accrual" per se. (McMenimen Supp. Memo. at 12-13.) Not all Massachusetts statutes of limitation employ the actual word "accrual." See, e.g., G.L. c. 197, § 9(a) ("an executor or administrator shall not be held to answer to an action by a creditor of the deceased unless such action is commenced within one year after the date of death of the deceased"); see also Post, 60 Mass. App. Ct. at 654 (confirming that G.L. c. 197, § 9(a) is a statute of limitation). The statute at issue here is like G.L. c. 197, §9(a) in that although it does not include the word "accrual," it is nonetheless indisputably a statute of limitations. *Accordingly, its limitation period is subject to equitable tolling.*

Indeed, even the cases concerning G.L. c. 175, § 181 cited by Mr. McMenimen acknowledge that, as a statute of limitations, it is subject to equitable tolling. See Slingsby, 2001 Mass. App. Div. LEXIS 7 at *7 (entertaining, but finding no support for, application of the "discovery rule"); Grande, 2000 Mass. App. Div. LEXIS 96 at *7-8 (same); Wilson Farm, 2002 Mass. Super. LEXIS 376 at *20-27 (denying summary judgment because fact issues remained as to whether G.L. c. 175, § 181 was equitably tolled). In this case, Plaintiffs' claims were tolled for approximately five years as a result of Mr. McMenimen's concerted, ongoing efforts to fraudulently conceal the true nature of their policy from them. See G.L. c. 260, § 12 ("If a person liable to a personal action fraudulently conceals the cause of such action from the knowledge of the person entitled to bring it, the period prior to the discovery of his cause of action by the person so entitled shall be excluded in determining the time limited for the commencement of the action."); Demoulas v. Demoulas Super Markets, Inc., 424 Mass. 501, 519 (1997)

14

("When a defendant fraudulently conceals a cause of action from the knowledge of a plaintiff, the statute of limitations is tolled under G.L.c. 260, § 12, for the period prior to the plaintiff's discovery of the cause of action.").

As discussed briefly above, it has already been demonstrated that Mr. McMenimen went to great lengths to conceal Plaintiffs' injuries from them, from at least July 1998, when the policy was issued, until Plaintiffs filed this lawsuit on July 1, 2004. He completed the policy terms sections of their application forms and did not show those sections to them before filing. (Second S.F.P. Aff. ¶ 4.) Once the policy was procured, he repeatedly misrepresented to them that it included a guaranteed $500,000 death benefit. (Id. ¶ 7.) He said he would remain responsible for their policy and that they should send their premium payments directly to him, which they continued to do even after (unbeknownst to them) he had left NEAG and was no longer the agent of record. (Id. ¶ 9.) Then, after Mr. McPhail called in April 2003 and told them the policy had been "orphaned" and was worth only $200,000, Mr. McMenimen told Plaintiffs not to deal with Mr. McPhail and said he would "re-underwrite" the policy to reflect the guaranteed $500,000 originally promised. (Id. ¶¶ 10, 12.) Finally, once it became apparent in early 2004 that no such "re-underwriting" had occurred, Mr. McMenimen gave Mr. Pietropaolo's son, Samuel F. Pietropaolo ("Sam P."), certain fabricated documents in May 2004 that shifted the blame from himself to Nationwide and NEAG, and he professed to arrange a meeting with Nationwide representatives that it now seems he never actually made any effort to arrange. (Id. ¶¶ 12, 13, 15.)

Given this unfortunate chain of events, Plaintiffs had no cause to suspect that anything was at all awry until *at least* April 2003, when Mr. Pietropaolo received Mr.

15

McPhail's phone call. Further, they only discovered that Mr. McMenimen was not being honest with them and that wrongdoing had occurred when he gave Sam P. what were (and are) apparently forged documents at their meeting in April 2004. Thus, per the "discovery rule," the applicable statutes of limitation only began to run in April 2003 at the earliest, when Mr. McPhail called and gave Mr. Pietropaolo information concerning his policy that contradicted what Mr. McMenimen had maintained since 1998. See Pruner v. Super. Ct., 382 Mass. 309, 312 (1981) ("a plaintiff's cause of action does not necessarily accrue when the defendant commits the negligent act, but rather accrues on the happening of any event likely to put the plaintiff on notice" (internal quotes omitted)); Friedman v. Jablonski, 371 Mass. 482, 485-486 (1976) (limitation period begins to run only "when a buyer learns of the misrepresentation or reasonably should have learned of the misrepresentation."). Since Plaintiffs filed suit less than two years later – and since the shortest applicable limitation periods (28 U.S.C. § 1658(b) and G.L. c. 175, § 181) are two years in length – Plaintiffs' claims are, in a word, timely.

Moreover, as discussed at length in Wilson Farm, "[t]o rely upon the fraudulent concealment doctrine, plaintiffs must show that the defendants took an affirmative act of concealment of the cause of action, *or that a fiduciary relationship existed between defendants and themselves*." 2002 Mass. Super. LEXIS 376 at *20 (emphasis supplied). In other words, if Mr. McMenimen was a fiduciary to the Plaintiffs, even if (counterfactually) they "had the means to discover" their injury, that fact would not "preclude the statute of limitations from tolling until they acquired *actual knowledge*" thereof. Id. at *21 (citing Demoulas, 424 Mass. at 519) (emphasis supplied). "The 'discovery rule' ... does not apply when the defendant is a fiduciary." Id. Put another

16

way, "[w]hen the defendant is a fiduciary, its failure to disclose the facts that would give rise to knowledge of a cause of action is equivalent to fraudulent concealment." Id. at *20.

Mr. McMenimen was Plaintiffs' fiduciary. A fiduciary relationship exists between an insurance agent and his or her customer where "special circumstances of assertion, representation and reliance" are present. Clough v. Brown, 59 Mass. App. Ct. 405, 418-419 (2003) (quoting Baldwin Crane & Equip. Corp. v. Riley & Rielly Ins. Agency, Inc., 44 Mass. App. Ct. 29, 31-32 (1997)). Here, as detailed in Sam P.'s Second Affidavit (see Second S.F.P. Aff. ¶¶ 3-7, 9-11), Mr. McMenimen "claim[ed] special knowledge" (regarding so-called "pension maximization" for municipal employees), he had "a long-standing relationship" with Plaintiffs, and they had "come to rely on [him] to help [them] procure necessary and appropriate insurance." Gonzalez ex rel. Espinal v. Arsenault, 2004 Mass. Super. LEXIS 336 at *16-17 (Sept. 8, 2004) (finding fiduciary relationship between broker and customer); see also Schwartz v. Travelers Indem. Co., 50 Mass. App. Ct. 672, 680-681 (2001) (discussing same factors as predicate for establishing fiduciary relationship); see also Bicknell, Inc. v. Havlin, 9 Mass. App. Ct. 497, 500 (1980) ("The nature and extent of the duty of care owed by an independent insurance agent to his client depends in part, at least, upon the degree of skill which he represents himself to possess"). Accordingly, he had an affirmative duty to disclose to them that their policy included a death benefit of just $200,000.[9]

---

[9] In his Opposition to Plaintiffs Amended Motion for Preliminary Injunction ("Opp.") (Docket No. 24), Mr. McMenimen argues that he *did* make such disclosure to Plaintiffs, in the form of a July 19, 1998 Policy Illustration signed by Mr. Passatempo (the "Illustration"). (Opp. at 14-15.) However, as indicated in a timeline of events prepared by Mr. McMenimen and given to Sam P. at their meeting in April 2004 ("Timeline"), Mr. McMenimen, in his own (somewhat cryptic) words, had Mr. Passatempo sign the Illustration "to get coverage since bound," but then confirmed with Mr. Armstrong on July 31, 1998 that "[t]he initial statement would reflect the $500K benefit for the trustee." (Second S.F.P. Aff. ¶¶ 7-8 & Ex.

In any event – tolling aside – since the law is abundantly clear that G.L. c. 175, § 181 is a statute of limitations rather than a statute of repose, the Court should reject Mr. McMenimen's call for certification of the question to the Supreme Judicial Court.

3. **Should This Court Ultimately Decide To Dismiss Plaintiffs' Federal Securities Law Claims, It Should Remand The Case To The Massachusetts Superior Court.**

Although Plaintiffs maintain that Counts VII and VIII of the Amended Complaint are viable and, for the reasons set forth above and in their Opposition, should survive Mr. McMenimen's Motion to Dismiss, if the Court does choose to dismiss Plaintiffs' federal claims it should then proceed to remand this matter to the Massachusetts Superior Court, where Plaintiffs originally filed suit. It was Mr. McMenimen who originally removed this action to federal court. If the federal claims are dismissed, there would be insufficient basis for this Court to maintain jurisdiction given that the remaining claims are viable and raise questions of state law only. See Rose v. Baystate Med. Center, Inc., 985 F. Supp. 211, 219 (D. Mass. 1997) ("even though the initial removal to federal court was not opposed by Plaintiff, subject matter jurisdiction cannot be conferred on federal courts by consent, and a federal court is obliged to remand a case *sua sponte* when it

---

C.) In other words, Mr. McMenimen indisputably knew at the time Mr. Passatempo signed the Illustration that Plaintiffs' policy *should* include a $500,000 guaranteed death benefit, which accords with Plaintiffs' allegation that he told them that their policy, as issued, *would* – and, after July 31, 1998, *did* – include such a death benefit. His Timeline also accords with Plaintiffs' allegations that Mr. McMenimen said the policy might include one or more riders; that he asked Mr. Passatempo to sign the Illustration and return it to him "ASAP" for processing; and that Plaintiffs did not know, and were not told, whether the Illustration related to the entire policy or to just one portion thereof. (Id. ¶¶ 7-8.) Further, the Timeline reflects that a second policy illustration was sent to Mr. Passatempo in August 1998 showing a $483,000 death benefit. (Id. at Ex. C.) In light of all of these misrepresentations by Mr. McMenimen, Plaintiffs plainly did not have notice in 1998 that a $200,000 death benefit was all they stood to receive. They relied on Mr. McMenimen's misrepresentations that the policy he had advised them to obtain was the policy they had, in fact, received. (Sam P.'s one-year stint at John Hancock during law school and while he was studying for the bar exam does not upset this conclusion. As stated in his Second Affidavit, "I learned only enough about insurance to recognize, when my father retired, that he needed advice from an experienced professional. Mr. McMenimen held himself out as such." (Second S.F.P. Aff. ¶ 11.).)

becomes apparent that subject matter jurisdiction is lacking." (internal quotes omitted)); see also 14C CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3739 (2d ed. Supp. 2005) ("if the jurisdictionally sufficient federal claims are dismissed before the trial commences, the district court normally should remand the jurisdictionally insufficient supplemental claims to the state court or order the claims dismissed").

## Conclusion

For the reasons stated above and in their Opposition to Mr. McMenimen's Motion to Dismiss (Docket No. 13), Plaintiffs respectfully urge the Court to deny Mr. McMenimen's Motion to Dismiss.

Respectfully submitted,

Plaintiffs RONALD P. PASSATEMPO, TRUSTEE, On behalf of the Samuel Pietropaolo Irrevocable Trust, SAMUEL PIETROPAOLO, GRANTOR to the Samuel Pietropaolo Irrevocable Trust, and PATRICIA D. PIETROPAOLO, BENEFICIARY of the Samuel Pietropaolo Irrevocable Trust,

By their counsel:

/s/ David M. Burkoff
Howard M. Cooper (BBO #543842)
David M. Burkoff (BBO #657447)
Todd & Weld LLP
28 State Street
Boston, MA 02109
(617) 720-2626

Dated: June 27, 2005